# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OAKWOOD HOMES CORPORATION, et.al.,<br><br>Debtor. | Chapter 11<br><br>Case No. 02-13396 (PJW) |
| OHC LIQUIDATION TRUST, by and through Alvarez & Marsal, LLC, the OHC Liquidation Trustee,<br><br>Plaintiff,<br>v.<br><br>DISCOVER RE and UNITED STATES FIDELITY & GUARANTY CO.,<br><br>Defendants. | Adv. Pro. No. 05-51766 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO WITHDRAW REFERENCE PURSUANT TO 28 U.S.C. § 157(d)

Dated: June 6, 2006

Karen C. Bifferato (No. 3279)
Marc J. Phillips (No. 4445)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141
- AND -

Harold S. Horwich
Stephen M. Hryniewicz
BINGHAM MCCUTCHEN LLP
One State Street
Hartford, CT 06103
(860) 240-2700

*Attorneys For Defendants, United States Fidelity & Guaranty Company and Discovery Managers, Ltd.*

# TABLE OF CONTENTS

*Page*

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ................................................. 1

SUMMARY OF ARGUMENT ..................................................................................................... 2

STATEMENT OF FACTS ............................................................................................................ 2

    A.   The Agreements ................................................................................................................ 2

    B.   The Trustee's Complaint and the Debtors' Plan ............................................................. 4

ARGUMENT ............................................................................................................................... 5

    A.   The Adversary Proceeding Should Be Withdrawn  Pursuant to Mandatory  Withdrawal Under 28 U.S.C. § 157(d). ...................................................................................... 6

    B.   The Adversary Proceeding  Should Be  Withdrawn for "Cause" Under 28 U.S.C. § 157(d). ................................................................................................................................ 8

CONCLUSION ............................................................................................................................ 11

## <u>TABLE OF AUTHORITIES</u>

*Page*

**CASES**

Beard v. Braunstein, 914 F.2d 434 .............................................................................. 10

Beard v. Braunstein, 914 F.2d 434, 445-47(3d Cir. 1990) ........................................... 7

Enviro-Scope Corp., 57 B.R. 1005 (E.D. Pa. 1985) ................................................... 11

Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999).................................................... 10

Hatzel & Buehler, 107 B.R. at 39 ............................................................................... 11

Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.,
    107 B.R. 34, 38 (D. Del. 1989)............................................................................... 6

In re Homeland Stores, Inc., 204 B.R. 427, 429 (D. Del. 1997)................................... 6

In re Homeland, 204 B.R. at 430-433 ........................................................................... 7

In re Homeland, 204 B.R. at 434 .................................................................................. 8

In re Oakwood Homes Corp.,
    __ B.R. __, 2006 WL 1314664 (Bankr. D. Del. 2006)....................................... 2, 4, 5

Leedy Mortg. Co. Inc., 62 B.R. 303, 306 (E.D. Pa. 1986) ......................................... 11

NDEP Corp. v. Handl-It, Inc., 203 B.R. 905, 908 (D. Del. 1996)................................ 11

Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)........................ 9

Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990)................................................................... 8

Smith Corona Corp. SCM, 205 B.R. 712, 714 (D. Del. 1996) ...................................... 6

Valley Media, Inc., 289 B.R. 27, 31 (Bankr. D. Del. 2003) ......................................... 10

**STATUTES**

U.S.C. § 157................................................................................... 2, 6, 7, 8, 9, 10, 11

ii

**OTHER AUTHORITIES**

Bankruptcy Code § 541m 542, 544 and 550.................................................................................. 5

Bankruptcy Code §§ 105 (a) and 502(c) ........................................................................................ 5

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This case was brought by a liquidating trust that is the successor to Oakwood Homes Corp. and its subsidiaries who were Chapter 11 debtors (the "Debtors"). The Debtors liquidated in Chapter 11 pursuant to a plan that was confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 31, 2004. The Debtors' plan created the OHC Liquidation Trust (the "Trust"), which is overseen by Alvarez & Marshal, LLC in its capacity as the OHC Liquidation Trustee (the "Trustee"). The Trust is vested with the authority to pursue various claims which the Debtors did not resolve during their bankruptcy case.

On June 1, 2005, the Trust filed the complaint (the "Complaint," a true and correct copy of which is attached as Exhibit A hereto) that commenced this case against Discovery Managers, Ltd.[1] and the United States Fidelity & Guaranty Co. (collectively, the "Defendants"). The Complaint asserted seven counts against Defendants. On December 5, 2005, Defendants filed their motion to dismiss all counts of the Complaint. By its Memorandum Opinion dated May 10, 2006, the Bankruptcy Court dismissed the four counts of the Complaint that asserted claims based on the Bankruptcy Code. The three counts that were not dismissed (the "Remaining Counts") assert state law claims for (a) breach of contract, (b) breach of implied covenant of good faith and fair dealing and (c) unjust enrichment. See In re Oakwood Homes Corp., __ B.R.

---

[1]   The case caption improperly lists, and the text of the Complaint improperly refers to, Discover Re. In fact, the entity associated with the Oakwood insurance program is Discovery Managers, Ltd.

__, 2006 WL 1314664 (Bankr. D. Del. 2006) (dismissing counts I, II, V and VI of the Complaint but not dismissing counts III, IV and VII).

Concurrently herewith, Defendants have filed with the Bankruptcy Court (a) their Motion To Withdraw The Reference in this adversary proceeding (the "Motion"), and (b) their Motion for Determination That Adversary Proceeding Is Non-Core Pursuant To Local Bankruptcy Rule 5011-1. This is the Defendants' memorandum in support of the Motion.

## SUMMARY OF **ARGUMENT**

1.    This action is subject to mandatory withdrawal under 28 U.S.C. § 157(d) because the Remaining Counts exclusively require consideration of non-bankruptcy law issues.

2.    This action should alternatively be withdrawn pursuant to be 28 U.S.C. § 157(d) because "cause" exists for permissive withdrawal where the Remaining Counts assert only non-core "garden variety" state law claims that will have to be ultimately adjudicated by the District Court.

## **STATEMENT** OF FACTS

The allegations of the Complaint concern insurance agreements entered into by Oakwood Homes Corporation ("Oakwood") and defendant United States Fidelity and Guaranty Company ("USF&G") prior to Oakwood's bankruptcy proceedings.

### A.    **The Agreements**

In July of 1998, USF&G agreed to provide insurance polices and insurance services to Oakwood. (Complaint, ¶ 1). The terms of the agreement were set forth in a written Indemnity Agreement (the "Indemnity Agreement," a copy of which is attached as Exhibit A to the

Complaint) between USF&G and Oakwood, and a Premium and a Loan Plan Agreement (the "Loan Agreement," a copy of which is attached as Exhibit B to the Complaint (collectively, the "Agreements")).

Under the Agreements, Oakwood agreed to pay (a) premiums to USF&G, and (b) a portion of losses and loss adjustment expenses incurred under the policies. (Indemnity Agreement at 7). Part of the premium due under the policies was paid through a secured loan. (Loan Agreement at 1). Oakwood agreed to provide security for the payment of amounts due under the insurance program. (Indemnity Agreement at 8-12; Loan Agreement at 2-5). The Trustee alleges that this was done in the form of letters of credit and a bond (Complaint, ¶¶ 22-23). These policies were underwritten and managed by certain of USF&G's affiliates, members of the Discover Re Managers, Inc. family of companies ("Discover Re"). (Loan Agreement at 7).

Under the terms of the Agreements, Oakwood retained the obligation to pay a portion of the losses and loss-adjustment expenses arising out of claims covered by the USF&G policies (the "Self Funded Retention" or "SFR"). (Indemnity Agreement at 3, 9). The SFR portion of each claim was set at $250,000 for automobile policies and $500,000 for workers compensation policies. (Indemnity Agreement Schedule A at 16, Indemnity Agreement Amendment No. 3). If Oakwood does not pay the SFR amount to the relevant claimant, USF&G is required by the insurance policies to pay the claimant. Discover then has the right to seek reimbursement from Oakwood. (Indemnity Agreement at 1). The Indemnity Agreement requires Oakwood to provide collateral to USF&G to secure Oakwood's performance of its obligations under the Agreements (Indemnity Agreement at 8-12). USF&G's obligation to pay the claims under these policies continues regardless of Oakwood's solvency or ability to pay its SFR obligations.

- 3 -

**B.    The Trustee's Complaint and the Debtors' Plan**

On November 15, 2002, the Debtors filed their voluntary petitions for Chapter 11 relief. See In re Oakwood, 2006 WL 1314664, *1.    On March 31, 2004, the Bankruptcy Court confirmed the Debtors' Chapter 11 plan, which, among other things created the Trust and appointed the Trustee.  See id. * 1-2.  USF&G and Discover were not creditors of Oakwood, did not file proofs of claim, did not vote on the plan and were not otherwise involved with the case.

On June 1, 2005, Trustee filed the Complaint against Defendants.  The Complaint seeks to recover proceeds of letters of credit and bonds held by the Defendants to secure Oakwood's obligations under the Agreements notwithstanding the fact that Oakwood breached the Indemnity Agreement by, among other things, ceasing the payment of claims. (Complaint, ¶¶ 2-3).

According to the Complaint, as of April 15, 2004, the Defendants were holding approximately $16,000,000 as security for the performance of Oakwood's obligations under the Agreements in the form of proceeds of letters of credit and bonds.  The Trustee acknowledges that, on April 15, 2004, Oakwood ceased complying with its Self Funded Retention obligations by ceasing to pay claims covered by the Agreements.  (Complaint, ¶ 2)  The Trustee also acknowledges that the Defendants have been paying claims since that time and have been applying the proceeds of the letters of credit and bonds to pay Oakwood's Self Funded Retention obligations.  Id.

The Trustee further acknowledges that the Agreements do not contain any provision requiring the Defendants to release the proceeds of the letters of credit and bonds before all of

- 4 -

the claims have been paid. (Complaint, ¶ 3). Nevertheless, the Trustee asserts that, for the benefit of the creditors of Oakwood, he is entitled to force an estimation of the Defendants' ultimate obligations and require the Defendants to turn over any collateral in excess of that amount (thereby imposing on the Defendants exactly the risk which the Debtors assumed under the Indemnity Agreement).

To achieve this end, the Complaint asserted seven counts against the Defendants. Four of the counts asserted claims that specifically invoked the Bankruptcy Code including (a) Count I, which sought estimation and recovery under §§ 105 (a) and 502(c) of the Bankruptcy Code, (b) Count II, which requested recovery of property under §§ 541 and 542 of the Bankruptcy Code, (c) Count V, which asserted fraudulent transfer under § 544 of the Bankruptcy Code, and (d) Count VI, which sought turnover under §§ 542 and 550 of the Bankruptcy Code. The Bankruptcy Court dismissed all of these claims. See In re Oakwood, 2006 WL 1314664.

The three Remaining Counts invoke no provision of the Bankruptcy Code and assert purely state law causes of action sounding in contract and quasi-contract, including (a) Count III, which asserts breach of contact under the Agreements, (b) Count IV, which claims breach of the implied covenant of good faith and fair dealing in connection with the Agreements, and (c) Count VII, which alternatively asserts a claim of unjust enrichment related to the transactions contemplated by the Agreements. Put simply, the Remaining Counts of the Complaint assert exclusively state law theories and should not remain in the bankruptcy court.

**ARGUMENT**

**A.    The Adversary Proceeding Should Be Withdrawn**
**Pursuant to Mandatory Withdrawal Under 28 U.S.C. § 157(d).**

Under 28 U.S.C. § 157(a), the Bankruptcy Court derives its jurisdiction from the standing

order of reference entered by this Court.  See In re Homeland Stores, Inc., 204 B.R. 427, 429 (D.

Del. 1997).  That reference can be withdrawn pursuant to 28 U.S.C. § 157(d).  Indeed, § 157(d)

mandates withdrawal of the reference of any bankruptcy proceeding that "requires the

consideration of both [the Bankruptcy Code] and other laws of the United States regulating

organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d).

Read literally, the text of the statute requires withdrawal where the dispute involves any

consideration of non-bankruptcy law.   However, courts have interpreted it to mandate

withdrawal only where the matter requires "substantial and material" consideration of non-

bankruptcy law.  See In re Smith Corona Corp. SCM, 205 B.R. 712, 714 (D. Del. 1996) ("[I]n

determining whether withdrawal is required under [§ 157(d) there must be] a need to consider

'other laws' outside of the Bankruptcy Code . . . [and] consideration of these 'other laws' must

be substantial and material."); Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc., 107

B.R. 34, 38 (D. Del. 1989) ("[T]he analysis to determine if this action should be mandatorily

withdrawn is whether resolution of the proceeding would involve substantial and material

consideration of non-Bankruptcy Code law.").   Thus the statute mandates withdrawal of the

reference of proceedings where the debtor/trustee asserts claims that invoke Bankruptcy Code

rights but also involve substantial and material consideration of non-bankruptcy law.

- 6 -

However, the basis for mandatory abstention in this case is even more compelling. The Remaining Counts *involve exclusively non-bankruptcy claims*. None of the Remaining Counts invoke any substantive Bankruptcy Code right or policy. Indeed, the Defendants have no other connection to the Debtors' bankruptcy cases other than the fact that they have been sued by the Trustee in this Adversary Proceeding. Where the debtor seeks to use the bankruptcy court as a forum to litigate purely non-bankruptcy claims (such as the garden variety breach of contract action relating to a prepetition agreement which is the essence of the Remaining Counts), withdrawal of the reference is mandatory under 28 U.S.C. § 157(d). This is particularly so where, as here, the debtor/trustee seeks to initiate such litigation in the bankruptcy court after confirmation and implementation of its plan. See In re Homeland, 204 B.R. at 430-433 (mandatory withdrawal of debtor's post-confirmation adversary proceeding asserting purely non-bankruptcy claims of breach of contract and ERISA violations); Hatzel & Buehler, 107 B.R. at 36-39 (mandatory withdrawal of debtor's adversary proceeding asserting 16 non-bankruptcy law claims that were "essentially a breach of contract action . . . under New York law"); see also Beard v. Braunstein, 914 F.2d 434, 445-47(3d Cir. 1990) (mandating withdrawal of reference of debtor's adversary proceeding that asserted claims "involving pre-petition contracts, allegedly breached before and after the filing of the petition" and did not invoke any specific bankruptcy right).

Accordingly, Defendants respectfully submit that this action, which has been narrowed to exclusively non-bankruptcy law issues in the Remaining Counts, is subject to mandatory withdrawal to be adjudicated in this Court.

- 7 -

**B.    The Adversary Proceeding Should Be
Withdrawn for "Cause" Under 28 U.S.C. § 157(d).**

This action should also be withdrawn for "cause" under 28 U.S.C. § 157(d). In addition

to its mandatory withdrawal provision discussed above, that section also provides that "[t]he

district court may withdraw, in whole or in part, any case or proceeding . . . for cause shown."

28 U.S.C. § 157(d). "Courts consider the following factors in determining whether cause has

been shown: '[a] the goals of promoting uniformity in bankruptcy administration, [b] reducing

forum shopping and confusion, [c] fostering the economical use of the debtors' and the creditors'

resources and [d] expediting the bankruptcy process.'" In re Homeland, 204 B.R. at 434

(quoting In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990)).[2]

Where, as here, the action was commenced by a debtor/trustee whose confirmed plan of

reorganization has already become effective and asserts only claims under non-bankruptcy law,

"cause" clearly exists to warrant withdrawal of the reference. See id. at 434 (withdrawing

reference of debtor's post-confirmation adversary proceeding asserting breach of contract and

ERISA claims).

> [A]lthough the bankruptcy case is still officially 'open'--ostensibly
> to resolve a few core matters, the Bankruptcy Court has fulfilled its
> *raison d'être*. This adversary action does not implicate the
> expertise of the Bankruptcy Court in juggling creditors' or debtors'

---

[2]    Courts also sometimes consider (a) the timing of the withdrawal request, and (b) whether
the parties have requested a jury trial. See In re Winstar Comm. Inc., 2005 WL 678507 (D. Del.
2005). Defendants have timely requested withdrawal of the reference in this case. After the
Bankruptcy Court's May 10, 2006 dismissal of the Trustee's claims that ostensibly invoked the
Bankruptcy Code, this action has now been officially narrowed to the Remaining Counts which
are alleged to arise exclusively under state law and therefore present purely non-core matters that
should be withdrawn under § 157(d). No party has requested a jury trial and therefore that factor
is immaterial in this case.

> rights or wading through the complexities of the Bankruptcy Code;
> rather it is litigation that although brought by a party in bankruptcy
> proceedings, could just as well have been initiated in the district
> court.

Id. Post-confirmation actions such as this occur after the essential bankruptcy process has

occurred and therefore maintaining the action in the Bankruptcy Court does not "promote

uniformity in bankruptcy administration or the economical use of debtors' and creditors'

resources, nor will it expedite a bankruptcy process that is, for all intents and purposes,

resolved." Id. Withdrawal will also deter forum shopping.   Absent withdrawal under these

circumstances, debtors would be permitted to bring virtually any lawsuit that it sought to assert

in the bankruptcy court no matter how unrelated it might be to the reorganization process or the

Bankruptcy Code.  See id. at 434 ("Congress did not intend the Bankruptcy Courts, which have

sharpened their expertise in a specialized body of law, to be flooded with non-chapter 11 [post-

confirmation] disputes that have such a tenuous relationship to a bankruptcy proceeding.").

   "Permissive withdrawal for 'cause' [also] includes considerations of the nature of the

proceeding (i.e., core or non-core proceedings) and judicial economy."  Hatzel & Buehler, 107

B.R. at 39.  Whether the proceeding is "core" or "non-core" under 28 U.S.C. § 157(b) carries

significant weight in the withdrawal analysis because it implicates fundamental jurisdictional

limitations on the bankruptcy courts.  See Northern Pipeline Co. v. Marathon Pipe Line Co., 458

U.S. 50 (1982) (holding that bankruptcy courts cannot adjudicate "state created private rights

such as the right to recover contract damages" which are constitutionally reserved for jurisdiction

of Article III courts).  With respect to non-core matters, the bankruptcy courts' "adjudicatory

power is limited to hearing the dispute and submitting 'proposed findings of fact and conclusions

of law to the district courts.'" Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999). A proceeding is core "[1] if it invokes a substantive right provided by title 11, or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." Id. at 836(internal quotations omitted). As noted above, none of the Remaining Counts invoke any substantive right under the Bankruptcy Code but rather assert purely state law causes of action relating to a prepetition contract that could arise outside of the context of the Debtors' chapter 11 case. As required by the Supreme Court's Marathon decision and 28 U.S.C. § 157(c)(1), the state law contract and quasi contract claims asserted in the Remaining Counts are non-core matters that can only be finally adjudicated by the district court. See Halper, 164 F.3d at 838-840 (holding simple state law breach of contract and illegal stock dividend claims to be non-core proceeding); Beard v. Braunstein, 914 F.2d 434 (reversing bankruptcy court adjudication of adversary proceeding initiated by debtor to assert claims for breaches of pre-petition lease agreement because such proceeding was non-core and mandating withdrawal of reference on remand to district court); Hatzel & Buehler, 107 B.R. at 39-40 (withdrawing reference for "cause" because debtor's state law contract and tort claims were non-core matters that can only be finally adjudicated by district court); Homeland, 204 B.R. at 433-434 (withdrawing reference for "cause" where debtor's post-confirmation adversary proceeding presented purely non-bankruptcy law issues); see also In re Valley Media, Inc., 289 B.R. 27, 31 (Bankr. D. Del. 2003) (determining purported "turnover claim" to be non-core because it was in substance a "state law contract claim and could arise in any context, not just in bankruptcy.").

Finally, "judicial economy favors permissive withdrawal of the reference of a non-core proceeding, since the district court will still need to review the merits of the dispute when considering the bankruptcy court's proposed findings of fact and conclusions of law." NDEP Corp. v. Handl-It, Inc., 203 B.R. 905, 908 (D. Del. 1996); see Hatzel & Buehler, 107 B.R. at 39 (judicial economy favors withdrawal of reference of non-core matters (citing In re Leedy Mortg. Co. Inc., 62 B.R. 303, 306 (E.D. Pa. 1986) and In re Enviro-Scope Corp., 57 B.R. 1005 (E.D. Pa. 1985)). Accordingly, Defendants respectfully request the Court to withdraw this action for cause pursuant to 28 U.S.C. § 157(d).

## CONCLUSION

For the forgoing reasons, Defendants hereby request the Court to enter an order substantially in the form attached to the Motion ordering withdrawal of this action pursuant to 28 U.S.C. § 157(d) and granting such other relief as the Court may deem appropriate and just under the circumstances.

Dated:  June 6, 2006               CONNOLLY BOVE LODGE & HUTZ LLP

Karen C. Bifferato (No. 3279)
Marc J. Phillips (No. 4445)
The Nemours Building
10007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141

- and –

- 11 -

Harold S. Horwich
Stephen M. Hryniewicz
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT  06103
Telephone:  (860) 240-2700

*Attorneys For Defendants, United States Fidelity &*
*Guaranty Company and Discovery Managers, Ltd.*

#469009

- 12 -

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 11 |
| OAKWOOD HOMES CORPORATION, et al., | ) |
| | ) Case No. 02-13396 (PJW) |
| Debtors. | ) |
| | ) |
| _____ | ) |
| | ) |
| OHC LIQUIDATION TRUST, by and through | ) |
| Alvarez & Marsal, LLC, the OHC Liquidation | ) |
| Trustee, | ) |
| | ) Adv. Pro. No. _____ |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DISCOVER RE and UNITED STATES | ) |
| FIDELITY & GUARANTY CO., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

## COMPLAINT

Plaintiff OHC Liquidation Trust, (the "Trust" or "Plaintiff"), by and

through Alvarez & Marsal, LLC, the OHC Liquidation Trustee (the "Trustee"), created

pursuant to the confirmed plan of reorganization of Oakwood Homes Corporation

("Oakwood") and its Chapter 11 debtor affiliates (each a "Debtor" and, collectively, the

"Debtors")[1], as and for its complaint against defendants Discover Re and United States

---

[1]    All capitalized terms used but not defined herein shall have the meanings ascribed
to such terms in the Second Amended Joint Consolidated Plan of Reorganization
of Oakwood Homes Corporation and its Affiliated Debtors and Debtors-In-
Possession, dated February 6, 2004, as modified (the "Plan") and the OHC
Liquidation Trust Agreement, dated April 14, 2004 (the "Trust Agreement").

Fidelity & Guaranty Co., (collectively, "Discover Re") respectfully alleges, on knowledge as to itself and, as to all other matters on information and belief, as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action to recover from Discover Re excess funds being held by Discover Re pursuant to certain agreements described more fully below, and entered into between and among Oakwood and Discover Re. Effective July 1, 1998 Discover Re issued certain workers compensation, automobile liability, and general liability to Oakwood. However, Discover Re's agreement to provide Oakwood with workers compensation and automobile liability insurance was conditioned upon, among other things, Oakwood causing to be issued certain security in favor of Discover Re to secure Oakwood's performance of its obligations under the insurance policies.

2.    From July 1, 1998 through April 15, 2004, Oakwood paid all claim amounts subject to the deductibles in the insurance policies (approximately $25,181,000). In addition to those payments, Discover Re required an additional $16,000,000 in collateral. Since April 15, 2004, Discover Re has taken from Oakwood approximately $16,000,000 in both cash, bonds and draws upon letters of credit issued in Discover Re's favor. Since April 15, 2004, Discover Re has been making claims payments from the collateral they drew upon. During the time period from April 15, 2004 through March 31, 2005, Discover Re has made payments to claimants under the insurance policies in the amount of approximately $1,460,000. Therefore, Discover Re continues to withhold approximately $14,579,000. A significant amount of the money held by Discover Re will never be needed to pay Oakwood's obligations under the insurance policies - a fact that is hardly surprising given that the most recent insurance policies expired in June 2002.

2

3.      The relevant agreements do not provide a specific time by which Discover Re must return the excess funds to Oakwood. Accordingly without Court intervention, Discover Re will not agree to return these excess funds to Plaintiff at this time, notwithstanding that the amount of excess funds can be calculated with reasonable precision at this time. Plaintiff's inability to access the excess funds being held by Discover Re threatens to derail what has so far been the timely and efficient distribution of assets to the holders of the beneficial interests in the Trust (i.e., the Debtors' unsecured creditors). Therefore, Plaintiff seeks an order commanding the immediate return of the excess funds being held by Discover Re.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding in connection with the voluntary petitions of Oakwood and certain of its subsidiaries under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

5.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E) and (O).

6.      The Court has jurisdiction over this proceeding pursuant to 11 U.S.C. §§ 105, 502, 541, 542, 544, and 548 and 28 U.S.C. §§ 157(a), 157(b) and 1334(b).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

3

## THE PARTIES

8.    Oakwood is a corporation organized under the laws of the State of North Carolina. Before selling their assets as part of the bankruptcy, the Debtors were a major manufacturer and retailer of modular homes in the United States. As part of their business, the Debtors also provided financing in the form of consumer loans to purchasers of their homes.

9.    Plaintiff is a liquidation trust created pursuant to the Plan and the Trust Agreement for the primary purpose of liquidating the Liquidation Assets – which assets include all causes of action, including avoidance and turnover actions, belonging to the Debtors – in a timely and efficient manner on behalf and for the benefit of the holders of the beneficial interests in the Trust (i.e., the Debtors' unsecured creditors).

10.    Defendant Discover Re is an insurance company having its principal places of business at 5 Batterson Park, Farmington, Connecticut  06032. Discover Re is a wholly-owned subsidiary of defendant United States Fidelity and Guaranty Company, an insurance company having its principal place of business in Connecticut.

## PROCEDURAL BACKGROUND OF THE BANKRUPTCY CASE

11.    On November 15, 2002 (the "Petition Date"), certain of the Debtors commenced with this Court voluntary cases under Chapter 11 of the Bankruptcy Code. The remaining Debtors filed for Chapter 11 protection on March 5, 2004.

12.    On March 31, 2004, the Court entered an order confirming the Plan.  The Plan became effective for most of the Debtors on April 15, 2004 the ("Effective Date").  On the Effective Date, pursuant to the terms of the Plan, all of the

4

Debtors' business and substantially all other assets of the Debtors' Chapter 11 estates were sold to Clayton Homes, Inc. ("Clayton").

13.     Section 6.3(b) of the Plan provides that for the creation of a liquidating trust pursuant to a liquidation trust agreement. The Plan also provided that the Debtors' unsecured creditors were to receive all beneficial interests in the Trust. On or around the Effective Date, the Debtors and the Trustee executed the Trust Agreement, which created the Plaintiff in this action.

14.     On the Effective Date, pursuant to Section 2.2 of the Trust Agreement and Sections 6.3(b) and (f) of the Plan, the Trust was vested with, among things, the right to prosecute and settle turnover, avoidance, and all other unsettled estate causes of action on behalf of the holders of the beneficial interests in the Trust.

## STATEMENT OF THE FACTS

**A.     The Policies**

15.     Discover Re provided Oakwood with workers compensation, automobile liability and general liability insurance for the period between July 1, 1998 and June 30, 2002 (the "Policies").[2]

16.     Specifically, during the period from July 1, 1998 through June 30, 1999, Discover Re provided (a) workers compensation insurance coverage for Oakwood (i) in Oregon under Policy number DRE 23-08505-98-02 and (ii) in all states other than Oregon under Policy number DRE-23-08504-98-6; and (b) automobile liability insurance coverage for Oakwood in (i) Texas under Policy number DRE 23-08502-98-3 and (ii) all states other than Texas under Policy number DRE 23-08501-98-718.

---

[2]     The general liability insurance policies are not at issue in this adversary proceeding.

17.    During the period from July 1, 1999 through June 30, 2000, Discover Re provided (a) workers compensation insurance coverage for Oakwood (i) in Oregon under Policy number DRE 1566099 and (ii) in all states other than Oregon under Policy number DRE 1566199; and (b) automobile liability insurance coverage for Oakwood in (i) Texas under Policy number DRE 23-08502-98-3 and (ii) all states other than Texas under Policy number DRE 23-08501-98-7.

18.    During the period from July 1, 2000 through June 30, 2001, Discover Re provided (a) workers compensation insurance coverage for Oakwood (i) in New Jersey under Policy number D111W00001 and (ii) in all states other than New Jersey under Policy number DRE 3125900; and (b) automobile liability insurance coverage for Oakwood in (i) Texas under Policy number DRE 23-08502-98-3 and (ii) all states other than Texas under Policy number DRE 23-08501-98-7.

19.    During the period from July 1, 2001 through June 30, 2002, Discover Re provided (a) workers compensation insurance coverage for Oakwood (i) in Nevada and Oregon under Policy number D111W00003; (ii) in New Jersey under Policy number D111W00004; and (iii) in all states other than Nevada, Oregon, and New Jersey under Policy number D11W00002; and (b) automobile liability insurance coverage for Oakwood in (i) Texas under Policy number D111A00003 and (ii) all states other than Texas under Policy number D111A00002.

20.    Each of the Policies required Oakwood to pay the policy premium and to indemnify or reimburse Discover Re for the first $500,000 of liability for each workers compensation claim and the first $250,000 of liability for each automobile

liability claim (the "Deductibles"). Because of these very high Deductibles, nearly all of the cost and expenses arising out of claims against these Policies is borne by Oakwood.

**B.    The Agreements**

21.    The Policies were issued in connection with two agreements, the "Indemnity Agreement" and the "Premium and Loan Agreement" (collectively, the "Agreements") (the Agreements are attached hereto as Exhibits A and B). The Agreements were first entered into between Oakwood and Discover Re on July 1, 1998.

22.    The Premium and Loan Agreement required Oakwood to pay premium cash payments during the term of the Policies. In addition, the Premium and Loan Agreement and the Indemnity Agreement required Oakwood to provide Discover Re with security for Oakwood's self-funded retention and obligations under the Premium and Loan Agreement. This security consisted of two surety bonds, the first issued by U.S. Fire Insurance Co. and an excess bond provided by American International Group, Inc. ("AIG").

23.    By the last policy period ended June 30, 2002 and going forward, Discover Re held $16 million in security provided by Oakwood. Of the $16 million, $9.5 million was a letter of credit number NZS434156 (the "LOC") that Oakwood caused to be issued by Wells Fargo Bank, N.A. ("Wells Fargo") in favor of Discover Re (A true and correct of the LOC is annexed hereto Exhibit C)[3] and $6.5 million in a surety bond that Oakwood caused to be issued by U.S. Fire Insurance Company under bond number 6101910621 in favor of Discover Re.

---

[3]    In 2002, AIG decided not to renew its bond with Oakland in favor of Discover Re. Thus, Oakwood caused Wells Fargo to issue the letter of credit in order to provide the additional security that Discover Re required under the Indemnity and Premium and Loan Agreements.

24.     On May 4, 2004, Discover Re had drawn down $750,000.00 from the LOC. On June 16, 2004, Discover Re had drawn down $8,750,000 from the Letter of Credit. Thus, Discover Re has fully drawn down the balance of the LOC.

25.     On May 2004, Discover Re drew down the $6.5 million bond issued by U.S. Fire Insurance Co.

## C.     Overpayment of Premiums

26.     In addition, at the end of each policy year, Discover Re had an audit conducted of the payments made by Oakwood under the Policies. For the policies for the year July 1, 2001 through June 30, 2002, the audit showed that Oakwood overpaid its premiums by $39,227.00. Discover Re has wrongfully held the $39,227.00 owed to Oakwood as additional security and has refused to release the monies to Oakwood. See Exhibit D.

27.     In summary, in connection with the 1998 through 2002 Policies, Discover Re wrongfully retains approximately $14,579,000 supposedly to cover amounts Oakwood will owe under the already-expired Policies.

## D.     Discover Re Wrongfully Holds The Excess Funds

28.     Plaintiff has conducted a review of Oakwood's outstanding workers compensation and automobile liability claims to determine the amount by which the funds retained by Discover Re exceed Discover Re's reasonably anticipated needs. Such analyses are routinely conducted by businesses and insurance companies alike. Indeed, the very business of the insurance industry, calculating an appropriate insurance premium and/or deductible in proportion to a perceived risk, consists of performing analyses such as the one conducted by Plaintiff. Plaintiff's estimation of losses and

8

expenses likely to be incurred by Oakwood under both the 1998 to 2002 Policies was based entirely on data provided by ESIS, Inc. ("ESIS") relating to workers compensation and automobile liability claims.[4]

29.     The last of the Policies expired in June 2002. None of the Policies covered occurrences for which there are likely to be latent injuries. Thus, it is hardly surprising that the majority of the $14,579,000 currently being held by Discover Re will never be needed to cover any obligations Oakwood may have in the future under the policies It cannot be disputed that Plaintiff is entitled to the return of any excess funds being held by Discover Re. Plaintiff may also be entitled to additional funds if it is determined after discovery that Discover Re improperly handled and/or managed any of the claims covered under the policies since all but one of the claims covered under the Policies are for amounts less than Oakwood's $500,000 deductible limit for workers compensation and $250,000 for automobile liability insurance.

30.     Neither the Indemnity Agreement nor the Premium and Loan Agreement contains any provision providing a termination date. Plaintiff has made numerous attempts to negotiate termination if Discover Re willingly will agree to terminate the Agreements and the return to Plaintiff the money it is owed. Discover Re has refused to do so.

31.     Currently, no method, other than an order of this Court, will guarantee the prompt return to Plaintiff of the excess funds being held by Discover Re and, therefore, the timely and efficient distribution of those funds to the holders the

---

[4] ESIS is a risk management company which was, pursuant to certain agreements, responsible for maintaining Oakwood's claim files, establishing reserves, and investigating, adjusting, and settling Oakwood's workers compensation and automobile liability claims.

9

beneficial interest in the Trust (i.e., the Debtor's unsecured creditors). It is in the best interests of the Court, the Trust, and the holders of the beneficial interests in the Trust that his case be closed promptly. Discover Re's act of holding captive the excess funds, which funds belong to the Trust, threatens unreasonably to delay the closing of this case and, more importantly, Plaintiff's ability to secure timely and efficient distribution of the funds to the holders of the beneficial interests in the Trust.

### FIRST CLAIM FOR RELIEF

### ESTIMATION OF DISCOVER RE'S CLAIMS PURSUANT TO 11 U.S.C. §<br>502(c)(1) AND RECOVERY OF PROPERTY OF THE ESTATES PURSUANT TO<br>THE EQUITABLE POWERS OF THE COURT UNDER 11 U.S.C. § 105(a)

32.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

33.     The refusal of Discover Re to return the excess funds currently being held by Discover Re seriously jeopardized the ability of the Plaintiff and Alvarez & Marsal, LLC, the Trustee, to fully, efficiently and effectively wind down Debtors' estates by unfairly and inequitably delaying the return of funds to the Plaintiff and, ultimately, to the holders of the beneficial interests in the Trust.

34.     Discover Re's refusal to return the excess funds to Plaintiff has prejudiced claimants in this proceeding by sequestering funds in which Plaintiff holds an interest, and which could otherwise be distributed to the holders of the beneficial interests in the Trust.

35.     Furthermore, the refusal of Discover Re to return the excess funds has produced a scenario in which either the conclusion of this proceeding will potentially be delayed indefinitely or Discover Re will be able unjustly to retain all excess funds at

the expense of the trust and, ultimately, the holders of the beneficial interests in the Trust (i.e., the Debtors' unsecured creditors).

36.    Under Section 502(c)(1), this Court may estimate for purpose for allowance any contingent or unliquidation claim, the fixing or liquidation of which, as the case may be would unduly delay the administration of the case. Under Section 105(a) of the Bankruptcy Code, this Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

37.    The Court should issue an order estimating the amount Oakwood is owed from Discover Re pursuant to Section 502(c)(1), and compel turnover of all excess amounts being held by Discover Re pursuant to the equitable powers granted by Section 105(a) of the Bankruptcy Code, and in the spirit of full, non-duplicative, and efficient case administration and disposition embodied by Sections 502, 541, 542, and 1141(d) the Bankruptcy Code.

## SECOND CLAIM FOR RELIEF

### RECOVERY OF PROPERTY OF THE
### ESTATE PURSUANT TO 11 U.S.C. §§ 541 AND 542

38.    Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

39.    Plaintiff retains a legal or equitable interest in the excess funds currently held by Discover Re.

40.    Discover Re, individually and as beneficiary of the bond and the LOC, is currently in possession, custody or control of the excess funds.

41.    The excess funds being held by Discover Re is not of inconsequential benefit to the estates.

11

42.    Discover Re is not custodian within the meaning of Section 542 of the Bankruptcy Code.

43.    Plaintiff is entitled to have the excess funds held by Discover Re returned to the estate as property of the estate pursuant to Sections 541 and 542 of the Bankruptcy Code.

### THIRD CLAIM FOR RELIEF

### BREACH OF CONTRACT

44.    Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

45.    The Indemnity Agreement and the Premium and Loan Agreement are valid and binding contracts between Discover Re and Oakwood.

46.    Oakwood has complied with its obligations under the 1998 through 2002 Agreements.

47.    Discover Re refusal to return the excess funds, which funds Discover Re will never need in connection with the Policies issued with the Agreements, constitutes a breach by Discover Re of the Agreements.

48.    By reason of the foregoing, Oakwood has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

49.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

50.    Discover Re has breached the implied covenant of good faith and fair dealing by refusing to negotiate in good faith a termination of the relevant agreements.

51.    By refusing to negotiate in good faith a termination of the relevant agreements, Discover Re has deprived Plaintiff of its right to receive a return of the excess funds being held by Discover Re.

52.    Plaintiff is entitled to the return of the excess funds being held by Discover Re under the implied covenant of good faith and fair dealing and Section 544 of the Bankruptcy Code.

## FIFTH CLAIM FOR RELIEF

## AVOIDANCE AND PRESERVATION OF FRAUDULENT TRANSFER
## PURSUANT TO APPLICABLE STATE LAW AND 11 U.S.C. § 544

53.    Plaintiff repeats and realleges each and every allegation set forth tin the preceding paragraphs as if fully set forth herein.

54.    Oakwood transferred property to or for the benefit of Discover Re (the "Conveyance") in the aggregate amount of at least $14,579,000.

55.    The Conveyance was made by Oakwood without receiving equivalent value in exchange for the Conveyance and Oakwood either (i) was insolvent at the time of the Conveyance or (ii) was rendered insolvent as a result of the Conveyance.

13

56.    Plaintiff is entitled to avoid the Conveyance as a fraudulent transfer, pursuant to applicable state law and Section 544(b)(1) of the Bankruptcy Code, for the preservation and benefit of the estate, pursuant to Section 551 of the Bankruptcy Code.

## SIXTH CLAIM FOR RELIEF

### RECOVERY AND TURNOVER OF VALUE OF
### AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. §§ 542 AND 550

57.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

58.    Upon avoidance of the Conveyance as a fraudulent transfer under the Sixth Claim for Relief of this Adversary Complaint, Plaintiff is entitled to turnover of the value of the avoided Conveyance by Discover Re as an initial transferee pursuant to Section 550(b) of the Bankruptcy Code.

59.    Pursuant to Section 542 of the Bankruptcy Code, Plaintiffs are entitled to turnover of the value of the avoided Conveyance by Discover Re as property of the estate pursuant to Section 541 of the Bankruptcy Code.

## SEVENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

60.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

61.     Discover Re has been enriched by obtaining and retaining property from Oakwood in the form of the excess funds in an amount to be determined at trial.

62.     Discover Re has benefited by obtaining and holding such excess funds.

63.     The enrichment of Discover Re comes at the expense of the Trust and the holders of the beneficial interests in the Trust.

64.     In equity and good conscience, Discover Re should not be allowed to retain the excess funds.

65.     Plaintiff is entitled to the return of the excess funds in an amount to be determined at trial under the doctrine of unjust enrichment and Section 544 of the Bankruptcy Code.

**WHERFORE,** Plaintiff OHC Liquidation Trust prays the Court enter judgment against defendants Discover Re, United States Fidelity & Guaranty, Co., as follows:

(i)     On its FIRST CLAIM FOR RELIEF, for an estimation of Discover Re's future liability under the Policies pursuant to Section 502(c)(1) of the Bankruptcy Code, and ordering Discover Re to return the excess, plus any applicable prejudgment interest and/or attorneys' fees and costs pursuant to the court's equitable powers under Section 105(a) of the Bankruptcy Code;

15

(ii)    On its SECOND CLAIM FOR RELIEF, for a judgment against Discover Re in an amount to be determined at trial plus any applicable prejudgment interest and/or attorneys' fees and costs, and ordering the turnover of such funds to the estate, pursuant to Sections 541 and 542 of the Bankruptcy Code;

(iii)    On its THIRD CLAIM FOR RELIEF, for a judgment against Discover Re in an amount to be determined at trial plus any applicable prejudgment interest and/or attorney's fees and costs, and ordering the turnover of such funds to the estate, pursuant to Sections 541 and 542 of Bankruptcy Code;

(iv)    ON its FOURTH CLAIM FOR RELIEF, for a judgment against Discover Re ordering compensatory damages in an amount to be determined at trial plus any applicable pre in an amount to be determined at trial plus any applicable prejudgment interest and/or attorney's fees and costs;

(v)    On its FIFTH CLAIM FOR RELIEF, for judgment against Discover Re avoiding the Conveyance as a fraudulent transfer, pursuant to applicable state law and Section 544(b)(1) of the Bankruptcy Code, for the preservation and benefit of the estate, pursuant to Section 551 of the Bankruptcy Code;

(vi)    On its SIXTH CLAIM FOR RELIEF, for judgment against Discover Re in an amount to be determined at trial plus any applicable prejudgment interest and/or attorneys' fees and costs, and ordering

16

Discover Re to turn over to the Trust the avoided Conveyance in the amount so determined plus any applicable prejudgment interest and/or attorney's fees and costs, pursuant to Sections 542 and 550 of the Bankruptcy Code.

(vii)    On its SEVENTH CLAIM FOR RELIEF, for a judgment against Discover Re in an amount to be determined at trial plus any applicable prejudgment interest and/or attorneys' fees and costs; and

(viii)    For such other and further relief as this Court may deem just and proper.

Dated            Wilmington Delaware
                 June 1, 2005

MORRIS NICHOLS ARSHT & TUNNELL

Donna L. Culver (No. 2983)
Jason A. Cincilla (No. 4232)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
(302) 658-3989

– and –

BROWN RUDNICK BERLACK ISRAELS LLP
Robert J. Stark, Esq.
Dana Montone
Seven Times Square
New York, NY  10036
(212) 704-0100

Counsel to OHC Liquidation Trust, by and through
Alvarez & Marsal, LLC, the OHC Liquidation
Trustee

17

# EXHIBIT A

# INDEMNITY AGREEMENT

This Indemnity Agreement ("Agreement") is entered into this first day of July, 1998, by and between United States Fidelity and Guaranty Company and/or the property casualty insurance company affiliates and subsidiaries designated on the signatory page hereof (hereinafter referred to as "Company") and Oakwood Homes Corporation with offices at P.O. Box 27801, Greensboro, North Carolina 27425 (hereinafter referred to as the "Insured").

WHEREAS, Company has issued or will issue certain insurance policies, (hereinafter, together with Endorsements thereof, "the Policies"), the Policy periods and self-funded retention(s) (the "SFR(s)") which are set forth in Schedule A attached hereto and incorporated herein by this reference as if set out in full; and

WHEREAS, Company has attached or may attach to the Policies certain endorsements, including those required by applicable Federal and/or State laws and regulations (all of which are referred to as the "Endorsements"), and has filed or may file with Federal and/or State governmental regulatory agencies evidence of the issuance of the Policy(ies) (all of which are referred to as the "Filings"); and

WHEREAS, Company has issued or may issue to third parties certificates or evidence of insurance ("Certificates") reflecting coverage provided under the Policy(ies); and

WHEREAS, Company has provided in the Policy(ies) that Insured shall assume all Ultimate Retained Losses up to the amount of the SFR(s); and

WHEREAS, the premium due under each Policy is reduced because of the SFR(s) assumed by Insured; and

WHEREAS, because of the Policy(ies), Filings and Certificates, Company may be responsible to third parties for Claims for which Insured is responsible under the SFR(s); and

WHEREAS, Company and Insured wish to set forth their mutual rights, duties and obligations with regard to the disposition of Claims consistent with the SFR(s); and

WHEREAS, Company and Insured wish to provide for adequate security to ensure the availability of funds to pay the Claims assumed by Insured within the SFR(s) and a share of the associated Claim Expenses.

Oakwood Homes  98

1

NOW, THEREFORE, for good and other valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

I.   DEFINITIONS

A.   The term "Case Reserve" as used in this Agreement shall mean an estimate of the value of a Claim and its associated Claim Expenses.

B.   The term "Claim(s)" as used in this Agreement shall mean any Claim or suit (including multiple Claims or suits) arising out of or in connection with any accident or disease.

C.   The term "Incurred But Not Reported" ("IBNR") as used in this Agreement shall mean the reserve on an actuarially sound basis against liability for future Claims which have already occurred but have not yet been reported to Insured and/or Company and shall also include expected future development of outstanding Case Reserves.

D.   The term "Loss" as used herein shall mean the amount of benefits or damages paid or payable on behalf of the Insured under a Policy(ies) with respect to a particular Claim.  Loss shall not include Claim Expenses.

E.   The term "Claim Expenses" as used in this Agreement shall mean:

1.   Attorney fees and all other litigation expenses.

2.   The cost of bonds to appeal a judgment or award or to release attachments, but only for bond amounts within the applicable limit of insurance under the Policy(ies).  Company does not have to furnish these bonds.

3.   All reasonable expenses incurred by Insured in the investigation or defense of a Claim, including actual loss of earnings up to $100 a day because of time off from work.

4.   All costs taxed against Insured in the Claim.

5.   Pre-judgment interest awarded against the Insured on that part of the judgment Company pays.  If Company makes an offer to pay the applicable limit of insurance under the Policy(ies), it will not pay any pre-judgment interest based on that period of time after the offer.

6.   All interest on the full amount of any judgment that accrues after entry of the judgment and before Company has paid, offered to pay or deposited in court the part of the judgment that is within the applicable limit of insurance under the Policy(ies).

Oakwood Homes  98

2

"Claim Expenses" do not include:

1.　Salaries and expenses of Company's or Insured's employees other than that portion of Company's employed attorneys' or paralegals' fees, salaries and expenses allocated to a specific Claim.

2.　Fees and expenses of independent claims adjusting organizations hired by Insured.

F.　The term "Policy(ies)" shall mean contracts or Policy(ies) of insurance issued pursuant to this Agreement and shall include any and all Endorsements thereof.

G.　The term "SFR(s)" shall mean the self-funded retention(s) set forth in Schedule A attached hereto and incorporated herein by this reference as if set out in full.

H.　"Outstanding SFR Obligations" shall mean the sum of the following amounts as Company determines based upon its records:

1.　The estimated Case Reserves and IBNR within the SFR(s) which Insured is obligated to pay under the Policy; and

2.　The unpaid Claim Expenses and any expected future development of outstanding Claim Expenses which Insured is obligated to pay pursuant to Paragraph E of Section III.

I.　The term "Ultimate Retained Loss" as used in this Agreement shall mean the sum of total paid Losses plus total Case Reserves, plus total paid Claim Expenses, plus total outstanding Claim Expenses, plus IBNR, all within the SFR(s) specified in Schedule A.

J.　The term "Insurance Related Expenses" as used in this Agreement shall mean amounts of money charged by any state, federal or other governmental authority with respect to:

1.　Ultimate Retained Losses; and

2.　Insured's share of Claim Expenses pursuant to Paragraph E. of Section III. of this Agreement.

Insurance Related Expenses include, but are not limited to premium taxes, premium surcharges, residual market charges, surcharges or assessments and guarantee (insolvency) fund charges, surcharges or assessments.

Oakwood Homes 98

3

II.   **APPLICATION OF AGREEMENT**

This Agreement shall apply to and shall run concurrently with the coverages under the Policies, continuing in full force and effect until terminated in accordance with the provisions of Section VIII. below.

III.   **ESTABLISHMENT OF RESERVES, DISPOSITION OF CLAIMS AND LOSS NOTIFICATION PROVISIONS**

A.   Company has the right, duty and ultimate authority to investigate, defend or settle any Claim.   The Company has the right to establish or revise any Case Reserve or IBNR with respect to Claims under the Policy.

B.   Company delegates the responsibility to investigate, adjust, defend and/or settle all Claims to Insured, subject to Insured meeting the following conditions:

1.   Insured  will notify Company of accidents, diseases or Claims in accordance with Paragraphs C. and D. below.

2.   Insured will establish a "Case Reserve" with respect to each such Claim as soon as such Claim becomes known to Insured.  Insured will revise such reserve from time to time on the basis of developments and facts known at the time of such revision.

3.   Insured will have no authority to pay, or agree to pay any amount of such Claims greater than the SFR Each Accident or Each Employee (For Disease) without Company's prior written consent.

4.   Company will have the right to associate with Insured in the defense of any Claim or to assume control of the defense of any Claim.  The assumption of control shall include, but not be limited to, the investigation and settlement of any Claim, the selection or retention of counsel and appeal of any judgment.

5.   When a Claim has been settled or adjudicated, Insured will promptly pay the amount of such Claim up to the SFR Each Accident or Each Employee (For Disease) to the party to whom the payment is due for Loss.

6.   Insured will pay its share of Claim Expenses in accordance with Paragraph E. below.

7.   Company may pay any part or all of such SFR(s) and, upon notification of the action taken, Insured will promptly reimburse Company for the amount of such payment up to such SFR(s) and Insured's share of Claim Expenses as have been paid by Company in accordance with Paragraph E. below.

Oakwood Homes  98

8. Any claim administrator(s) Insured utilizes for claim handling services must be approved in writing by Company in advance. Company approves the following claim administrator(s): ESIS .

C. Insured must see to it that Company is notified of an accident or disease which may result in a Claim seeking a total amount for Loss in excess of the applicable SFR(s). The notice must be made as soon as possible, but no later than 30 calendar days from the date  Insured is notified of such accident or disease. The notice should include:

1. How, when and where the accident or disease took place;

2. The names and addresses of any injured persons and witnesses; and

3. Complete details of the injury, disease or death.

D. Insured will furnish Company with:

1. A quarterly report which provides the following information for each Claim which was outstanding, opened, revised or eliminated during the previous quarter:  The identity of the claimants or injured parties; the dates, places, description and cause of injuries or damages; the amounts of reserves for such Claim;  Claim Expenses (both paid and reserved) and payments of judgments or settlements.  This report must be furnished no later than thirty (30) calendar days after the end of each quarter.

2. Written notification of each Claim which has, should have or is likely to have, without regard to liability, a Claim and Claim Expenses reserve equal to or exceeding fifty percent (50%) of the applicable SFR.  Written notice must be provided as soon as possible, but no later than fifteen (15) calendar days from the date Insured has sufficient knowledge of facts surrounding such Claim which could put Insured on notice that such reserve or payment is indicated. Complete files on such Claim must be given to Company within thirty (30) calendar days from the date Company requests such files.

3. Written notification of each Claim which involves serious injury(ies). This notice must be provided as soon as possible, but no later than ten (10) business days from the date Insured has knowledge of such Claim.  Serious injuries include, but are not limited to:

a. Cord Injury - paraplegia, quadriplegia;

b.    Amputations - requiring a prosthesis;

c.    Brain damage affecting mentality or central nervous system - such as permanent disorientation, behavior disorder, personality change, seizures, motor deficit, inability to speak (Aphasia), hemiplegia or unconsciousness (Comatose);

d.    Blindness;

e.    Burns - involving over 10% of body with third degree or 30% with second degree;

f.    Multiple fractures - involving more than one member or non-union;

g.    Fracture of both heel bones (Fractured or Bilateral OS Calcis);

h.    Nerve damage causing paralysis and loss of sensation in arm and hand (Brachial Plexus Nerve Damage);

i.    Massive internal injuries affecting body organs;

j.    Injury to nerve at base of spinal canal (Cauda Equina) or any other back injury resulting in incontinence of bowel and/or bladder;

k.    Fatalities;

l.    Any Claim not specified above that presents an unusual exposure to the coverage;

m.    Any other serious injury or damage which may involve Company's liability.

Individual written loss reports of all serious injuries or damages must be furnished within thirty (30) calendar days from the date Insured has knowledge of any Claim which involves such serious injuries or damages. This report must contain, at a minimum, the facts surrounding the Claim, a description of damages and injuries, suggested reserves and recommendations for future claims handling.

4.    Other claim information or reports as requested by Company from time to time.

Oakwood Homes 98

6

E.  The applicable SFR will be applied separately to each accident or disease, first as respects the payment of Loss and then to the payment of Claim Expenses. The balance of any Claim Expenses due will be payable by Company in addition to its limits of liability under the Policy(ies).

   If a Claim involves Claim Expenses only, in no event will Insured be obligated to pay Claim Expenses in connection with any one accident or disease for an amount greater than the applicable SFR.

   Notwithstanding, anything in the policies set forth in Schedule A to the contrary, Claim Expenses shall be included with respect to the SFR.

F.  Company shall have the right to inspect, audit and copy during normal business hours all files, data and other written information in the possession of Insured relating to Claims.

G.  The parties agree that all Claim files in the possession of Insured or its successor, assignee, nominee, trustee or representative(s) are the joint property of the parties.

H.  In addition to the reasons for cancellation set forth in the Policy, if Insured pays, settles or agrees to pay or settle any Claim for an amount greater than the applicable SFR(s) without Company's prior written consent or if Insured fails to permit inspection, audit, copying or to otherwise cooperate with Company to enable Company to establish or revise reserves for Claims or if Insured fails to obtain Company's approval in writing of any change of Insured's claims administrator(s) in advance, or if Insured fails to notify Company of accidents, diseases, injuries, Claims or Claim Expenses in accordance with Paragraphs C. and D. above, or if Insured fails to comply with any security obligation in accordance with Section VI, then such acts or omissions will be deemed reasonable grounds for cancellation of the Policy and filings and certificates representing the Policy, except as otherwise provided by law.

IV.  **RIGHTS OF RECOVERY**

A.  In the event of any payment for Losses, Company shall participate with Insured in the exercise of Insured's rights of recovery against any person or organization liable therefor. Insured shall do nothing after a Claim to prejudice such rights and shall do everything necessary to secure such rights.

B.  Recoveries shall be applied first to reimburse any party (including Insured) that paid any amount in excess of Company's limit of liability under the Policy; then to reimburse Company up to the amount Company paid; and lastly to reimburse such parties (including Insured) that are entitled to claim the balance of any recovery under the Policy.

Oakwood Homes 98

However, a different apportionment may be made to effect settlement of a Claim by agreement signed by all parties including Company and Insured.

C.   Reasonable expenses incurred in the exercise of rights of recovery shall be apportioned between the parties in the ratio of their respective losses for which recovery is sought.

V.   <u>INDEMNIFICATION</u>

Insured will defend, indemnify, and hold Company harmless from and against any and all liability, damages, fines, penalties, assessments, costs and expenses (including reasonable attorney fees) in connection with:

A.   The Ultimate Retained Losses arising out of or in connection with the Policy(ies), for the applicable Policy periods, as set forth in Schedule A attached hereto and made a part hereof; and

B.   Insured's share of Claim Expenses which Company incurs in the administration, settlement and defense of Claims pursuant to Paragraph E. of Section III. above; and

C.   All liability for punitive or exemplary damages, fines and/or penalties, other than those for which coverage is afforded under the Policies, suffered or incurred by Company as a result of any actions or omissions of Insured or its agents, representatives, third party administrators or adjusters in the investigation, adjustment, defense and/or settlement of Claims.

Notwithstanding, anything in the policies set forth in Schedule A to the contrary, Insured will indemnify Company for Claim Expense pursuant to paragraph III. E.

D.   Any claim, loss or suit for payment of Insurance Related Expenses with respect to Losses within the SFR(s).  Company shall promptly notify the Insured of the existence of such claim, loss or suit and shall afford Insured the opportunity to join Company in any proceeding to contest such claim, loss or suit.

VI.   <u>SECURITY</u>

A.   Insured will provide Company with security for the performance of the following:

1.   Insured's obligations under Section V. hereof for the applicable policy periods as set forth in Schedule A attached hereto; and

Oakwood Homes  98

8

2.  Insured's past, present or future obligations to Company or its affiliates and subsidiaries with respect to SFR programs or other programs underwritten by Discovery Managers, Ltd. on behalf of the Company or its affiliates and subsidiaries which are associated with policies not included in Schedule A attached hereto.

Such security will be provided to Company at all times while this Agreement is in effect or while any obligation indicated in Paragraph 2. above remains in effect. Such security shall be in the form of a Letter of Credit, cash or other collateral acceptable to Company.

B.  In the event that Insured furnishes Company with a Letter or Letters of Credit as security under Paragraph A. above, the Letter or Letters of Credit shall be issued in favor of Company by a bank approved by Company, which is not a parent, subsidiary or affiliate of Insured and which meets all three of the following criteria:

1.  Member of the United States Federal Reserve System; and

2.  Rated "B" or better by Lace Financial Corporation or any other financial rating organization selected by Company; and

3.  On the approved list of banks for Letters of Credit maintained by the National Association of Insurance Commissioners.

Notwithstanding anything else set forth herein to the contrary, Company may at any time request that a Letter of Credit be replaced should the issuing bank become unacceptable to Company. In such event, Insured shall deliver or cause to be delivered to Company, within thirty (30) days of Company's request, a replacement Letter of Credit issued by a bank acceptable to Company in the same amount and form as the Letter which it replaces.

The Letter of Credit shall be in the form as Schedule C attached hereto and incorporated herein by this reference. Each such Letter of Credit shall be irrevocable, clean and unconditional, issued for a term of at least twelve (12) months and shall be, by its terms, subject to an unlimited number of automatic renewals thereafter for additional twelve (12) month terms, unless the issuer bank shall advise Company in writing at least thirty (30) days prior to the next expiration date of the bank's intention not to have the Letter of Credit be considered renewed. Insured shall deliver or cause to be delivered to Company, at least fifteen (15) days prior to the expiration date of the Letter of Credit which is about to non-renew, a replacement Letter of Credit establishing credit in favor of Company in the same amount as the Letter of Credit which it replaces. Upon timely receipt of the replacement Letter of Credit, Company shall immediately cancel the original Letter of Credit by notation and return it to Insured, postage prepaid, registered mail.

Oakwood Homes 98

C.    In the event that Insured furnishes Company with a Performance Bond(s) as security under Paragraph A. above, such bond(s) shall be issued in favor of Company, as obligee, by a Surety approved by Company, which is not a parent, subsidiary or affiliate of Insured, as Principal. The Performance Bond shall be in the form as Schedule D attached hereto and incorporated herein by this reference. Notwithstanding anything else set forth to the contrary, Company may at any time request that a Performance Bond be replaced should the Surety become unacceptable to Company. In such event, Insured shall deliver or cause to be delivered to Company, within thirty (30) days of Company's request, a replacement Performance Bond issued by a Surety acceptable to Company in the same amount and form as the Performance Bond which it replaces. Each such Performance Bond shall remain in full force and effect until all the Insured's obligations under this Agreement are met, unless the Surety shall advise the Company in writing that it intends to cancel such bond at least sixty (60) days prior to the cancellation date. Insured shall deliver or cause to be delivered to Company, at least thirty (30) days prior to such cancellation date, a replacement Performance Bond establishing credit in favor of Company, as Obligee, in the same amount and form as the Performance Bond which it replaces. If Insured fails to deliver such substitute collateral by such date, Company may claim the full penal amount of such bond and hold and apply such amount to secure, cover and pay when due any and all the obligations of the Insured under this Agreement.

D.    The original amount of security provided by Insured for the period July 1, 1998 to July 1, 1999, shall be in the aggregate amount of $5,103,000 which is the combined amount of security for:

1.    Insured's SFR obligations under this Agreement; and

2.    Insured's obligations under a separate Premium and Loan Agreement between Company and Insured dated July 1, 1998.

The original amount of security for the period July 1, 1998 to July 1, 2000 shall be indicated in an amendment to this Agreement.

The amount security will be adjusted subsequently as follows:

1.    <u>Increases</u>

Whenever the sum of Insured's past, present or future Outstanding SFR Obligations as stated in items A.1. and 2. under this Section VI exceeds the current amount of security provided by Insured to

Oakwood Homes 98

10

Company hereunder or under any other Agreement with respect to such Outstanding SFR Obligations, Insured will obtain an increase in the amount of such security within thirty (30) calendar days equal to the difference between such Outstanding SFR Obligations and the amount of the then current security in the form of Letters of Credit or other collateral acceptable to Company.

2.  Decreases

As of the second anniversary of the termination date of the Policy and on each anniversary thereafter, Company will allow a reduction in the then current amount of security if such amount is greater than the Retention Obligations valued at such anniversary dates. In such event, Company will execute any document necessary to order a reduction in the amount of the then current security to equal the difference, if any, within sixty (60) calendar days after such anniversary.

For purposes of adjusting the amount of security by Company, as provided in 1. and 2. above, Insured will render to Company on October 1, 1998, and within thirty (30) days from the end of each calendar quarter thereafter, a statement of the estimated Ultimate Retained Losses valued at such times for the applicable Policy periods as set out in Schedule A attached hereto. The statement of estimated Ultimate Retained Losses shall contain actual paid losses, the Case Reserves, the IBNR, and the Claim Expenses (paid and reserved).

E.  The security furnished to Company under this Agreement may be executed, immediately drawn upon or made claim upon in whole or in part, as the case may be, by Company only under the following circumstances:

1.  To indemnify Company for all sums of money which are subject to indemnification from Insured under Section V. above which Company has paid or becomes liable to pay by reason of Insured's failure to pay, for an amount up to, but not exceed, the amount Company has paid or has become liable to pay by reason of Insured's failure to pay under Section V. above;

2.  Insured's failure to deliver or cause to be delivered a replacement Letter of Credit or other security acceptable to Company, after receipt of notice from Company of the non-renewal of a Letter or Letters of Credit or other security, pursuant to the terms and provisions of Section VI. B. and VI. C. above, which ever applies, in which case Company may draw fully upon the unexpired Letter or Letters of Credit or other security acceptable to Company for which it has received notice of non-renewal;

Oakwood Homes 98

3.  Insured's failure to deliver or cause to be delivered a replacement Letter of Credit or other security acceptable to Company, after a bank which has issued a Letter or Letters of Credit or other security acceptable to Company becomes unacceptable to Company, pursuant to the terms and provisions of Section VI.B. and VI. C. above, which ever applies, in which case Company may draw fully upon such Letter or Letters of Credit or other security;

4.  Insured's failure to increase security provided under this Agreement pursuant to the terms and provisions of Section VI.D. above, in which case Company may execute against, draw upon or make claim upon the security provided under this Agreement; or

5.  Insured's failure to pay any premiums within the time provided in the Policy.

In the event that Company draws down on the Letter or Letters of Credit or other security pursuant to either Subparagraphs 2, 3 or 4 of this Paragraph E., Company shall be free to hold the proceeds thereof as security until it receives acceptable collateral or Letters of Credit or notation adjustment, as the case may be. If Insured subsequently furnishes an acceptable replacement Letter or Letters of Credit, other security or notation adjustment, as the case may be, Company shall return the proceeds of such draw(s) from the date of such draw(s), within five (5) business days of receipt of written directions indicating to whom such return shall be made, signed and verified by duly authorized officers of Insured.

VII.   **TERMINATION OF POLICY(IES)**

Notwithstanding any other provisions of this Agreement or remedies which Company may have under this Agreement or otherwise, it is expressly understood and agreed that any breach by Insured of its obligations under Sections V. and VI. above, if not remedied within thirty (30) business days after written notice shall constitute an immediately effective cancellation by Company of each and every Policy(ies) whose terms have not yet expired, except as otherwise provided by law.

VIII.  **TERM**

The parties agree that this Agreement shall continue in full force and effect as long as there are any Case Reserves, unresolved Claims or IBNR remaining in connection with or under any Policy(ies). Neither the non-renewal nor the cancellation of any Policy(ies) shall terminate or otherwise affect this Agreement. Insured and Company agree that this Agreement shall continue in full force and effect for the purpose of determining the rights and obligations of the parties in the event termination has occurred and, subsequent thereto, either of the following occurs:

Oakwood Homes 98

A.   A Claim which had been reported and closed prior to the termination of this Agreement is reopened; or

C.   A Claim allegedly within the Policy period but which has not been reported prior to the termination of this Agreement until such Claim has been closed.

The terms and provisions of Sections III., IV., V. and VI. above shall survive termination of this Agreement.

IX.   ATTORNEYS' FEES

In the event any action or arbitration proceeding is commenced to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs incurred therein.

X.   WAIVERS

Forbearance, neglect or failure by Company to enforce any and all of the provisions of this Agreement or to insist upon strict compliance by Insured shall not be construed as a waiver of any rights or privileges of Company. A waiver of any past act or circumstances shall not constitute or be a course of conduct or waiver of any subsequent action or circumstances.

XI.   ASSIGNMENT

This Agreement is not assignable by any party, without the prior written consent of all parties.

XII.   ENTIRETY OF AGREEMENT

This Agreement supersedes all previous Indemnity Agreements between Company and Insured as to the subject matter covered by this Agreement, and any prior statements, agreements or representations between the parties are terminated and no longer of any force and effect. This Agreement applies to, and shall inure to the benefit of, the parties hereto, their successors and assigns.

XIII.   APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut, without regard to its rules regarding conflict of laws.

Oakwood Homes  98

13

XIV.    <u>CONSENT TO JURISDICTION</u>

To the extent that any legal action, suit or proceeding arises out of or relates to this Agreement or the transactions contemplated hereby, the parties hereto irrevocably submit to the jurisdiction of the state courts of the State of Connecticut or any Federal court located in the State of Connecticut to hear and determine such action, suit or proceeding. Each party agrees not to assert as a defense in any such action, suit or proceeding, any Claim that it is not subject personally to the jurisdiction of such court; that its property is exempt or immune from attachment or execution; that the action, suit or proceeding is brought in an inconvenient forum; that the venue of the action, suit or proceeding is improper; or that this Agreement or the subject matter hereof may not be enforced in or by such court.

XV.    <u>NOTICES</u>

All requests and notices hereunder shall be in writing and shall be sufficient in all respects if sent by certified or registered mail, if to Company:

United States Fidelity and Guaranty Company

c/o Discovery Managers, Ltd.
30 Waterside Drive
Farmington, Connecticut 06032

Attention:  Compliance Officer

and if to Insured:    Tim Graff
OAKWOOD HOMES CORPORATION
P. O. Box 27081
GREENSBORO, NC 27425-7081

All statements, reports, requests and notices hereunder shall be deemed given when received.

Oakwood Homes  98

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives this _14th_ day of _JAN_ , 19_99_.

ATTEST:                    UNITED STATES FIDELITY AND GUARANTY COMPANY

_____          By: _____

                           Title: _VP USF&G_

ATTEST:                    INSURED

_____          By: _____

                           Title: _VICE PRESIDENT INSURANCE_ .

Oakwood Homes 98

15

SCHEDULE A

| POLICY NUMBER | SFR | POLICY PERIOD |
|---|---|---|
| DRE 23-08505-98-6 | Workers' Compensation and Employers Liability Coverage $500,000 Each Accident $500,000 Each Employee for Disease | July 1, 1998 to July 1, 1999 |
| DRE 23-08501-98-7 | Auto Liability Coverage $250,000 Each Accident | July 1, 1998 to July 1, 2000 |
| DRE 23-08502-98-3 | Auto Liability Coverage $250,000 Each Accident | July 1, 1998 to July 1, 2000 |

Oakwood Homes  98

16

# SCHEDULE B

## Claim Information and Reports

SCHEDULE C

## REQUIRED LETTER OF CREDIT

Irrevocable Clean                              Issue Date:_____
Letter of Credit No._____

To Beneficiary:    United States Fidelity and Guaranty Company
                   c/o Discovery Managers, Ltd.
                   30 Waterside Drive
                   Farmington, Connecticut 06032

                   Attention:         Compliance Officer


We have established this clean, irrevocable, and unconditional Letter of Credit in your favor as beneficiary for drawings up to U.S. $_____ effective immediately. This Letter of Credit is issued, presentable and payable at our office at (issuing bank address) and expires with our close of business on _____. Except when the amount of this Letter of Credit is increased, this Credit cannot be modified or revoked without your consent.

The term "Beneficiary" includes any successor by operation of law of the named Beneficiary. If a court of law appoints a successor in interest to the named beneficiary, then the named beneficiary includes and is limited to the court appointed domiciliary receiver (including conservator, rehabilitator or liquidator).

We hereby undertake to promptly honor your sight draft(s) drawn on us, indicating our Credit No._____, for all or any part of this Credit upon presentation of your draft drawn on us at our office specified in paragraph one on or before the expiration date hereof or any automatically extended expiry date.

Except as expressly stated herein, our undertaking is not subject to any agreement, requirement or qualification. The obligation of (issuing bank) under this Credit is the individual obligation of (issuing bank) and is in no way contingent upon reimbursement with respect thereto, or upon our ability to perfect any lien, security interest or any other reimbursement.


Oakwood Homes 98

18

This Letter of Credit is deemed to be automatically extended without amendment for one year from the expiration date or any future expiration date, unless thirty days prior to such expiration date, we notify you by registered or certified mail that this Letter of Credit will not be renewed for any such additional period.

This Letter of Credit is subject to the 1993 Revision of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce (Publication No. 500). If this Credit expires during an interruption of business as described in Article 17 of said Publication 500, the bank hereby specifically agrees to effect payment if this Credit is drawn against within 30 days after the resumption of business.

Very truly yours,

_____
(issuing bank)

Oakwood Homes 98

SCHEDULE D

**BOND TO SECURE INDEMNITY AGREEMENT**

**BOND # _____**

KNOW ALL PERSONS BY THESE PRESENTS:

That _____, as Principal, (hereinafter called Principal), and _____, a corporation of the State of _____, having its principal place of business in _____, as Surety, (hereinafter called Surety), are held and firmly bound unto The United States Fidelity and Guaranty Company (hereinafter called Obligee), in the full and just sum of _____, ($_____) for which payment, well and truly to be made, the Principal and Surety hereby bind themselves, their respective legal representatives, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, The Principal has entered or will enter into a certain Indemnity Agreement with the Obligee dated _____ (hereinafter called the Agreement,) in connection with losses and other expenses arising out of Policy(ies) of insurance as set forth in Schedule A of the Agreement.

AND WHEREAS, Section VI of the Agreement requires the Principal provide security in the form of a Security Bond to guarantee that certain payments to the Obligee are made pursuant to the terms and conditions of the Agreement.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall well and truly perform and carry out the covenants, terms and conditions of the Agreement, then this obligation shall be void; otherwise this obligation shall remain in full force and effect and the Principal and Surety do jointly and severally bind themselves to pay amounts due the Obligee in the manner prescribed herein subject only to the following conditions.

1.    The Obligee's statement to the Surety of the amount due, either as security or reimbursement or both, pursuant to the Agreement, shall be absolute proof of the existence and extent of the liability of the Principal and the Surety to the Obligee hereunder.

2.    The Principal and Surety warrant and agree that claims made upon this bond sent certified mail to the Surety at the above address, accompanied by the Obligee's statement of the amount due, will result in payment of the claimed amount to the Obligee by the Surety or the Principal within twenty (20) days of such mailing.

Oakwood Homes 98

20

3.    Failure to reimburse or pay the Obligee as herein provided shall cause the Principal and the Surety to be additionally liable for any and all reasonable costs and expenses, including attorney's fees, incurred by the Obligee in enforcing this bond, such liability shall be in addition to the bond penalty.

4.    Without limiting the provisions of paragraph 3 above, multiple claims are permitted on this bond up to the total bond penalty in the aggregate.

5.    Forbearance by the Obligee in enforcing any conditions of the Agreement or this bond shall not waive or abridge any right of the Obligee hereunder. Extensions of time granted the Principal, or other changes or modification to the Agreement, shall not change or diminish the obligation of this bond and the Surety hereby waives notice of them.

6.    This bond may be canceled by the Surety by sending advance written notice by certified mail to the Obligee at the address stated above, stating when, not less than 60 days thereafter, such cancellation shall be effective. It is understood that if this bond is to be canceled by the Surety, the Principal is obligated under the Agreement to provide the Obligee substitute collateral in an amount not less than the face amount of this bond and form acceptable to the Obligee not later than thirty (30) days prior to the effective date of cancellation. If the Principal fails to deliver such substitute collateral at least thirty (30) days prior to the effective date of such cancellation, then the Obligee may claim the full penal amount of this bond and hold and apply such amount to secure, cover and pay when due any and all obligations of the Principal to the Obligee under and pursuant to the Agreement. Following the effective date of cancellation, the liability of the Surety shall cease except for claims made upon the Surety prior to the effective date of such cancellation (1) for amounts due to the Obligee pursuant to the Agreement or (2) for the full penal amount for failure to tender substitute collateral.

Signed and sealed by the Principal and the Surety on the _____ day of _____.

Principal

By _____

Name: _____

Title: _____

Surety

By _____

Name:_____

Title:_____

Oakwood Homes 98

21

AMENDMENT #2  INDEMNITY AGREEMENT DATED July 1, 1998
BETWEEN
UNITED STATES FIDELITY AND GUARANTY
AND
OAKWOOD HOMES CORPORATION

**Section VI. D. is amended to read:**

D.    The original amount of security provided by Insured for the period July 1, 1998 to July 1, 2001, shall be in the aggregate amount of $13,000,000 which is the combined amount of security for:

1. Insured's SFR obligations under this Agreement; and

2. Insured's obligations under separate Premium and Loan Agreements between Company and Insured dated July 1, 1998, July 1, 1999, and July 1, 2000.

The amount security will be adjusted subsequently as follows:

1.    <u>Increases</u>

Whenever the sum of Insured's past, present or future Outstanding SFR Obligations as stated in items A.1. and 2. under this Section VI exceeds the current amount of security provided by Insured to Company hereunder or under any other Agreement with respect to such Outstanding SFR Obligations, Insured will obtain an increase in the amount of such security within thirty (30) calendar days equal to the difference between such Outstanding SFR Obligations and the amount of the then current security in the form of Letters of Credit or other collateral acceptable to Company.

2.    <u>Decreases</u>

As of the first anniversary of the termination date of the Policy and on each anniversary thereafter, Company will allow a reduction in the then current amount of security if such amount is

greater than the Retention Obligations valued at such anniversary dates. In such event, Company will execute any document necessary to order a reduction in the amount of the then current security to equal the difference, if any, within sixty (60) calendar days after such anniversary.

For purposes of adjusting the amount of security by Company, as provided in 1. and 2. above, Insured will render to Company on October 1, 1998, and within thirty (30) days from the end of each calendar quarter thereafter, a statement of the estimated Ultimate Retained Losses valued at such times for the applicable Policy periods as set out in Schedule A attached hereto. The statement of estimated Ultimate Retained Losses shall contain actual paid losses, the Case Reserves, the IBNR, and the Claim Expenses (paid and reserved).

**Schedule A is amended to include the following additional policies:**

| POLICY NUMBER | SFR | POLICY PERIOD |
|---|---|---|
| DRE 3125900 | Workers Comp. & Empl. Liab.<br>$500,000 BI Each Accident<br>$500,000 BI by Disease, Each Employee | July 1, 2000 to<br>July 1, 2001 |

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives this ____ day of _____, 2000.

ATTEST:      UNITED STATES FIDELITY AND GUARANTY COMPANY

By: _____

Title: _____ Vice President _____

ATTEST:      INSURED

By: _____

Title: _____ Risk Manager _____

AMENDMENT #3  INDEMNITY AGREEMENT DATED July 1, 1998
BETWEEN
UNITED STATES FIDELITY AND GUARANTY
AND
OAKWOOD HOMES CORPORATION

EFFECTIVE DATE: JULY 1, 2001

1.    **Section VI. D. is amended to read:**

D.    The original amount of security provided by Insured for the period July 1, 1998 to July 1, 2002, shall be in the aggregate amount of $16,000,000 which is the combined amount of security for:

1. Insured's SFR obligations under this Agreement; and

2. Insured's obligations under separate Premium and Loan Agreements between Company and Insured dated July 1, 1998, July 1, 1999, July 1, 2000 and July 1, 2001.

The amount security will be adjusted subsequently as follows:

1.    Increases

Whenever the sum of Insured's past, present or future Outstanding SFR Obligations as stated in items A.1. and 2. under this Section VI exceeds the current amount of security provided by Insured to Company hereunder or under any other Agreement with respect to such Outstanding SFR Obligations, Insured will obtain an increase in the amount of such security within thirty (30) calendar days equal to the difference between such Outstanding SFR Obligations and the amount of the then current security in the form of Letters of Credit or other collateral acceptable to Company.

2.    Decreases

As of the first anniversary of the termination date of the Policy and on each anniversary thereafter, Company will allow a reduction in the then current amount of security if such amount is

greater than the Retention Obligations valued at such anniversary dates. In such event, Company will execute any document necessary to order a reduction in the amount of the then current security to equal the difference, if any, within sixty (60) calendar days after such anniversary.

For purposes of adjusting the amount of security by Company, as provided in 1. and 2. above, Insured will render to Company on October 1, 1998, and within thirty (30) days from the end of each calendar quarter thereafter, a statement of the estimated Ultimate Retained Losses valued at such times for the applicable Policy periods as set out in Schedule A attached hereto. The statement of estimated Ultimate Retained Losses shall contain actual paid losses, the Case Reserves, the IBNR, and the Claim Expenses (paid and reserved).

2.    **Schedule A is amended to include the following additional policies:**

| POLICY NUMBER | SFR | POLICY PERIOD |
|---|---|---|
| D 111W00002 | Workers Comp. & Empl. Liab. $500,000 BI Each Accident $500,000 BI by Disease, Each Employee | July 1, 2001 to July 1, 2002 |
| D 111W00004 | Workers Comp. & Empl. Liab. $500,000 BI Each Accident $500,000 BI by Disease, Each Employee | July 1, 2001 to July 1, 2002 |
| D 111A00002 | Automobile Liability $250,000 Each Accident | July 1, 2001 to July 1, 2002 |
| D 111A00003 | Automobile Liability $250,000 Each Accident | July 1, 2001 to July 1, 2002 |

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives this ____ day of _____, 2001.

ATTEST:     UNITED STATES FIDELITY AND GUARANTY COMPANY

_____     By: _____

                                  Title: _____Vice President_____

ATTEST:    INSURED

                                  By: _____

                                  Title: _____

# EXHIBIT B

# PREMIUM AND LOAN PLAN AGREEMENT

This Premium and Loan Plan Agreement ("Agreement") is entered into this first day of July, 2001, by and between United States Fidelity and Guaranty Company and/or the property casualty insurance company affiliates and subsidiaries issuing the policy(ies) hereunder (hereinafter referred to individually or collectively as "we", "our" or "ours") and Oakwood Homes Corporation with offices at P.O. Box 27801, Greensboro, North Carolina 27425 (hereinafter referred to as "you" or "yours").

WHEREAS, we have issued or will issue certain insurance policies (hereinafter, together with endorsements thereof, "the Policies") which are set forth together with policy periods in Schedule A attached hereto and incorporated herein by this reference as if set out in full; and

WHEREAS, the premiums for the insurance under the Policies are determined and payable in accordance with the terms of such Policies; and

WHEREAS, you and we have agreed to utilize a Premium and Loan Plan (hereinafter referred to as the "Plan") to permit full payment of premiums through a combination of cash installments and the proceeds of a secured loan (hereinafter referred to as the "Loan") and;

WHEREAS, because the total premium under the Policies will be paid by you and booked by us and because a portion of that premium will have been paid by the proceeds of the Loan, proper accounting practices require us to secure the Loan; and

WHEREAS, an Incurred Loss Retrospective Rating Program (hereinafter referred to as the "Retro Program") as described under the Policies and under a separate Retrospective Rating Endorsement (hereinafter referred to as the "Retro Endorsement") between you and us will be utilized to adjust the premiums under the Policies.

NOW, THEREFORE, for good and other valuable consideration, receipt of which is hereby acknowledged, we and you agree as follows:

I.    APPLICATION OF AGREEMENT

This Agreement shall apply to and shall run concurrently with the coverages (subject to the Retro Program) under the Policies, continuing in full force and effect until terminated in accordance with the provisions of Section V. below.

1

Premium and Loan Plan Agreement

II.    **COLLECTION OF PREMIUMS**

We will collect a total amount of premium cash payments which equals $26,543 from you during the term of the Policy as follows:

| Amount of Premium Cash Installment | Due Date |
|---|---|
| $5308 | 7/1/2001 |
| $4247 | 8/1/2001 |
| $4247 | 9/1/2001 |
| $4247 | 10/1/2001 |
| $4247 | 11/1/2001 |
| $4247 | 12/1/2001 |

The remainder of the premiums under the Policies which equals $313,732 will be paid with the proceeds of a Loan from us.

III.    **LOSS PAYMENT FUND**

You, or your approved Claims Administrator on your behalf, will establish a Loss Payment Fund Account (hereinafter referred to as "Loss Payment Fund") at the inception of the Policies for the purpose of paying losses and loss adjustment expenses (as such term is defined in the Policies) within the loss limits (hereinafter referred to as "Retro Loss Limits") that are included under the Retro Program. At the inception of the Policies and at the beginning of each month thereafter, the amount of the Loss Payment Fund will equal an amount which represents a good faith estimate of two and one half months of expected paid losses and loss adjustment expenses within the Retro Loss Limits. Monthly, you or your approved Claims Administrator, shall provide us with a statement of losses and loss adjustment expense within the Retro Loss Limits paid from the Loss Payment Fund in the previous month.

IV.    **SECURITY AND LOAN ADJUSTMENTS**

A.    You will provide us with security for the performance of the following:

1.    Payment of the Loan applicable to policy periods as set forth in Schedule A attached hereto; and

2.    Your past, present and future obligations to us or our affiliates and subsidiaries with respect to premium and loan plans or self-funded retention programs underwritten by Discovery Managers,

2

Premium and Loan Plan Agreement

Ltd. on our behalf or our affiliates and subsidiaries which are associated with policies not included in Schedule A attached hereto.

Such security will be provided to us at all times while this Agreement is in effect or while any obligation indicated in Paragraph 2. above remains in effect. Such security shall be in the form of a Letter of Credit, cash or other collateral acceptable to us.

B.    In the event that you furnish us with a Letter or Letters of Credit as security under Paragraph A. above, the Letter or Letters of Credit shall be issued in our favor by a bank approved by us, which is not a parent, subsidiary or affiliate of you. The Letter of Credit shall conform to the requirements indicated in Section VI. B. of the Indemnity Agreement dated July 1, 1998 between Company and Insured.

C.    In the event that Insured furnishes Company with a Performance Bond(s) as security under Paragraph A. above, such bond(s) shall be issued in favor of Company, as obligee, by a Surety approved by Company, which is not a parent, subsidiary or affiliate of Insured, as Principal. The Performance Bond shall conform to the requirements indicated in Section VI. C. of the Indemnity Agreement dated July 1, 1998 between Company and Insured.

D.    The security amount shall include the amount of the Loan. The original amount of security provided by you shall be in the aggregate amount of $16,000,000. The Loan amount will be subsequently adjusted as follows:

1.    On or about January 1, 2003 and annually thereafter we shall perform an incurred loss retrospective premium adjustment for the Policies pursuant to the terms of the Policies and the Retro Endorsement. Concurrently with each such retrospective rating adjustment, a Loan Adjustment Calculation will be performed by us (until the Loan Closing Calculation described in 2. below). The Loan Adjustment Calculation shall be the combined difference between:

a.    the incurred loss retrospective premium so calculated, at the time of each such Loan Adjustment Calculation and

b.    the amount of cash (cash premium installments for the Policies pursuant to Section II above and reimbursed losses and loss adjustment expenses within the Retro Loss Limits pursuant to Section III above) we have received from you as of the time of such Loan Adjustment Calculation that will become the new face

3

Premium and Loan Plan Agreement

amount of the Loan. The amount of collateral allocable to the Loan will be amended to reflect such revised face amount of the Loan. We will execute any document necessary to order a reduction in the amount of the then current collateral, to reflect the revised face Loan amount, within thirty (30) days after such computation.

2. On January 1, 2007, we shall perform a fifth incurred loss retrospective premium adjustment for the Policies pursuant to the terms of the Policies and the Retro Endorsement. Concurrently with such retrospective premium adjustment, a Loan Closing Calculation will be performed by us. The combined difference between the incurred loss retrospective premium so calculated and the amount of cash (cash premium installments for the Policies pursuant to Section II above and reimbursed losses and loss adjustment expenses within the Retro Loss Limits pursuant to Section III above) we have received from you as of the time of such closing calculation will be due to us by you in cash. You will pay us such difference in cash within thirty (30) days after our billing date. Within thirty (30) days of receipt of your payment in full, we will return the portion of the then current amount of collateral allocable to the Loan to the issuing bank or surety company. Such payments shall discharge your obligations under this Plan only. You may have continuing obligations to pay additional premiums generated from future incurred loss retrospective premium adjustments pursuant to the terms of the Policies and the Retro Endorsement. Payments under this Plan do not discharge you from such continuing obligations. All bills for any additional premiums generated from future incurred loss retrospective premium adjustments will be settled in cash.

E. The security furnished to us under this Agreement may be executed, immediately drawn upon or made claim upon in whole or in part, as the case may be, by us only under the following circumstances:

1. Your failure to pay amounts due under this Agreement;

2. Your failure to deliver or cause to be delivered a replacement Letter of Credit or other security, after receipt of notice from us of the non-renewal of a Letter or Letters of Credit or other security, pursuant to the terms and provisions of Section IV.B. and IV.C. above, in which case we may draw fully upon the unexpired Letter or Letters of Credit or other security for which it has received notice of non-renewal;

3. Your failure to deliver or cause to be delivered a replacement Letter of

4

Credit or other security, after a bank which has issued a Letter or Letters of Creditor other security becomes unacceptable to us, pursuant to the terms and provisions of Section IV.B. and IV.C. above, in which case we may draw fully upon such Letter or Letters of Credit or other security;

In the event that we draw down on the Letter or Letters of Credit or other security pursuant to either Subparagraphs 2, or 3 of this Paragraph E., we shall be free to hold the proceeds thereof as security until it receives acceptable collateral or Letters of Credit or notation adjustment, as the case may be. If you subsequently furnish an acceptable replacement Letter or Letters of Credit or notation adjustment, or other security as the case may be, we shall return the proceeds of such draw(s) from the date of such draw(s), within five (5) business days of receipt of written directions indicating to whom such return shall be made, signed and verified by your duly authorized officers. Any drawing against a Letter of Credit or other security, whether under this Paragraph E. or in order to realize upon the security for the Loan, shall reduce the amount of the obligations secured thereby to the extent of the drawing.

V.    SPECIAL PLAN TERMINATION PROVISIONS

The following are additional conditions of the Plan. A breach of any of these conditions shall terminate the Plan, in which case you will make immediate payment in full of all outstanding Loan balances:

A.    This plan is designed to accommodate your needs and ours within the framework of insurance accounting practices, corporate obligations and legal requirements. If the Plan ceases to conform to any of these obligations, or if we are required by a governmental authority to discontinue it, the Plan will be terminated.

B.    This Loan shall become immediately due and payable in the event of your bankruptcy, insolvency, liquidation or dissolution or in the event of your default in the payment of any of your obligations to us or if we shall deem ourselves insecure for any reason whatsoever. In the event that collection proceedings are reasonably necessary to collect (whether from you, your surety company or issuer of a Letter of Credit as the case may be), any obligation under this agreement, any bond or Letter of Credit, you will pay all reasonable expenses, including attorney fees, of such collection. Delay by either us or you in exercising any right or power under this Agreement shall not constitute a waiver by that party of such right or power.

5

Premium and Loan Plan Agreement

VI.    ATTORNEY'S FEES

In the event any action is commenced to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs incurred therein.

VII.    WAIVERS

Forbearance, neglect or failure by us to enforce any and all of the provisions of this Agreement or to insist upon strict compliance by you shall not be construed as a waiver of any of our rights or privileges. A waiver of any past act or circumstances shall not constitute or be a course of conduct or waiver of any subsequent action or circumstances.

VIII.    ASSIGNMENT

This Agreement is not assignable by any party, without the prior written consent of all parties.

IX.    ENTIRETY OF AGREEMENT

This Agreement supersedes all previous Premium and Loan Plan Agreements between you and us as to the subject matter covered by this Agreement, and any prior statements, agreements or representations between the parties are terminated and no longer of any force and effect. This Agreement applies to, and shall inure to the benefit of, the parties hereto, their successors and assigns.

X.    APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut, without regard to its rules regarding conflict of laws.

XI.    CONSENT TO JURISDICTION

To the extent that any legal action, suit or proceeding arises out of or relates to this Agreement or the transactions contemplated hereby, the parties hereto irrevocably submit to the jurisdiction of the state courts of the State of Connecticut or any Federal court located in the State of Connecticut to hear and determine such action, suit or proceeding. Each party agrees not to assert as a defense in any such action, suit or proceeding, any claim that is not subject personally to the jurisdiction of such court; that its property is exempt or immune from attachment or execution; that the action, suit or proceeding is brought in an inconvenient forum; that the

6

venue of the action, suit or proceeding is improper; or that this Agreement or the subject matter hereof may not be enforced in or by such court.

XII.   NOTICES

All requests and notices hereunder shall be in writing and shall be sufficient in all respects if sent by certified or registered mail, if to us:

> United States Fidelity and Guaranty Company
>
> c/o Discovery Managers, Ltd.
> 30 Waterside Drive
> Farmington, Connecticut 06032
>
> Attention:   Compliance Officer

and if to you:

> Oakwood Homes Corporation
> P.O Box 27081
> Greensboro, NC 27425-7081
> Attn: Risk Manager

All statements, reports, requests and notices hereunder shall be deemed given when received.

7

Premium and Loan Plan Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives this _____ day of _____, 2001.

ATTEST:                           UNITED STATES FIDELITY AND GUARANTY COMPANY

By: _____

Title: _____Vice President_____

ATTEST:                           INSURED

By: _____

Title:_____FNP_____

8

SCHEDULE A

<u>POLICY NUMBER</u>

D111W00003

<u>POLICY PERIOD</u>

July 1, 2001 to July 1, 2002

Premium and Loan Plan Agreement

## SCHEDULE B

## REQUIRED LETTER OF CREDIT

Issue Date: _____

Irrevocable Clean
Letter of Credit No. _____

To Beneficiary:     United States Fidelity and Guaranty Company
c/o Discovery Managers, Ltd.
30 Waterside Drive
Farmington, Connecticut 06032

Attention:     Credit Officer

We have established this clean, irrevocable, and unconditional Letter of Credit in your favor as beneficiary for drawings up to U.S. $_____ effective immediately. This Letter of Credit is issued, presentable and payable at our office at (issuing bank address) and expires with our close of business on _____. Except when the amount of this Letter of Credit is increased, this Credit cannot be modified or revoked without your consent.

The term "Beneficiary" includes any successor by operation of law of the named Beneficiary. If a court of law appoints a successor in interest to the named beneficiary, then the named beneficiary includes and is limited to the court appointed domiciliary receiver (including conservator, rehabilitator or liquidator).

We hereby undertake to promptly honor your sight draft(s) drawn on us, indicating our Credit No._____, for all or any part of this Credit upon presentation of your draft drawn on us at our office specified in paragraph one on or before the expiration date hereof or any automatically extended expiry date.

Except as expressly stated herein, our undertaking is not subject to any agreement, requirement or qualification. The obligation of (issuing bank) under this Credit is the individual obligation of (issuing bank) and is in no way contingent upon reimbursement with respect thereto, or upon our ability to perfect any lien, security interest or any other reimbursement.

Page 1 of 2

10

Premium and Loan Plan Agreement

This Letter of Credit is deemed to be automatically extended without amendment for one year from the expiration date or any future expiration date, unless thirty days prior to such expiration date, we notify you by registered or certified mail that this Letter of Credit will not be renewed for any such additional period.

This Letter of Credit is subject to the 1993 Revision of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce (Publication No. 500). If this Credit expires during an interruption of business as described in Article 17 of said Publication 500, the bank hereby specifically agrees to effect payment if this Credit is drawn against within 30 days after the resumption of business.

Very truly yours,

_____

(issuing bank)

Page 2 of 2

11

Premium and Loan Plan Agreement

# EXHIBIT C

Operations Group
Northern California
525 Market Street, 25th Floor
San Francisco, CA 94105

PAGE: 1

DATE: MAY 15, 2002

AMENDMENT TO CREDIT NO.
NZS434156
AMENDMENT NUMBER: 2

APPLICANT:
OAKWOOD HOMES CORPORATION
7800 MCCLOUD ROAD
GREENSBORO 27409-9634, NEW CALEDONIA

OAKWOOD HOMES

BENEFICIARY:
UNITED STATES FIDELITY & GUARANTY
COMPANY C/O DISCOVERY MANAGERS, LTD
5 BATTERSON PARK RD., FARMINGTON
CT 06032 ATTN: CREDIT OFFICER

THIS AMENDMENT IS TO BE CONSIDERED AS PART OF THE ABOVE CREDIT AND MUST BE
ATTACHED THERETO.

THE ABOVE MENTIONED CREDIT IS AMENDED AS FOLLOWS:

THE AMOUNT OF THIS CREDIT HAS BEEN INCREASED BY USD 4,500,000.00.

THE AMOUNT OF THE CREDIT ISSUED NOW TOTALS USD 9,500,000.00.

THE FOLLOWING ADDITIONAL CONDITION HAS BEEN ADDED:

THE EFFECTIVE DATE OF THE INCREASED AMOUNT FROM USD5,000,000.00 TO
USD9,500,000.00 IS FROM MAY 31, 2002.

ALL OTHER TERMS UNCHANGED.

AUTHORIZED SIGNATURE

PLEASE CONTACT IRENE KWAN BY TELEPHONE AT 415-396-8131 OR BY FAX AT
(415)284-9453 REGARDING ANY INQUIRIES.

Customer Copy - Not Original Instrument

JUN-12-2002 WED 10:42 AM TRADE BANK                    FAX NO. 4152849453                    P. 03/05



International Trade Services
525 Market Street, 25th Floor
San Francisco, CA 94105

# WELLS FARGO BANK, N.A.
## TRADE SERVICES DIVISION, NORTHERN CALIFORNIA
### 525 MARKET STREET, 25TH FLOOR
### SAN FRANCISCO, CALIFORNIA 94105
### 1 800 798 2815 OPTION 1
### Fax : (415)284-9453
Email : sftrade@wellsfargo.com

## IRREVOCABLE STANDBY LETTER OF CREDIT

Date:  March 19, 2002

Amount: US$5,000,000.00                    Expiration: July 1, 2002

Our Letter of Credit No. NZS434156

**Beneficiary:**                                **Applicant:**
United States Fidelity & Guarantee             Oakwood Homes Corporation
Company                                        7800 McCloud Road
c/o Discovery Managers, Ltd.                   Greensboro, NC 27409-9634
5 Batterson Park Rd.
Farmington, CT 06032

Attention : Credit Officer

Gentlemen:

We hereby establish this irrevocable Letter of Credit in your favor for drawings up to US$5,000,000.00 (Five Million United States Dollars) effective immediately. This Letter of Credit is issued, presentable and payable at our above office and expires at our above-mentioned office with our close of business on July 1, 2002. Except when the amount of this Letter of Credit is increased, this Letter of Credit cannot be modified or revoked without your consent.

Except as otherwise herein provided, this Letter of Credit is unconditional.

1

*This is an integral part of our Letter of Credit No. NZS434156*          **Page 2**

The term "Beneficiary" includes any successor by operation of law of the named beneficiary including, without limitation, any liquidator, rehabilitator, receiver or conservator.

We hereby undertake to promptly honor your sight draft(s) drawn on us, indicating our Credit No. NZS434156 , for all or any part of this Credit if presented at Wells Fargo Bank, N.A., Trade Services Division, Northern California, 525 Market Street, 25th Floor, San Francisco, CA 94105 on or before the expiration date or any automatically extended expiration date.

Drafts hereunder must be marked "Drawn under Wells Fargo Bank, N.A. Letter of Credit No. NZS434156 dated March 19, 2002."

Except as expressly stated herein, this undertaking is not subject to any agreement, condition or qualification. Our obligation under this Letter of Credit shall be our individual obligation and is in no way contingent upon the reimbursement with respect thereto, our upon our ability to perfect any lien, security interest or any other reimbursement.

It is a condition of this Letter of Credit that it is deemed to be automatically extended without amendment for one year from the expiry date hereof, or any future expiration date, unless at least thirty (30) days prior to such expiration date, we notify you by registered mail or overnight courier that this Letter of Credit will not be renewed for any additional period.

**This Letter of Credit is issued in replacement of Letter of Credit number S4172500 issued by First Union National Bank dated June 18, 2001 ( "First Union Letter of Credit").**

**This letter of credit is inoperative** but shall automatically become operative upon our receipt at our Trade Services Division, Northern California, 525 Market Street, 25th Floor, San Francisco, California, Attention: Jai Chaudhary, Manager Standby Unit, [ fax number (415)284-9453 or (415)541-0299 ] of a fax confirmation from you stating that you have agreed to the cancellation of the First Union Letter of Credit.

JUN-12-2002 WED 10:42 AM TRADE BANK          FAX NO. 4152849453          P. 05/05

*This is an integral part of our Letter of Credit No. NZS434156*          **Page 3**

Except as otherwise stated herein, this Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication Number 500. However, if this Credit expires during an interruption of business as described in Article 17 we hereby specifically agree to effect payment if the Letter of Credit is drawn against within 30 days after the resumption of business.

Very truly yours,

**WELLS FARGO BANK, N.A.**

By: _____
(Authorized Signature)
JAMES SINGH

3

Operations Group
Northern California
525 Market Street, 25th Floor
San Francisco, CA 94105

PAGE: 1

DATE: MARCH 28, 2002

AMENDMENT TO CREDIT NO.
NZS434156
AMENDMENT NUMBER: 1

APPLICANT:
OAKWOOD HOMES CORPORATION
7800 MCCLOUD ROAD
GREENSBORO 27409-9634, NEW CALEDONIA

OAKWOOD HOMES

BENEFICIARY:
UNITED STATES FIDELITY & GUARANTY
COMPANY C/O DISCOVERY MANAGERS, LTD
5 BATTERSON PARK RD., FARMINGTON
CT 06032 ATTN: CREDIT OFFICER

THIS AMENDMENT IS TO BE CONSIDERED AS PART OF THE ABOVE CREDIT AND MUST BE
ATTACHED THERETO.

THE ABOVE MENTIONED CREDIT IS AMENDED AS FOLLOWS:

THIS CREDIT HAS BEEN RENDERED OPERATIVE.

ALL OTHER TERMS UNCHANGED.

------------------------------
AUTHORIZED SIGNATURE

PLEASE CONTACT IRENE KWAN BY TELEPHONE AT 415-396-8131 OR BY FAX AT
(415)284-9453 REGARDING ANY INQUIRIES.

Customer Copy - Not Original Instrument

JUN-12-2002 WED 10:42 AM TRADE BANK          FAX NO. 4152849453          P. 02/05

Operations Group
Northern California
525 Market Street, 25th Floor
San Francisco, CA 94105

PAGE: 1

DATE: MAY 15, 2002

AMENDMENT TO CREDIT NO.
NZS434156
AMENDMENT NUMBER: 2

APPLICANT:
OAKWOOD HOMES CORPORATION
7800 MCCLOUD ROAD
GREENSBORO 27409-9634, NEW CALEDONIA

OAKWOOD HOMES

BENEFICIARY:
UNITED STATES FIDELITY & GUARANTY
COMPANY C/O DISCOVERY MANAGERS, LTD
5 BATTERSON PARK RD., FARMINGTON
CT 06032 ATTN: CREDIT OFFICER

THIS AMENDMENT IS TO BE CONSIDERED AS PART OF THE ABOVE CREDIT AND MUST BE
ATTACHED THERETO.

THE ABOVE MENTIONED CREDIT IS AMENDED AS FOLLOWS:

THE AMOUNT OF THIS CREDIT HAS BEEN INCREASED BY USD 4,500,000.00.

THE AMOUNT OF THE CREDIT ISSUED NOW TOTALS USD 9,500,000.00.

THE FOLLOWING ADDITIONAL CONDITION HAS BEEN ADDED:

THE EFFECTIVE DATE OF THE INCREASED AMOUNT FROM USD5,000,000.00 TO
USD9,500,000.00 IS FROM MAY 31, 2002.

ALL OTHER TERMS UNCHANGED.

AUTHORIZED SIGNATURE

PLEASE CONTACT IRENE KWAN BY TELEPHONE AT 415-396-8131 OR BY FAX AT
(415)284-9453 REGARDING ANY INQUIRIES.

Branch Copy

# EXHIBIT D

# MARSH

**Kathy L. Belk**
Client Representative

Marsh USA Inc.
100 North Tryon Street
Suite 3200
Charlotte, NC 28202
704 343 7122  Fax  704 376 0404
Kathy.Belk@marsh.com
www.marsh.com

March 24, 2004

Mr. Joe Buczkowski
Risk Manager
Oakwood Homes Corporation
PO Box 27081
Greensboro, NC  27425-7081

Subject:
**Audits**
**Effective July 1, 2001 to July 1, 2002**

Dear Joe,

Enclosed, please find the following Audits for the policy term **July 1, 2001 to July 1, 2002**:

➢ **Workers Compensation (All other States)** which generated an **additional premium of $1,981.**
Our invoice no. 286144 is enclosed as well.
➢ **Workers Compensation (NJ)** – the additional premium due for this audit is included in the
above invoice.
➢ Workers Compensation (NV, OR) – this audit will be included in the Retro Adjustment
forthcoming from Discover Re.
➢ **Automobile Audit for All other States and Texas** which generated a **credit of $41,208.** Our
invoice no. 286145 is also enclosed.

The **difference between the Workers Compensation Audits and Automobile Audits is a credit of**
**$39,227 due Oakwood Homes.** Also included is a summary page showing a comparison of
estimated payrolls/autos and audited payrolls/autos.

Please look these over and advise if you agree with the audits. Should you have any questions,
please do not hesitate to call.

Sincerely,

*Kathy Belk*

Kathy L. Belk
Client Representative

*Requested check*
*3/30/04 – 10:30A*

MMC  Marsh & McLennan Companies



5 Batterson Park Road
Farmington, CT. 06032 PH: 860-674-2660 Fax: 860-674-2670

**Invoice**

41056    06/06/2003    1

Bill to:    (Original Billing)
Joe Marley
Marsh, Inc.
100 North Tryon Street
Suite 3200
Charlotte, NC 28202

# INVOICE

| Account Name | Effective Date | Expiration Date | Line of Business |
|---|---|---|---|
| Oakwood Homes Corporation | 07/01/2001 | 07/01/2002 | Auto Liability |

Policy Number(s)
D111A00002
D111A00003

| | |
|---|---|
| Gross Premium | -$41,208 |
| Less: Broker Expenses | 0 |
| Plus: Surcharges & Assessments | 0 |
| Total Amount Due | $-41,208 |

| Payment Type | Payment # | Due Date | Amount Due |
|---|---|---|---|
| Premium | 1 | 06/30/2003 | -41,208 |
| | | Total | $-41,208 |

Remit to
Checks:  Discovery Managers, Ltd.  PO Box 19095  Newark, NJ  07195-0095
Wires:  ABA: #021-000-018  Account: #890-0252-855  Account Name: Discovery Managers, Ltd.
Broker ID: 853

Final Audit Adjustment

# UNITED STATES FIDELITY AND GUARANTY COMPANY
## STATEMENT OF
## PREMIUM AUDIT ADJUSTMENT

**INSURED:** Oakwood Home Corporation

**POLICY PERIOD:**
**FROM:** 7/1/2001 **TO:** 7/1/2002

**PRODUCER:** Discovery Managers, Ltd

**AUDIT PERIOD:**
**FROM:** 7/1/2001 **TO:** 7/1/2002

| Company: USF&G | Policy Number: D111A00002 | Type: | Automobile Liability |
| | D111A00003 | | |

| | |
|---|---|
| Estimated: | 940 |
| Ending: | 669 |
| Average: | 805 |
| Rate: | 305.23 |
| Earned Premium: | 245,710 |

| | |
|---|---|
| Deposit Premium: | $286,918 |
| Earned Premium: | $245,710 |
| **Return Premium:** | **$41,208** |



5 Batterson Park Road
Farmington, CT. 06032  PH: 860-674-2660 Fax: 860-674-2670

**Invoice**

41621    07/02/2003    1

*Bill to:*    *(Original Billing)*
Joe Marley
Marsh, Inc.
100 North Tryon Street
Suite 3200
Charlotte, NC 28202

# INVOICE

| Account Name | Effective Date | Expiration Date | Line of Business |
|---|---|---|---|
| Oakwood Homes Corporation | 07/01/2001 | 07/01/2002 | Workers Compensation |

Policy Number(s)
D111W00002
D111W00004

| | |
|---|---|
| Gross Premium | $4,392 |
| Less: Broker Expenses | 0 |
| Plus: Surcharges & Assessments | -2,411 |
| Total Amount Due | $1,981 |

| Payment Type | Payment # | Due Date | Amount Due |
|---|---|---|---|
| Premium | 1 | 08/02/2003 | 4,392 |
| Surcharge & Assessment | 1 | 08/02/2003 | -2,411 |
| | | Total | $1,981 |

**Remit to**
Checks:  Discovery Managers, Ltd.  PO Box 19095  Newark, NJ  07195-0095
Wires:    ABA: #021-000-018      Account: #890-0252-855    Account Name: Discovery Managers, Ltd.
Broker ID:  853

final audit premium due

**Oakwood Homes Corporation**
**Workers Compensation SFR**
**Premium Audit Adjustment**
**7/1/01 to 7/1/02**

### Earned Premiumn Calculation

| | |
|---|---|
| 249,144,320 | D111W00002 All Other States |
| 110,734 | D111W00004  NJ |
| 249,255,054 | |
| .152 | program composite rate |
| $378,868 | total premium |
| $160 | Plus NJ Expense Constant not previously billed |
| $379,028 | |

### Audited Surcharges & Assessments

| | |
|---|---|
| $43,802 | D111W00002 All Other States |
| $333 | D111W00004  NJ |
| $44,135 | |

### TOTALS

| | Premium | Surcharges & Assessments | Total |
|---|---|---|---|
| Earned | $379,028 | $44,135 | $423,163 |
| Estimated | $374,636 | $46,546 | $421,182 |
| Amount Due | $4,392 | ($2,411) | $1,981 |

6/6/03