# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Chapter 11 |
| OAKWOOD HOMES CORPORATION, <u>et</u> <u>al</u>., | ) | |
| | ) | Case No. 02-13396 (PJW) |
| Debtors. | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, by and through Alvarez & Marsal, LLC, the OHC Liquidation Trustee, | ) | |
| | ) | |
| | ) | |
| | ) | Adv. Pro. No. 05-51766 (PJW) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISCOVER RE and UNITED STATES FIDELITY & GUARANTY CO., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OHC LIQUIDATION TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE

Donna L. Culver (#2983)
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

-and-

Emilio A. Galván
Robert Stark
Dana S. Montone
Brown Rudnick Berlack Israels LLP
Seven Times Square
New York, New York  10036
(212) 704-0100

Attorneys for OHC Liquidation Trust, by and through Alvarez & Marsal LLC, the OHC Liquidation Trustee

June 27, 2006

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF CITATIONS ...............................................................................ii

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ..................................................................... 3

    A.    Background................................................................................. 3

    B.    The Policies And Agreements ............................................... 4

    C.    Oakwood's Security Held By Discover Re ......................... 4

NATURE AND STAGE OF THE PROCEEDING .................................... 6

ARGUMENT ............................................................................................ 7

    A.    The Applicable Legal Standard .......................................... 7

    B.    Mandatory Withdrawal Of The Reference Does Not Apply .............. 7

    C.    "Cause" For Permissive Withdrawal Of The Reference
            Does Not Exist ...................................................................... 9

CONCLUSION ......................................................................................... 17

# TABLE OF CITATIONS

**Page(s)**

**Cases**

Adams v. Med. Accounts Receivable Solutions, Inc.
(In re Coram Healthcare Corp.), Nos. 00-3299, Adv. 03-53964,
2003 WL 22948234 (Bankr. D. Del. Dec. 12, 2003)............................................. 13

Beard v. Braunstein,
914 F.2d 434 (3d Cir. 1990) ....................................................................................9, 16

Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp.,
106 B.R. 367 (D. Del. 1989)................................................................................ 8, 9, 16

Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.,
107 B.R. 34 (D. Del. 1989).....................................................................................9, 16

In re Homeland Stores, Inc.,
204 B.R. 427 (D. Del. 1997)....................................................................................... 9

In re Pruitt,
910 F.2d 1160 (3d Cir. 1990) ............................................................................... 10, 11

Montgomery Ward, LLC v. Smith Protective Servs., Inc.
(In re Montgomery Ward LLC), Nos. 00-4667, 02-10052, Civ.A. 04-229,
2004 WL 2537080 (D. Del. Nov. 4, 2004)................................................................ 11

NVF Co. v. New Castle County,
276 B.R. 340 (D. Del. 2002), aff'd, 61 Fed. Appx. 778 (3d Cir. 2003)................ 11

PBGC v. Continental Airlines, Inc. (In re Continental Airlines),
138 B.R. 442 (D. Del. 1992)....................................................................................... 8

PBGC v. Smith Corona Corp. (In re Smith Corona Corp.),
205 B.R. 712 (D. Del. 1996)....................................................................................... 8

Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),
Nos. 01-01430, 01-01063, Civ.A. 04-928, 2004 WL 2713101
(D. Del. Nov. 16, 2004) ............................................................................................. 10

Travelers Cas. & Sur. Co. v. Skinner Engine Co.
(In re American Capital Equipment LLC), 325 B.R. 372 (W.D. Pa. 2005)........... 9

Valley Forge Plaza Assocs. v. Fireman's Fund Ins. Cos.,
    107 B.R. 514 (E.D. Pa. 1989) ..................................................................11, 14, 15

Wakefern Food Corp. v. C & S Wholesale Grocers, Inc.
    (In re Big V Holding Corp.), Nos. 00-04372, 01-758, CIV.A. 01-233,
    2002 WL 1482392 (D. Del. July 11, 2002)................................................................. 7

West Elecs., Inc. v. Nat'l Union Fire Ins. Co. (In re West Elecs., Inc.),
    128 B.R. 900 (Bankr. D.N.J. 1991) ......................................................................... 14

Windsor Commc'ns Group, Inc. v. Grant,
    75 B.R. 713 (E.D. Pa. 1985) ................................................................................... 14

**Statutes**

28 U.S.C. § 157(d) .............................................................................................. 1, 7, 9

28 U.S.C. § 157(b)(2)(A) ........................................................................................ 15

Plaintiff OHC Liquidation Trust (the "OHC Trust"), by and through Alvarez & Marsal, LLC, the OHC Liquidation Trustee (the "Trustee"), created pursuant to the confirmed plan of reorganization of Oakwood Homes Corporation ("Oakwood") and its Chapter 11 debtor affiliates (each a "Debtor" and, collectively, the "Debtors"), respectfully submits this memorandum of law in opposition to the motion to withdraw the reference of defendants Discover Re and United States Fidelity & Guaranty Co. (collectively, the "defendants").

## PRELIMINARY STATEMENT

Defendants' motion to withdraw the reference is a blatantly misguided effort that ignores both the plain language of the applicable statute and the facts and circumstances of the case. As stated more fully below, defendants have not, and cannot, show that this adversary proceeding meets the statutorily defined conditions for mandatory withdrawal, or that the relevant factors for permissive withdrawal weigh in favor of such relief. The motion must therefore be denied.

Defendants ask the court to mandate withdrawal because only "non-bankruptcy" claims remain in this action. But the statutory language regarding mandatory withdrawal provides that the district court "shall . . . so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or other activities affecting interstate commerce." 28 U.S.C. § 157(d) (emphasis added). Thus, a court may mandate withdrawal if consideration of federal law – not state law -  would be required. Here, the only

claims that remain are <u>state law</u> claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Thus, under the plain language of the statute, mandatory withdrawal does not apply.

Defendants' argument for permissive withdrawal fails because the relevant factors that a court must consider do not come close to weighing in favor of withdrawal. To warrant permissive withdrawal, the Court must consider the interests of: (1) promoting uniformity in bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering the economical use of the debtors' and creditors' resources; and (4) expediting the bankruptcy process. Defendants fall woefully short of showing how, in light of these factors, withdrawal could be appropriate. In addition, defendants' argument that because this action is "non-core," the reference should be withdrawn, also falls flat. Although only state-law claims remain, this action is a matter concerning the administration of the estate and, therefore, is a "core" proceeding.

In short, defendants' motion is wholly lacking in merit and should be denied.

## FACTUAL BACKGROUND

**A.    Background**

This action arises out of defendants' wrongful retention of more than $14.5 million that defendants, two insurance companies which issued policies to Oakwood, drew down from a letter of credit and a surety bond that Oakwood had provided to defendants.  Oakwood provided the surety bond and letter of credit to defendants to secure Oakwood's obligations to reimburse them for claims that they paid on Oakwood's behalf.

Oakwood was a major manufacturer and retailer of modular homes in the United States.  See Compl. ¶ 8 (attached as Exhibit A to Defendants' Motion To Withdraw The Reference, hereinafter, the "Motion").   On November 15, 2002 (the "Petition Date"), Oakwood and its Debtor affiliates commenced voluntary cases in this Court pursuant to Chapter 11 of the Bankruptcy Code. See Compl. ¶ 11.   The remaining Debtors filed for Chapter 11 protection on March 5, 2004.  See Compl. ¶ 11.

On March 31, 2004, the Court entered an order confirming the Plan.  See Compl. ¶ 12.  The Plan became effective for most of the Debtors on April 15, 2004 the ("Effective Date").  See Compl. ¶ 12.  Plaintiff OHC Trust is a liquidating trust created pursuant to section 6.3(b) of the Plan.  See Compl. ¶ 13. On or around the Effective Date, the Debtors and the Trustee executed the Trust Agreement, which created the OHC Trust.  See Compl. ¶ 13.  On the Effective Date, pursuant to Section 2.2 of the Trust Agreement and Sections 6.3(b) and (f) of the Plan, the Trust was vested with, among things, the right to prosecute and

settle turnover, avoidance, and all other unsettled estate causes of action on behalf of the holders of the beneficial interests in the Trust.  See Compl. ¶ 14. This action is brought pursuant to this power.

## B.    The Policies and Agreements

The defendants issued workers' compensation, automobile liability, and general liability insurance polices to Oakwood for the period from July 1, 1998, through June 30, 2002 (the "Policies").  See Compl. ¶ 15.  The Policies were issued in conjunction with two agreements – the "Indemnity Agreement" and the "Premium and Loan Plan Agreement" (collectively, the "Agreements") – entered into by Oakwood and USF&G on July 1, 1998.  See Compl. ¶ 21.

The Agreements required Oakwood to provide Discover Re with security to cover Oakwood's reimbursement obligation in connection with Oakwood's self-funded retentions and other obligations under the Premium and Loan Agreement.  See Compl. ¶ 22.  The security that Oakwood provided consisted of a surety bond and a letter of credit.

## C.    Oakwood's Security Held By Discover Re

The letter of credit that Oakwood provided to Discover Re was in the amount of $9.5 million and the surety bond Oakwood provided to Discover Re was in the amount of $6.5 million, for a total of $16 million.  On May 4, 2004, Discover Re had drawn down $750,000 of the letter of credit.    As of June 16, 2004, Discover Re had drawn down the remaining $8,750,000 of the letter of credit.  By May 2004, Discover Re had drawn down on the full amount of the surety bond - $6.5 million.  Thus, Discover Re had drawn down on $16 million of

Oakwood's money more than <u>one-and-a-half years</u> after the Petition Date (November 15, 2002). Since April 15, 2004 – more than two years ago – Discover Re has only made payments to claimants in the aggregate amount of $1,460,000. <u>See</u> Compl. ¶ 2. However, defendants continue to withhold $14,579,000 of Oakwood's money. The last of the Policies expired in June 2002. None of the Policies covered occurrences for which there are likely to be latent injuries. Thus, the vast majority, if not all, of the more than $14.5 million currently being held by Discover Re is unnecessary to secure any conceivable reimbursement obligation on Oakwood's part. Thus, the OHC Trust had repeatedly requested the return of this money, but the defendants have refused.

## NATURE AND STAGE OF THE PROCEEDING

As a result of defendants' wrongful withholding of the OHC Trust's money, the OHC Trust filed the Complaint in this action on June 1, 2005, asserting causes of action for (a) estimation and recovery under §§ 105(a) and 502(c) of the Bankruptcy Code (Count 1); (b) recovery of property under §§ 541 and 542 of the Bankruptcy Code (Count 2); (c) breach of contract under the Agreements (Count 3); (d) breach of the implied covenant of good faith and fair dealing in connection with the Agreements (Count 4); (e) fraudulent transfer under § 544 of the Bankruptcy Code (Count 5); (f) turnover and avoidance under §§ 542 and 550 of the Bankruptcy Code (Count 6); and (g) unjust enrichment (Count 7).

On December 5, 2005, defendants filed a motion to dismiss the Complaint on the grounds that (1) this action should be dismissed because it was brought in an improper forum under the forum-selection provisions of the Agreements and (2) that the OHC Trust failed to state a claim upon which relief could be granted. On May 10, 2006, the Court issued its opinion, rejecting defendants' argument that this action should be dismissed based on the forum-selection clause. The Bankruptcy Court denied defendants' motion to dismiss with respect to Counts 3, 4, and 7 and granted the remainder of defendants' motion. Accordingly, the OHC Trust's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment remain, and should remain, in the Bankruptcy Court.

## ARGUMENT

### A.    The Applicable Legal Standard

The Bankruptcy Code sets forth the procedure governing withdrawal of the reference under 28 U.S.C. § 157(d), which provides that:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.  The district shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or other activities affecting interstate commerce.

28 U.S.C. § 157(d).

"The first sentence of this statute describes the conditions under which withdrawal is permissive, while the second sentence describes the conditions under which withdrawal is mandatory."  Wakefern Food Corp. v. C & S Wholesale Grocers, Inc. (In re Big V Holding Corp.), Nos. 00-04372, 01-758, CIV.A. 01-233, 2002 WL 1482392, at *3 (D. Del. July 11, 2002).  (Ex. A hereto).  As set forth more fully below, this case does not satisfy the conditions for mandatory or permissive withdrawal and, therefore, the reference should not be withdrawn.

### B.    Mandatory Withdrawal Of The Reference Does Not Apply

Defendants' argument that withdrawal of the reference should be granted is frivolous.  Under the express language of section 157(d), mandatory withdrawal applies only where the consideration of federal law outside the Bankruptcy Code is necessary to resolve the proceeding.  Here, only state law

claims remain to be decided.  Thus, mandatory withdrawal is inapplicable here and the reference should not be withdrawn.

Under section 157(d), mandatory withdrawal is appropriate only when two conditions are met:  "(1) consideration of law outside of Title 11 (the "Bankruptcy Code") is necessary for the resolution of the case or proceeding; and (2) the consideration of <u>federal</u> law outside the Bankruptcy Code necessary to resolve the proceeding is 'substantial and material.'"  <u>See</u> <u>also</u> <u>PBGC v. Continental Airlines, Inc. (In re Continental Airlines)</u>, 138 B.R. 442, 444-45 (D. Del. 1992) (emphasis added); <u>PBGC v. Smith Corona Corp. (In re Smith Corona Corp.)</u>, 205 B.R. 712, 714 (D. Del. 1996).  Thus, where an action involves only <u>state</u> law, it does not meet the requirements of mandatory withdrawal.  <u>See</u> <u>In re Big V Holding Corp.</u>, 2002 WL 1482392, at *3 (holding that where action "involve[d] only state law tort and contract claims, it clearly does not meet the requirements for mandatory withdrawal"); <u>Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp.</u>, 106 B.R. 367, 370 n.2 (D. Del. 1989) ("this case involves solely issues of state law and this Court's decision is based entirely on the 'discretionary' withdrawal provided for in the first sentence of section 157(d)," not mandatory withdrawal).

The OHC Trust's remaining claims against defendants are for breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment – all state law claims.  This case no longer involves federal law.  Accordingly, mandatory withdrawal does not apply here.

Defendants' argument for mandatory withdrawal is based upon the notion that OHC Trust's remaining claims "involve exclusively non-bankruptcy claims." See Motion at 7. Defendants' argument misses the mark, logically, as the issue is whether any federal law issues remain. The cases that defendants cite dealt with issues of federal law outside of the bankruptcy context, which is not the case here. See Motion at 7 (citing In re Homeland Stores, Inc., 204 B.R. 427, 427-33 (D. Del. 1997); Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc., 107 B.R. 34, 38 (D. Del. 1989)).[1]

Accordingly, mandatory withdrawal of the reference does not apply and defendants' motion should be denied.

## C.    "Cause" For Permissive Withdrawal Of The Reference Does Not Exist

Defendants' argument that this action should be withdrawn "for cause" is equally erroneous. Under section 157(d), "[t]he district court may withdraw, in whole or in part, any case or proceeding . . . for cause shown." 28 U.S.C. § 157(d). The movant bears the burden to show cause. Central Hudson Gas & Elec. Corp., 106 B.R. at 370; Travelers Cas. & Sur. Co. v. Skinner Engine Co. (In re American Capital Equipment LLC), 325 B.R. 372, 374-75 (W.D. Pa. 2005). As set forth below, defendants have not, and cannot, establish cause for withdrawal of the reference in this action.

---

[1]    The third case that defendants cite for their argument concerning mandatory withdrawal of the reference, Beard v. Braunstein, 914 F.2d 434 (3d Cir. 1990), also is inapplicable. In their Motion, defendants disingenuously state that the Beard court "mandate[ed] withdrawal of reference". However, the Beard case did not even deal with withdrawal of the reference and only dealt with the right to a jury trial.

The United States Court of Appeals for the Third Circuit has articulated several factors that district courts should consider in determining "cause" for withdrawal of the reference pursuant to section 157(d).  See In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990).  These factors are:  (1) promoting uniformity in bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering the economical use of the debtors' and creditors' resources; and (4) expediting the bankruptcy process.  Id.  The application of these factors weighs heavily against withdrawal.

This action has and will promote uniformity in bankruptcy administration, foster the economical use of the debtors' and creditors' resources and expedite the bankruptcy process.  This adversary proceeding has been before the Bankruptcy Court for more than one year.  The Bankruptcy Court has familiarized itself with the facts and issues surrounding this case and has issued an opinion on defendants' motion to dismiss, which (though it reached conclusions at odds with the OHC Trust's position), carefully considered the factual and legal issue relevant to this action.  In addition, the Bankruptcy Court has entered a scheduling order for discovery in this matter and the parties have exchanged initial requests for documents.  See Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.), Nos. 01-01430, 01-01063, Civ.A. 04-928, 2004 WL 2713101, at *4 (D. Del. Nov. 16, 2004) (denying motion to withdraw the reference where the adversary proceeding had been in bankruptcy court for over two years and the bankruptcy court had overseen a motion to dismiss).  (Ex. B hereto).  Furthermore, there are two other similar adversary proceedings brought by the

OHC Trust that are pending before the Bankruptcy Court.[2]  See Montgomery Ward, LLC v. Smith Protective Servs., Inc. (In re Montgomery Ward LLC), Nos. 00-4667, 02-10052, Civ.A. 04-229, 2004 WL 2537080, at * (D. Del. Nov. 4, 2004) (denying motion to withdraw the reference where uncomplicated claims and defenses were at issue and the Debtor had other proceedings before the bankruptcy court).  (Ex. C hereto).

Defendants do not, and cannot, argue that these factors weigh in their favor, and only conclusorily state that actions brought post-confirmation do not "promote uniformity in bankruptcy administration or the economical use of debtors' and creditors' resources, nor . . . expedite the bankruptcy process." See Motion at 9.   Defendants do not cite any case law in support of their conclusory argument.   "Indeed, the Bankruptcy Code contemplates resolving claims after the confirmation of a plan of reorganization."  NVF Co. v. New Castle County, 276 B.R. 340, 348 (D. Del. 2002), aff'd, 61 Fed. Appx. 778 (3rd Cir. 2003).   Furthermore, courts have denied motions to withdraw the reference even where the adversary proceeding was brought post-confirmation.  See, e.g., In re Montgomery Ward, 2004 WL 2537080, at *1; Valley Forge Plaza Assocs. v. Fireman's Fund Ins. Cos., 107 B.R. 514, 516 (E.D. Pa. 1989).

Furthermore, the final Pruitt factor – reducing forum shopping and confusion – does not weigh in favor of withdrawal.  In their Motion, Defendants

---

[2]    The following adversary proceedings, which are similar to this adversary proceeding, are as follows:   (1)  OHC Liquidation Trust, by and through Alvarez & Marsal, LLC, the OHC Liquidation Trustee v. United States Fire Insurance Co., Adv. Pro. No. 04-57054 (PJW); and (2) OHC Liquidation Trust, by and through Alvarez & Marsal, LLC, the OHC Liquidation Trustee v. Clayton Homes, Inc., Adv. Pro. No. 04-54839 (PJW).

state that "[w]ithdrawal will also deter forum shopping." <u>See</u> Motion at 8. Any implication by defendants that the OHC Trust has engaged in forum shopping is absurd. Indeed, it is the opposite. It is defendants, not the OHC Trust, who are forum shopping. In their motion to dismiss, defendants attempted to argue that this action should be dismissed because the forum-selection clauses in the Agreements required this action be brought in Connecticut. Having seen that argument rejected, defendants now take another bite at the apple, and seek to have the action transferred to district court. Accordingly, the forum-shopping factor weighs against granting the motion for withdrawal.

In addition, the OHC Trust did not bring this action in the Bankruptcy Court because it was "forum-shopping;" instead, because it did so because it was required to under the Plan. The Plan provides that the Bankruptcy Court:

> shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, for the following purposes:
>
> * * *
>
> (h) except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases . . . ;
>
> * * *
>
> (t) to approve any Claims settlement entered into or offset exercised by the Liquidation Trust and the Liquidation Trustee;
>
> * * *
>
> (u) to resolve any dispute or matter under or in connection with the Liquidation Trust; . . . ."

<u>See</u> Second Amended Joint Consolidation Plan of Reorganization of Oakwood Homes Corporation And Its Affiliated Debtors And Debtors-In-Possession, attached hereto as Exhibit D, § 11.1 at 72-73.

On its face, section (h) provides that the Bankruptcy Court should have exclusive jurisdiction to determine all adversary proceedings instituted in the Chapter 11 Cases, as defined under the Plan. This adversary proceeding, which was brought in the Chapter 11 Cases as defined under the Plan, falls under that section. Section (u) of the Confirmed Plan provides the Bankruptcy Court with exclusive jurisdiction over cases brought by the Liquidation Trust. And, section (t) of the Plan confirms this Court's exclusive jurisdiction over cases brought by the Liquidation Trust.[3] Thus, under the Plan, the Bankruptcy Court has exclusive jurisdiction over this adversary proceeding and the reference should not be withdrawn.

Defendants' primary argument for withdrawal is based on their meritless belief that because only "non-bankruptcy" claims remain, this action is "non-core." Yet, "[s]imply because the proceeding presents questions of state law does not necessarily mean that the proceeding is 'non-core' or otherwise beyond the jurisdiction of the bankruptcy courts." <u>Adams v. Med. Accounts Receivable Solutions, Inc. (In re Coram Healthcare Corp.)</u>, Nos. 00-3299, Adv. 03-53964, 2003 WL 22948234, at *3 (Bankr. D. Del. Dec. 12, 2003) (citations omitted). (Ex. E hereto). Courts have stated that "[i]n general, 'core' proceedings include all proceedings integral to the restructuring of debtor-creditor

---

[3]    Although section (t) speaks of settlement, that language logically suggests that actions involving the Liquidation Trust will be in the Bankruptcy Court.

rights, whether or not they involve questions of state law, and all proceedings in which the right to relief is created by title 11 of the United States Code." <u>Valley Forge Plaza Associates</u>, 107 B.R. at 516 (<u>quoting</u> <u>Windsor Commc'ns Group, Inc. v. Grant</u>, 75 B.R. 713, 721 (E.D. Pa. 1985)).

In addition, defendants wrongfully argue that actions involving "non-bankruptcy" claims, which are brought post-petition, are "non-core." Courts in this circuit have ruled otherwise. In <u>West Elecs., Inc. v. Nat'l Union Fire Ins. Co. (In re West Elecs., Inc.)</u>, 128 B.R. 900 (Bankr. D.N.J. 1991), the debtor-in-possession filed an adversary proceeding to recover on an insurance policy for post-petition loss of its property. 128 B.R. at 901-02. The insurance company filed a motion to determine whether the adversary proceeding was core or non-core and requested abstention by the court. <u>Id.</u> at 902. In support of its motion, the insurance company asserted that the case was a "garden-variety date common law breach of contract action concerning an insurance policy entered into by the debtor pre-petition" and, therefore, the action was non-core. <u>Id.</u> at 903 (citation omitted). The court rejected the insurance company's argument and held that the action was core. <u>Id.</u> at 905. The court reasoned that:

> the events resulting in the loss and cause of action for recovery under the insurance policy arose after the filing of the petition. . . . . [T]he cause of action which is the subject matter of this complaint could not possibly have arisen prior to the filing of the petition since the loss involved occurred post-petition. . . . The Third Circuit has made it clear that a distinction must be drawn between a pre-petition and a post-petition cause of action.

Id. at 904.  Applying that reasoning, the In re West court held that, given that the loss and cause of action occurred post-petition, this case "fits into the category described in 28 U.S.C. § 157(b)(2)(A) as a 'matter concerning the administration of the estate.'"  Id. at 904.  Thus, the court held that the matter constituted a "core" proceeding.   See also Valley Forge Plaza Assocs., 107 B.R. at 517 (holding that debtor's action against insurers for state law contract claims was a core proceeding and denying insurers' motion to withdraw the reference).

Here, the breach of contract claims at issue involve post-petition loss and  breaches.  The Petition Date was November 15, 2002.  On March 31, 2004, the Court entered an order confirming the Plan, which became effective for most of the Debtors on April 15, 2004.   Discover Re did not draw down on the letter of credit and surety bond until May and June 2004, more than one year after the petition date.   Thus,  the OHC Trust, which established by the Plan, could not have brought this action against defendants until post-petition.[4]

Accordingly, given that defendants' breaches of the Agreements and related wrongful conduct occurred post-petition, this action is a "matter concerning the administration of the estate," and, therefore, should be classified as a "core" matter.

Even if this Court determines that this action is non-core, which it should not, "[p]roceedings should not be withdrawn for the sole reason that they

---

[4]      Discover Re drew down on the letter of credit and the surety bond shortly after  confirmation of the Plan, apparently in response to the Plan confirmation.  Upon confirmation, the Debtors' business ceased and the defendants, therefore, could not thereafter look to the Debtors to maintain the letter of credit and surety bond.  Given the timing of the draws, Discover Re's breach of the Agreements and other wrongful actions are inextricably connected to the bankruptcy case brought by Oakwood.

are non core.   The 'cause shown' requirement in section 157(d) creates a 'presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court unless rebutted by a contravening policy.'" Central Hudson Gas & Elec. Corp., 106 B.R. at 371.   Thus, this Court has held that "…the nature of the proceeding (i.e., core or non-core) is not sufficient cause for withdrawal."   Id. at 370. (denying motion to withdraw reference where movant's sole ground for withdrawal was that proceeding was non-core).

In this vein, the cases cited by defendants in their Motion are misplaced.  See Motion at 10.   In Beard v. Braunstein, the United States Court of Appeals for the Third Circuit held that the action, which involved pre-petition contracts breached before and after the filing of the petition was non-core.  914 F.2d 434, 445 (3d Cir. 1990).   However, in Beard, unlike here, the Third Circuit was "…not presented with and thus [did] not decide whether . . . a claim only for the post-petition breach of a contract entered into pre-petition, [is] a core matter[ ]."  Id.   Given that the action at bar involves the post-petition breach of contracts entered into pre-petition, the holding in Beard is inapplicable.   Similarly, Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc., 107 B.R. 34 (D. Del. 1989) involved pre-petition contracts and not post-petition breaches, and also is inapplicable.

For the foregoing reasons, defendants have not demonstrated "cause" for permissive withdrawal of the reference.   Accordingly, defendants' motion must be denied.

## CONCLUSION

Based on all of the foregoing, the defendants' motion to withdraw the reference should be denied in its entirety.

Dated:  June 27, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL

By:

_Donna L. Culver_
Donna L. Culver (#2983)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

-and-

Emilio A. Galván
Robert Stark
Dana S. Montone
Brown Rudnick Berlack Israels LLP
Seven Times Square
New York, New York  10036
(212) 209-4800

Attorneys for OHC Liquidation Trust, by and through Alvarez & Marsal LLC, the OHC Liquidation Trustee

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
In re: BIG V HOLDING CORP., et al., Debtors.
WAKEFERN FOOD CORP., Plaintiff,
v.
C & S WHOLESALE GROCERS, INC., Defendant.
**No. 00-04372(RTL), 01-758, CIV.A.**
**01-233(GMS).**

July 11, 2002.

After cooperative member filed for Chapter 11 relief, food cooperative wholesaler filed state court action alleging that competitor tortiously interfered with its contractual relations with member. After case was removed to bankruptcy court, creditors' committee moved to withdraw reference to bankruptcy court. The District Court, Sleet, J., held that: (1) creditors' committee had unconditional right to intervene, and (2) withdrawal of reference was not warranted.

Motion denied.

West Headnotes

**[1] Bankruptcy 51 ⟐2160**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2159 Parties
                51k2160 k. Intervention. Most Cited Cases
Creditors' committee had unconditional right to intervene in food cooperative wholesaler's non-core adversary proceeding against competitor for tortious interference with its contractual relations with debtors, where suit sought injunction against Chapter 11 debtors' supply agreement with competitor. 11 U.S.C.A. § 1109(b); Fed.Rules Civ.Proc.Rule 24(a)(1), 28 U.S.C.A.

**[2] Bankruptcy 51 ⟐2103**

51 Bankruptcy
    51I In General
        51I(E) Reference
            51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
Withdrawal of reference to bankruptcy court was not warranted in food cooperative wholesaler's non-core adversary proceeding against competitor for tortious interference with its contractual relations with debtors, even though wholesaler had right to jury trial, where bankruptcy court had already issued declaratory judgment in adversary proceeding that was factually and legally interrelated with action, and wholesaler had not yet officially filed jury demand. 28 U.S.C.A. § 157(b)(1).

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On November 22, 2000, the Debtors, Big V Holding Corp., *et al.,* filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to 28 U.S.C. § 157(a), the bankruptcy cases were referred from the United States District Court for the District of Delaware to the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"). [FN1] Since the petition date, the Debtors have continued in possession of their properties and the management and operation of their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On December 6, 2000, an Official Committee of Unsecured Creditors ("the Creditors' Committee") was appointed by the United States Trustee pursuant to § 1102 of the Bankruptcy Code. Presently before the court is the Creditors' Committee's March 20, 2001 motion to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

withdraw the reference to the Bankruptcy Court. Since Wakefern has yet to assert a proper jury demand, and since considerations of judicial economy favor leaving the adversary proceeding in the Bankruptcy Court until it is ready for trial, Wakefern's motion to withdraw the reference will be denied at this time.

> FN1. Referral of Title 11 proceedings from the United States District Court for the District of Delaware to the United States Bankruptcy Court for the District of Delaware is automatic pursuant to a Standing Order of Reference dated July 23, 1984.

## II. FACTS

Wakefern Food Corporation ("Wakefern"), the plaintiff in this adversary proceeding (the "C & S Action"), is a food cooperative wholesaler that centralizes the purchasing of inventory and supplies for its members. The Debtors have been a member of the Wakefern cooperative since 1959. Pursuant to the stockholder agreement and by-laws governing Wakefern members, the Debtors are obligated to purchase approximately 85% of their products from Wakefern.

On August 3, 2000, the Debtors decided that their continued participation in Wakefern was detrimental to their business and, as a result, entered into a supply agreement with C & S Wholesale Grocers, Inc. ("C & S"), a direct competitor of Wakefern. On November 28, 2001, six days after the Debtors filed for relief under chapter 11, Wakefern filed suit against C & S in New Jersey state court. The complaint alleged that C & S, by executing an agreement with the Debtors, had engaged in tortious interference with Wakefern's contractual relations and had aided and abetted the Debtors' breach of fiduciary duty. The complaint seeks preliminary and permanent injunctions as well as damages. The C & S Action was removed to the United States Bankruptcy Court for the District of New Jersey and was subsequently transferred to the United States Bankruptcy Court for the District of Delaware, the Honorable Raymond T. Lyons

presiding.[FN2]

> FN2. Judge Lyons is a visiting United States Bankruptcy Judge from the District of New Jersey.

On March 20, 2001, Wakefern filed a motion to withdraw the reference of the C & S Action to the Bankruptcy Court. C & S objected, arguing that Wakefern had failed to make a simultaneous motion to the Bankruptcy Court for a determination of whether the C & S Action was a "core" or "non-core" proceeding as required by Delaware Local Bankruptcy Rule 5011-1. On May 25, 2001, the Bankruptcy Court issued an order designating the C & S Action as a "non-core" proceeding. Therefore, C & S withdrew its objection to Wakefern's motion to withdraw the reference. The Debtors and the Creditors' Committee, however, have continued to oppose the motion. On January 31, 2001, the Creditors' Committee filed a motion to intervene in the C & S Action, which was granted by the bankruptcy court on February 15, 2001. The court has no record of a motion to intervene being filed by the Debtors.

**\*2** Central to the C & S Action is the Debtors' termination of the Wakefern supply agreement and execution of the C & S Supply agreement. Before proceeding with the C & S supply agreement, the Debtors sought a declaratory judgment from the Bankruptcy Court in order to determine whether the Debtors would owe a large withdrawal payment to Wakefern if they proceeded with the C & S supply agreement. On September 14, 2001, in *Big V Supermarkets, Inc. v. Wakefern Food Corp.*, 267 B.R. 71, 111 (Bankr.D.Del.2001), the Bankruptcy Court held that the Debtors would be obligated to make the withdrawal payment. The Bankruptcy Court also made specific findings as to what would constitute a breach of good faith and fair dealing with regards to the Debtors' attempts to abandon the Wakefern supply agreement.

Apart from the declaratory judgment action, the Bankruptcy court has presided over numerous scheduling and pretrial conferences and disputes, including Wakefern's February 9, 2001 motion to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compel the Debtors' assumption/rejection of the Wakefern Agreement and C & S's March 28, 2001 motion to dismiss, or in the alternative, to stay proceedings. In sum, the C & S Action is intertwined with several proceedings and matters which are or were before the Bankruptcy Court. Furthermore, Bankruptcy Court Judge Lyons stated that he believes the C & S Action should be adjudicated together with the other actions relating to the bankruptcy case. During a March 28, 2001 scheduling conference, Judge Lyons stated, "I think this is a three party dispute that should be dealt with together."

One final fact is crucial to the court's analysis of Wakefern's motion. To date, Wakefern has not made any formal demand for a jury trial. However, Wakefern has indicated that they plan to file an amended complaint with the formal jury trial demand after the court decides this motion to withdraw the reference. Wakefern refuses to file the amended complaint for fear that filing a claim in the Bankruptcy Court could constitute consent to the jurisdiction of the Bankruptcy Court and consequently, waiver of the right to a jury trial.

### III. DISCUSSION

#### A. Intervention

Neither the Debtors or the Creditors' Committee are parties to the C & S Action. Therefore, in order for their objection to be heard, they must have properly intervened in the adversary proceeding.

Federal Rule of Civil Procedure 24(a)(1) provides that upon timely application anyone shall be permitted to intervene in an action "when a statute of the United States confers an unconditional right to intervene." Both the Debtors and the Creditors Committee believe that they have an unconditional right to be heard under 11 U.S.C. § 1109(b), which states, in part, "A party in interest, including the debtor, ... [or] a creditors' committee ... may raise and may appear and be heard on any issue in a case under this chapter." Wakefern argues that the C & S Action, an adversary proceeding, is not a "case

under this chapter" as required by the statute. Although the circuits are split on whether section 1109(b) confers an unconditional right to intervene, [FN3] the Third Circuit has taken a clear position on the issue. In *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1241 (3d Cir.1994), the Third Circuit held that section 1109(b) gives a creditors' committee an unconditional right to intervene in a non-core adversarial proceeding in federal district court which is "related to" a bankruptcy case.

> FN3. The Fourth, Fifth, and Eleventh Circuits have held that § 1109(b) does not create an absolute right of intervention in any adversary proceedings, not even those that are brought "under" chapter 11. *See Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1286-1287 (5th Cir.1985); *In re Charter Co.*, 876 F.2d 866, 871 (11th Cir.1989); *Matter of Richman*, 104 F.3d 654, 658 (4th Cir.1997)

**\*3** [1] A civil proceeding is "related to" bankruptcy when the outcome of that proceeding could conceivably have any effect on the estate being administered. *See Halper v. Halper*, 164 F.3d 830, 837 (3d Cir.1999). The complaint in the adversary proceeding between Wakefern and C & S seeks an injunction against the Debtors' supply agreement with C & S. Thus the adversary proceeding clearly affects the Debtors' estate and their ability to reorganize. Moreover, the procedural history of the C & S Action indicates that it is "related to" the bankruptcy. The proceeding was removed from state court pursuant to 28 U.S.C. § 1452(a), which allows a party to remove a cause of action that is "related to" a bankruptcy case. Furthermore, the C & S Action was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a), which mandates that proceedings "related to" a case under title 11 shall be referred to the bankruptcy judges for the district. Therefore, the C & S Action clearly satisfies the "related to" requirement.

Since the C & S Action is "related to" the bankruptcy, the *Phar-Mor* holding dictates that the Debtors and Creditors' Committee have an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

unconditional right to intervene under section 1109(b).[FN4] In the instant proceeding, the Creditors' Committee has properly filed a motion to intervene and has otherwise complied with the requirements for intervention pursuant to Rule 24(c) . Therefore, since 11 U.S.C. § 1109(b) gives a creditors' committee an unconditional right to intervene in light of *Phar-Mor*, the Creditors' Committee is a proper intervenor in this matter pursuant to Rule 24(a)(1). [FN5]

> FN4. Bankruptcy Rule 7024, the sole Bankruptcy rule governing intervention in an adversary proceeding, merely adopts Federal Rule of Civil Procedure 24.

> FN5. Based upon the current record, the court has been unable to determine whether the Debtors have filed a timely motion to intervene. Therefore the Debtors will not be considered a proper intervenor in this proceeding for purposes of Wakefern's motion to withdraw the reference; however, the Creditors' Committee's opposition to the motion should adequately represent the interest of the Debtors.

B. Mandatory v. Permissive Withdrawal of the Reference

The C & S Action was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a). The procedure governing withdrawal of the reference to the Bankruptcy Court is stated in 28 U.S.C. § 157(d) , which reads,
"The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce ." 28 U.S.C. § 157(d).

The first sentence of this statute describes the conditions under which withdrawal is permissive, while the second sentence describes the conditions under which withdrawal is mandatory. Since the C & S Action involves only state law tort and contract claims, it clearly does not meet the requirements for mandatory withdrawal. Therefore, the permissive withdrawal standard applies. Under this standard, the court may withdraw the reference of the adversary proceeding "for cause shown." *See* 28 U.S.C. § 157(d).

As the movant in this case, Wakefern bears the burden to show cause. *NDEP Corp. v. Handl-It, Inc.,* 203 B.R. 905, 907 (D.Del.1996). The statute does not define "cause," but guideposts exist to elucidate the meaning of the word. The Third Circuit has stated that a court should consider: "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *In re Pruitt,* 910 F.2d 1160, 1168 (3d Cir.1990). However, the "factors listed in *Pruitt* were not designed to be exhaustive; they are only minimal standards." *NDEP Corp.,* 203 B.R. at 908. Relevant considerations might also include " the nature of the proceedings (*i.e.,* core or non-core) and judicial economy." *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.,* 107 B.R. 34, 39 (D.Del.1989). Another factor which should be considered is "whether the parties have requested a jury trial." *Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp.,* 106 B.R. 367, 371 (D.Del.1989). The court will now consider these factors.

C. Factors to Consider in Determining Whether to Withdraw the Reference

1. Core v. Non-Core and Judicial Economy

**\*4** [2] There are strictures upon the Bankruptcy Court's authority to hear and determine non-core proceedings that do not apply in the instance of core proceedings. *See* 28 U.S.C. § 157(b)(1). Thus, a determination of whether the C & S Action is a core or non-core proceeding is crucial to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

determination of the Creditors' Committee's motion. In an Order dated May 25, 2001, the Bankruptcy Court declared that the current adversary proceeding is non-core. No party has challenged the Bankruptcy Court's ruling, therefore, the court concludes the C & S Action is a non-core proceeding.

Moving to the question of judicial economy, the court believes the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process, as set forth in *Pruitt*, 910 F.2d at 1168, would seem to be best served by leaving the C & S Action in the Bankruptcy Court.[FN6]

> FN6. The court is aware that courts in this district have held that "judicial economy favors permissive withdrawal of the reference of a non-core proceeding, since the district court would still need to review the merits of the dispute when considering the bankruptcy court's proposed findings of fact and conclusions of law." *NDEP Corp.*, 203 B.R. at 908, (paraphrasing *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc.*, 107 B.R. 34, 39 (D.Del.1989)). Given the facts and circumstances of this case, the court declines to follow this precedent.

The Bankruptcy Court is intimately familiar with the numerous complex issues surrounding the C & S Action. In fact, on September 14, 2001, the Bankruptcy Court issued a declaratory judgment in a separate adversary proceeding to this bankruptcy case which is interrelated with the C & S Action. *See Big v. Supermarkets, Inc.*, 267 B.R. 71. In that proceeding, the Bankruptcy Court held that Wakefern would be entitled to a withdrawal payment if the Debtors were to proceed with their supply agreement with C & S. *Id.* at 111. Furthermore, the Bankruptcy Court made specific findings as to what would constitute a breach of good faith and fair dealing with regard to the Debtors' attempts to abandon the Wakefern supply agreement. *Id.* Thus, it is apparent that the

Bankruptcy Court is very familiar with the facts and issues which are crucial to the determination of the C & S Action. Specifically, the Bankruptcy Court has become familiar with important provisions of Wakefern's By-Laws and Stockholders' Agreement, all of which are crucial to the C & S Action. In sum, the Bankruptcy Court has already expended invaluable time and energy familiarizing itself with the facts and issues surrounding the C & S Action. Considerations of judicial economy thus weigh in favor of leaving the case with the Bankruptcy Court. *See Northwestern Institute of Psychiatry, Inc. v. Travelers Indem. Co.*, 272 B.R. 104, 109 (E.D.Pa.2001) ("The bankruptcy court is familiar with the parties, the factual background of the case and the legal issues involved. Therefore, this court finds no reason to disturb the present course and it declines to withdraw the reference as judicial economy will be served by allowing the adversary action to remain in bankruptcy court").

### 2. Right to a Jury Trial

The right to a jury trial is an important factor in determining a motion to withdraw the reference. This is so because absent the express consent of both parties and a special designation of jurisdiction by the district court, the Bankruptcy Court may not hold a jury trial in a non-core proceeding. *See* 28 U.S.C. § 157(e).

**\*5** It is clear that Wakefern has a constitutional right to a jury trial in this case. The Seventh Amendment states, "In Suits at common law where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved ..." U.S. CONST. amend. VII. In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the Supreme Court explained that "suits at common law" referred to controversies in which legal rights were to be determined, as distinguished from cases in which only equitable rights were recognized and only equitable remedies were administered. Furthermore, the Court stated that the Seventh Amendment only requires a jury trial if a cause of action is legal in nature and it involves a matter of private right. *Id.* at 42 n. 4. The C & S Action, a contract and tort action for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

damages, is clearly legal in nature and involves a matter of private right. *See NDEP Corp.,* 203 B.R. at 909.

However, although Wakefern has a right to a jury trial of the C & S Action, a proper jury demand has not been made. Wakefern has stated that upon the court's determination of this motion to withdraw the reference, it will file the amended complaint containing a demand for a jury trial. While Wakefern's intention to formally demand a jury trial is duly noted, the fact remains that they have not yet done so. Wakefern is reluctant to file an amended complaint with a jury demand because it believes, not without reason, that filing an amended complaint could quite possibly constitute waiver of their Seventh Amendment right to have their claims tried by jury. *See Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1250-1253 (3d Cir.1993) (identifying two theories whereby courts have divested parties of their rights to a jury in the bankruptcy context. Under the "waiver theory," a party can lose its right to a jury trial by voluntarily submitting to the jurisdiction of the bankruptcy court through the filing of a petition or claim in the bankruptcy court).

Although Wakefern may be entitled to a jury trial, their potential entitlement at some future date is not sufficient grounds to withdraw the reference at this time. Withdrawal of the reference based on the ground that a party is entitled to a jury trial should be deferred until the case is "trial ready." *See In re Northwestern Institute of Psychiatry, Inc.,* 268 B.R. 79, 84 (E.D.Pa.2001) (citing *In re Commercial Financial Services, Inc.,* 239 B.R. 586, 596 (N.D.Okla.1999); *see also Barlow & Peek, Inc. v. Manke Truck Lines, Inc.,* 163 B.R. 177, 179 (D.Nev.1993) (refusing to withdraw reference until " it is clear that a jury trial will be necessary and that the case is prepared and ready for such trial to commence"). It would be premature to withdraw the reference to the bankruptcy court based upon the unfixed proposition that a jury trial may occur in the future. At the present time, the case is not ready for trial. Assuming that Wakefern does file the amended complaint containing a proper jury demand, a jury trial may not be necessary in order to resolve the C & S Action. During the March 28,

2001 scheduling conference in connection with the C & S Action, Bankruptcy Court Judge Lyons stated that this case "cries out for settlement." Until Wakefern properly asserts their right to a jury trial, the C & S Action should remain in the Bankruptcy Court.

**\*6** The court is persuaded that Wakefern's right to a jury trial, if properly asserted in the future, will not be adversely affected by having the Bankruptcy Court preside over pretrial matters until the case is ready to be tried in the District Court. Until that time, the bankruptcy judge can serve basically the same function as a magistrate. *See In re Delaware and Hudson Ry. Co.,* 122 B.R. 887, 897 (D.Del.1991).

### IV. CONCLUSION

In this case, judicial economy weighs heavily in favor of leaving the C & S Action in the Bankruptcy Court, since that court has already issued a declaratory judgment in an adversarial proceeding which is factually and legally interrelated with the C & S Action. Withdrawal of the reference at this point based on Wakefern's right to a jury trial would be premature, since Wakefern has yet to officially file a jury demand.

The court will deny Wakefern's motion to withdraw the reference, but will do so without prejudice. When the C & S Action is ready for trial, Wakefern may file a renewed motion to withdraw the reference.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. Wakefern's request for withdrawal of the reference to bankruptcy is DENIED;
2. This denial is without prejudice to Wakefern's ability to renew its request for withdrawal of the reference at a later time, when a jury trial has been properly demanded and the case becomes ready for trial.

D.Del.,2002.
In re Big V Holding Corp.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2002 WL 1482392 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01CV00233 (Docket) (Apr. 09, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d    Page 1

Not Reported in F.Supp.2d, 2004 WL 2713101 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: WINSTAR COMMUNICATIONS, INC., et
al., Debtors.
Christine C. SHUBERT, Chapter 7 Trustee of
Winstar Communications, Inc. and Winstar
Wireless, Inc., Plaintiff,
v.
LUCENT TECHNOLOGIES, INC., Defendant.
**No. 01-01430, 01-01063, Civ.A.04-928-JJF.**

Nov. 16, 2004.

Sheldon K. Rennie, of Fox, Rothschild LLP,
Wilmington, Delaware, Stephen M. Rathkopf, and
David R. King, of Herrick, Feinstein LLP, New
York, New York; Richard G. Smolev, of Kaye
Scholer LLP, New York, New York, for Plaintiff,
of counsel.
Daniel J. DeFranceschi, Rebecca L. Booth, and
Jason M. Madron, of Richards, Layton & Finger,
P.A., Wilmington, Delaware, Paul C. Saunders, and
Daniel Slifkin, of Cravath, Swaine & Moore LLP,
New York, New York, for Defendant, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Presently before the Court is the Motion Of
Defendant Lucent Technologies, Inc. To Withdraw
The Reference To The Bankruptcy Court (D.I.1).
For the reasons discussed, Lucent's motion will be
denied.

Background

On April 18, 2001, Winstar Communications, Inc.
and Winstar Wireless, Inc. (collectively, "Winstar")
filed a voluntary petition for relief under Chapter 11
of the Bankruptcy Code. Winstar concurrently
commenced an Adversary Proceeding alleging that
Lucent Technologies, Inc. ("Lucent") breached

several of the contracts between Winstar and
Lucent, allegedly forcing Winstar to file its
bankruptcy petition. Lucent filed several proofs of
claim, asserting claims against Winstar that include
secured and unsecured claims for sums alleged due
under agreements between Lucent and Winstar.

In January 2002, the Court converted the
bankruptcy to Chapter 7 and the bulk of Winstar's
assets were subsequently liquidated. Following the
conversion, Christine C. Shubert ("the Trustee")
interceded to prosecute this action as Plaintiff and
filed the Second Amended Complaint (A.D.I.69).

In the Second Amended Complaint, the Trustee
demanded a "trial by jury as to all issues so triable,"
and added Count XI, a claim seeking to equitably
subordinate Lucent's claims. Two other claims
remain in the case-Count VII for Breach of the
Parties' Subcontracting Arrangement and Count X
for Return of Preferential Transfer.

After the Bankruptcy Court decided the Motion of
Lucent Technologies Inc. to Dismiss Certain Claims
Of The Second Amended Complaint (A.D.I.70),
Lucent made a demand for a jury trial and asserted
four counterclaims for fraud and negligent
misrepresentation. (A.D.I.156.) Lucent asserted
these counterclaims with regard to financial
information that Winstar allegedly provided to
Lucent during due diligence that Lucent conducted
in November and December 2000.

There is currently a Motion For Summary Judgment
(A.D.I.210) filed by Lucent pending in the
Bankruptcy Court.

The Bankruptcy Court has not determined whether
this matter is a core or non-core proceeding.

Parties' Contentions

By its motion, Lucent seeks to withdraw the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2713101 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

reference of the Adversary Proceeding from the Bankruptcy Court. Lucent contends that "cause" for permissive withdrawal exists for several reasons related to its alleged right to a jury trial in the district court.

First, Lucent contends that it is entitled to a trial by jury based on the Trustee's demand for a jury trial, which, pursuant to Federal Rule of Civil Procedure 38, may not be revoked without Lucent's consent.

Second, Lucent contends that it did not waive its right to a jury trial before the district court as to all claims when Lucent filed its proof of claim. Lucent contends that filing a proof of claim waives only the right to a jury trial in the district court as to claims that are necessarily part of the disallowance or allowance of the proof of claim. Lucent contends that Counts VII and X and Lucent's counterclaims are not necessary elements in the allowance or disallowance of Lucent's proofs of claim. Furthermore, Lucent contends that the district court should hear the Trustee's claim for equitable subordination, not triable to a jury as of right, because it arises from the same facts, transactions, and issues raised by Counts VII and X.

*2 Third, Lucent contends that it would be more efficient for the district court to decide the pending motion for summary judgment in this action because it reviews *de novo* any such ruling made by the Bankruptcy Court.

Finally, Lucent argues that, because the Court need not determine whether the remaining claims in this lawsuit are core or non-core, Local Bankruptcy Court Rule 5011-1 should be waived.

In response, the Trustee contends that Lucent waived any right to a jury trial when it filed proofs of claim against the estate. The Trustee specifically contends that by filing the claims, Lucent submitted itself to the Bankruptcy Court's equitable powers and conferred jurisdiction upon the Bankruptcy Court to consider its counterclaims as a core matter. The Trustee further contends that, should the Court determine the matter is non-core and that Lucent has a right to a jury trial, Lucent's motion should be denied because: 1) Lucent's jury demand was

defective; 2) Lucent's demand to withdraw the reference is untimely; and 3) Lucent's motion to withdraw the reference is procedurally defective because Lucent has failed to move before the Bankruptcy Court for a core/non-core determination.

Discussion

I. Legal Standard For Discretionary Withdrawal Of
A Reference

Under 28 U.S.C. § 1334(b), district courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Pursuant to 28 U.S.C. § 157(a), each district court may refer cases under title 11 to the Bankruptcy Court for disposition. However, under Section 157(d), the referred proceeding can be withdrawn from the Bankruptcy Court and returned to the district court. Section 157(d) provides for both mandatory withdrawal and discretionary withdrawal. In this case, Lucent seeks withdrawal only under the standards for discretionary withdrawal.

In providing for discretionary withdrawal, Section 157(d) states: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). This Court has acknowledged that the requirement that cause be shown "creates a ' presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy." ' *Hatzel & Buehler, Inc. V. Central Hudson Gas & Elec.,* 106 B.R. 367, 371 (D.Del.1989) (citations omitted).

The Court of Appeals for the Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for discretionary withdrawal. These factors include: 1) promoting uniformity in bankruptcy administration; 2) reducing forum shopping and confusion; 3) fostering economical use of debtor/creditor resources; 4) expediting the bankruptcy process;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 3

Not Reported in F.Supp.2d, 2004 WL 2713101 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and 5) timing of the request for withdrawal. *In re Pruitt,* 910 F .2d 1160, 1168 (3d Cir.1990) (citing *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 999 (5th Cir.1985)).

**\*3** Local Rules for the United States Bankruptcy Court for the District of Delaware state that the movant for withdrawal shall concurrently file with the Clerk a motion for a determination by the Bankruptcy Court with respect to whether the matter or proceeding is core or non-core. Bankr.D. Del. R. 5011-1.

### II. Lucent's Right To A Jury Trial

The sole reason for "cause" for permissive withdrawal that Lucent cites in its briefs is Lucent's right to a jury trial on Counts VII and X of the Trustee's Second Amended Complaint and on Lucent's counterclaims for fraud and negligent misrepresentation. The parties do not dispute that these issues may, by right, be triable by a jury.

### A. Count X, Preferential Payment Claim

Count X seeks to recover $194 million paid by Winstar to Lucent in December 2000. The Court finds that Lucent may have been entitled to a jury trial on the issue of preferential payment had it presented no claim in the bankruptcy proceeding and awaited a federal action by the Trustee. *See Schoenthal v. Irving Trust Co.,* 287 U.S. 92, 94-95 (1932). However, a creditor who submits a proof of claim against a bankruptcy estate has no right to a jury trial on issues raised in defense of such a claim. *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1250 (3d Cir.1994) (citing *Langenkamp v. Culp,* 498 U.S. 42, 45 (1990)).

The Court finds that, in view of the holdings in *Billing* and *Langenkamp,* Lucent's filing proofs of claim triggered the process of allowance and disallowance of those claims, thereby subjecting Lucent to the equity power of the Bankruptcy Court. Thus, the Court finds that the Trustee's subsequent preference action is now part of the claims allowance process, and is triable only in

equity. *Id.* For these reasons, the Court concludes that there is no right to a jury trial on the issue of the alleged preferential transfer.

Lucent contends that *Langenkamp* is inapplicable in these circumstances because the Trustee made a jury demand and, pursuant to Federal Rule of Civil Procedure 38, cannot withdraw that jury demand without Lucent's consent. Rule 38(d), which states that a jury demand "may not be withdrawn without the consent of the parties," ensures that one party may rely on another's jury demand. Fed.R.Civ.P. 38 . However, the Court finds that because Lucent waived its right to a jury trial as to the alleged preferential transfer, its consent to the Trustee's withdrawal of her jury trial demand is not required. *See* Moore, *Federal Practice 3d* § 38.50[10][d].

### B. Count VII, Subcontract Claim

In Count VII, the Trustee alleges that Lucent breached the subcontract between Lucent and Winstar Wireless, Inc. and/or breached a legally-binding course of conduct between Lucent and Winstar. Lucent contends that whether it is found to have breached an alleged obligation to lend additional money to Winstar has no bearing on Lucent's ability to recover on its proofs of claim. The Court is not persuaded by Lucent's argument that the determination of its proofs of claim does not depend on the outcome of the Trustee's Subcontract Claim. The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of the res of the estate and, thus, is now part of the claims allowance process, triable only in equity. For this reason, the Court concludes that there is no right to a jury trial on the issue of the Subcontract Claim.

### C. Lucent's Counterclaims

**\*4** Similarly, the Court is not persuaded that Lucent's Fraud and Negligent Misrepresentation Counterclaims will not affect the allowance or disallowance of Lucent's proofs of claim. The Court finds that Lucent's Fraud and Negligent Misrepresentation Counterclaims involve a decision

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 4

Not Reported in F.Supp.2d, 2004 WL 2713101 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

regarding the distribution of the bankruptcy estate and, thus, are now part of the claims allowance process, triable only in equity. For this reason, the Court concludes that there is no right to a jury trial on the issue of the Fraud and Negligent Misrepresentation Counterclaims.

### III. *In Re Pruitt* Factors For Cause

Although Lucent has not addressed the standards for "cause" for a permissive withdrawal of a reference set forth in *In re Pruitt,* 910 F.2d at 1168, the Court does not find that the factors as a whole support the Court's withdrawing the reference to the Bankruptcy Court for several reasons.

First, the Court finds that the timing of the request for withdrawal supports the proceeding remaining in Bankruptcy Court. The Adversary Proceeding has already been in Bankruptcy Court for over two years, and the Bankruptcy Court has overseen extensive discovery and pretrial matters, and has decided a motion to dismiss filed by Lucent.

Next, the Court finds that considerations of uniformity in bankruptcy administration support the proceeding being heard in the Bankruptcy Court. The preferential payment and equitable subordination claims are purely bankruptcy-related in nature and the resolution of these claims will affect the distribution to creditors within the proceeding.

Finally, the Court finds that maintaining the proceeding in Bankruptcy Court will diminish the risk of forum shopping and will lessen confusion by fostering consistent administration of the estate.

For these reasons, the Court concludes that the *Pruitt* factors do not support withdrawing the reference from the Bankruptcy Court.

### IV. Local Bankruptcy Rule 5011-1

The record does not show that Lucent has filed a motion for determination by the Bankruptcy Court as to whether the matter or proceeding is core or

non-core. Thus, the Court finds that Lucent did not follow Local Bankruptcy Court Rule 5011-1. For this additional reason, the Court will maintain the proceeding before the Bankruptcy Court.

### Conclusion

In sum, the Court concludes that discretionary withdrawal of the instant adversary proceeding is not warranted because: 1) Lucent has waived its right to a jury trial with regard to the claims at issue; 2) the factors set forth in *In re Pruitt* do not support a finding of cause; and 3) Lucent has not followed Local Bankruptcy Rule 5011-1. Accordingly, the Court will deny the Motion Of Defendant Lucent Technologies, Inc. To Withdraw The Reference To The Bankruptcy Court (D.I.1).

An appropriate Order will be entered.

### ORDER

At Wilmington, this 16th day of November 2004, for the reasons set forth in the Memorandum Opinion issued this date,

**\*5** IT IS HEREBY ORDERED that the Motion Of Defendant Lucent Technologies, Inc. To Withdraw The Reference To The Bankruptcy Court (D.I.1) is *DENIED.*

D.Del.,2004.
In re Winstar Communications, Inc.
Not Reported in F.Supp.2d, 2004 WL 2713101 (D.Del.)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 2537080 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: MONTGOMERY WARD, LLC, et al.
Debtors.
MONTGOMERY WARD, LLC, Plaintiff,
v.
SMITH PROTECTIVE SERVICES, INC. d/b/a
Smith Protective Protection Security, Defendant.
**No. 00-4667-RTL, 02-10052, Civ.A. 04-229-JJF.**

Nov. 4, 2004.

Jason W. Harbour, of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware, Joseph L.
Steinfeld, Jr., and Kelly J. Shannon, of ASK
Financial, Eagan, Minnesota, for Plaintiff, of
Counsel.
Martin J. Weis, of Dilworth Paxson LLP,
Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Presently before the Court is an Amended
Motion To Withdraw The Reference Of Adversary
Proceeding No. 02-10052-RTL From The United
States Bankruptcy Court To The United States
District Court For The District Of Delaware And
For Transfer To The Northern District Of Texas
(D.I.2) filed by Defendant, Smith Protective
Services, Inc. ("Smith Protective"). For the reasons
set forth below, the Court concludes that
discretionary withdrawal and transfer of the instant
adversary proceeding is not warranted, and
therefore, the Court will deny Smith Protective's
Motion.

STATEMENT OF FACTS

On December 28, 2000, Montgomery Ward LLC ("

Montgomery Ward") filed a voluntary petition for
relief under Chapter 11 of the Bankruptcy Code. On
August 20, 2002, the Third Amended Chapter 11
Plan of Liquidation Proposed By The Official
Committee of Unsecured Creditors of Montgomery
Ward LLC (the "Plan") was confirmed and made
effective. Shortly thereafter, Montgomery Ward
filed the instant Adversary Proceeding seeking the
avoidance and recovery of preferential transfers
totaling $210,930.20, pursuant to Section 547 and
550 of the Bankruptcy Code.

By its Motion, Smith Protective seeks to withdraw
the reference of this adversary proceeding to this
Court, and if withdrawal is granted, Smith then
requests the Court to transfer this action to the
United States District Court for the District of
Texas. Smith Protective contends that "cause"
exists for permissive withdrawal, because the
Bankruptcy Court's caseload is overburdened with
thousands of preference actions and there are an
insufficient number of judges to handle them. In
addition, Smith Protective contends that if
withdrawal of the reference is granted, then transfer
of this proceeding to the Northern District of Texas
is appropriate, because Smith Protective is a
corporation formed under Texas law and located in
Texas, and the services related to the dispute
underlying this adversary proceeding were rendered
in Texas. Thus, Smith Protective contends that the
bulk of discovery, including the location of
document and witnesses, is in Texas.

DISCUSSION

Under 28 U.S.C. § 1334(b), district courts "have
original but not exclusive jurisdiction of all civil
proceedings arising under title 11, or arising in or
related to cases under title 11." Pursuant to 28
U.S.C. § 157(a), each district court may refer cases
under title 11 to the Bankruptcy Court for
disposition. However, under Section 157(d), the
referred proceeding can be withdrawn from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2537080 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Bankruptcy Court and returned to the district court. Section 157(d) provides for both mandatory withdrawal and discretionary withdrawal. In this case, Smith Protective seeks withdrawal only under the standards for discretionary withdrawal.

In providing for discretionary withdrawal, Section 157(d) states: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." This Court has acknowledged that the requirement that cause be shown "creates a 'presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy." ' *Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec.,* 106 B.R. 367, 371 (D.Del.1989) (citations omitted).

*2 The Court of Appeals for the Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for discretionary withdrawal. These factors include: (1) promoting uniformity of bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering economical use of debtor/creditor resources; (4) expediting the bankruptcy process; and (5) timing of the request for withdrawal. *In re Pruitt,* 910 F.2d 1160, 1168 (3d Cir.1990) (adopting *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 999 (5th Cir.1985)).

Evaluating these factors in the context of this case, the Court concludes that Smith Protective has not established cause for withdrawal of the reference. The instant adversary proceeding is a core proceeding under the Bankruptcy Code involving relatively uncomplicated claims and defenses and relatively basic discovery. *In re Philadelphia Training Center Corp.,* 155 B.R. 109 (E.D.Pa.1993) (declining permissive withdrawal in similar circumstances). The amount in controversy in this case is relatively small, and the parties have not yet conducted any discovery. Thus, it is entirely possible that this case may be resolved prior to the need for any extensive proceedings before the Bankruptcy Court, and in any event, if proceedings are needed before the Bankruptcy Court, the Court is persuaded that they will be of a routine nature.

Further, the Debtor has several hundred similar proceedings before the Bankruptcy Court in its Chapter 11 case, and therefore, the Court is persuaded that maintaining this action in the Bankruptcy Court will contribute to the orderly and efficient administration of the Debtor's estate.[FN1] Because the Court declines to withdraw the reference, transfer to the Northern District of Texas will not be discussed. Accordingly, the Court, in its discretion, will deny Smith Protective's Motion for withdrawal of the reference and transfer to the Northern District of Texas.

> FN1. The Court is aware of the large volume of cases burdening this district's Bankruptcy Court; however, the Bankruptcy Court is actively addressing the overload problem with, for example, visiting judges and a successful mediation program.

### CONCLUSION

For the reasons discussed, the Amended Motion To Withdraw The Reference Of Adversary Proceeding No. 02-10052-RTL From The United States Bankruptcy Court To The United States District Court For The District Of Delaware And For Transfer To The Northern District Of Texas filed by Smith Protective will be denied.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this 4th day of November 2004, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that the Amended Motion To Withdraw The Reference Of Adversary Proceeding No. 02-10052-RTL From The United States Bankruptcy Court To The United States District Court For The District Of Delaware And For Transfer To The Northern District Of Texas (D.I.2) filed by Defendant, Smith Protective Services, Inc. is *DENIED.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 3

Not Reported in F.Supp.2d, 2004 WL 2537080 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


D.Del.,2004.
In re Montgomery Ward, LLC
Not Reported in F.Supp.2d, 2004 WL 2537080
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:04CV00229 (Docket) (Apr. 13, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, et al.,[1] | ) ) | Case No. 02-13396 (PJW) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |

---

## SECOND AMENDED JOINT CONSOLIDATED PLAN OF REORGANIZATION OF OAKWOOD HOMES CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

Dated: February 6, 2004

**MORRIS, NICHOLS, ARSHT & TUNNELL**
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

- and -

**RAYBURN COOPER & DURHAM, P.A.**
C. Richard Rayburn, Jr.
Albert F. Durham
Patricia B. Edmondson
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina 28202-1675
(704) 334-0891

Co-Counsel for Oakwood Homes Corporation, et al., Debtors and Debtors In Possession

---

[1] The Debtors are the following entities: Oakwood Homes Corporation, New Dimension Homes, Inc., Dream Street Company, LLC, Oakwood Shared Services, LLC, HBOS Manufacturing, LP, Oakwood MHD4, LLC, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc., Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., Golden West Leasing, LLC, Crest Capital, LLC and Preferred Housing Services, LP.

THIS PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES WHETHER DEBT OR EQUITY OF THE DEBTORS SHOULD EVALUATE THIS PLAN IN LIGHT OF THE PURPOSES FOR WHICH IT WAS PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTUAL, THREATENED OR POTENTIAL ACTIONS, THIS PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## TABLE OF CONTENTS

Page

ARTICLE I.   DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW   1

1.1   DEFINITIONS.   1
(1)   1997 BONDS SECURED CLAIM   1
(2)   1997-A GUARANTEE   1
(3)   1997-B GUARANTEE   1
(4)   1997-C GUARANTEE   1
(5)   1997-D GUARANTEE   1
(6)   1998 BONDS SECURED CLAIM   2
(7)   1998-B GUARANTEE   2
(8)   1998-C GUARANTEE   2
(9)   1998-D GUARANTEE   2
(10)   1999-A GUARANTEE   2
(11)   1999-B GUARANTEE   2
(12)   1999-C LIMITED GUARANTEE   2
(13)   1999-C GUARANTEE   2
(14)   1999-D GUARANTEE   2
(15)   1999-E GUARANTEE   2
(16)   2000-A GUARANTEE   2
(17)   2000-B GUARANTEE   2
(18)   2001-B GUARANTEE   2
(19)   2001-C GUARANTEE   2
(20)   2001-D GUARANTEE   2
(21)   2001-E GUARANTEE   3
(22)   2002-A GUARANTEE   3
(23)   2002-B GUARANTEE   3
(24)   ADMINISTRATIVE CLAIM   3
(25)   ADMINISTRATIVE CLAIM BAR DATE ORDER   3
(26)   AFFILIATE DEBTOR(S)   3
(27)   ALLOWED CLAIM OR INTEREST   3
(28)   ALLOWED [CLASS DESIGNATION] CLAIM OR INTEREST   4
(29)   AMENDED AND RESTATED BYLAWS   4
(30)   AMENDED AND RESTATED CERTIFICATES OF INCORPORATION   4
(31)   APPROVAL HEARING   4
(32)   ASSETS   4
(33)   AUTO SECURED CLAIM   4
(34)   AVOIDANCE ACTIONS   4
(35)   B-2 REMIC GUARANTEES   5
(36)   B-PIECE REMIC CERTIFICATES   5
(37)   BALLOT

(38)  BALLOT DEADLINE ........................................................ 5
(39)  BALLOTING AGENT ...................................................... 5
(40)  BANKRUPTCY CODE ...................................................... 5
(41)  BANKRUPTCY COURT .................................................... 5
(42)  BANKRUPTCY RULES .................................................... 5
(43)  BAR DATE ORDER ........................................................ 5
(44)  BERKSHIRE .................................................................. 5
(45)  BID PROCEDURES ORDER .............................................. 5
(46)  BSI ............................................................................ 5
(47)  BUSINESS DAY ............................................................ 6
(48)  BUYER ...................................................................... 6
(49)  CAROLINA SECURED CLAIM ......................................... 6
(50)  CASH ........................................................................ 6
(51)  CASH EQUIVALENTS .................................................... 6
(52)  CAUSES OF ACTION .................................................... 6
(53)  CHAPTER 11 CASE ...................................................... 6
(54)  CLAIM ...................................................................... 6
(55)  CLAIMS AGENT .......................................................... 7
(56)  CLAIMS/INTERESTS OBJECTION DEADLINE ..................... 7
(57)  CLASS ...................................................................... 7
(58)  CONFIRMATION DATE .................................................. 7
(59)  CONFIRMATION HEARING .............................................. 7
(60)  CONFIRMATION ORDER ................................................ 7
(61)  CONVENIENCE CLAIM .................................................. 7
(62)  CONVENIENCE CLASS ELECTION .................................... 7
(63)  CONVENIENCE CLASS OPT-IN ELECTION .......................... 7
(64)  CONVENIENCE CLASS OPT-OUT ELECTION ....................... 7
(65)  CREDITORS' COMMITTEE ............................................. 8
(66)  DEBTOR-HELD INTEREST .............................................. 8
(67)  DEBTOR(S) ................................................................ 8
(68)  DIP CLAIM ................................................................ 8
(69)  DIP LENDERS ............................................................ 8
(70)  DISALLOWED ............................................................. 8
(71)  DISCLOSURE STATEMENT .............................................. 8
(72)  DISCLOSURE STATEMENT ORDER ................................... 8
(73)  DISPUTED AMOUNT ..................................................... 8
(74)  DISPUTED CLAIM OR INTEREST ..................................... 9
(75)  DISPUTED CLAIMS RESERVE ......................................... 9
(76)  DISTRIBUTION ADDRESS ............................................... 9
(77)  DISTRIBUTION DATE .................................................... 9
(78)  EFFECTIVE DATE ......................................................... 9
(79)  ESTATE ..................................................................... 9
(80)  ESTIMATION ORDER .................................................... 9
(81)  EXCLUDED ASSETS ..................................................... 10
(82)  EXCLUDED SALE DEBTOR ASSETS ................................. 10
(83)  EXCLUDED SALE TRUST ASSETS ................................... 10
(84)  EXECUTORY CONTRACT SCHEDULE ................................ 10

(ii)

(85)   EXIT FACILITY ................................................. 10
(86)   EXIT FACILITY AGREEMENT ........................ 10
(87)   EXIT FACILITY LENDER ............................... 10
(88)   FACE AMOUNT .......................................... 10
(89)   FEE CLAIM ................................................ 10
(90)   FEE ORDER ............................................... 10
(91)   FINAL DIP AGREEMENT .............................. 11
(92)   FINAL DIP ORDER ..................................... 11
(93)   FINAL ORDER ............................................ 11
(94)   FIRST AMERICAN SECURED CLAIM ............ 11
(95)   FOOTHILL .................................................. 11
(96)   FOOTHILL SECURED CLAIM ....................... 11
(97)   FUTURE CLAIM .......................................... 11
(98)   HOLDER .................................................... 12
(99)   IMPAIRED .................................................. 12
(100)  INITIAL DISTRIBUTION DATE ...................... 12
(101)  INITIAL STAND ALONE TRUST ASSETS ......... 12
(102)  INSIDER .................................................... 12
(103)  INTERCOMPANY CLAIM .............................. 12
(104)  INTEREST .................................................. 12
(105)  INTERESTED PARTY PROFESSIONALS .......... 12
(106)  JPMORGAN ............................................... 13
(107)  JUNIOR NOTES ......................................... 13
(108)  JUNIOR NOTES CLAIM ............................... 13
(109)  JUNIOR NOTES INDENTURE ........................ 13
(110)  JUNIOR NOTES INDENTURE TRUSTEE .......... 13
(111)  LIEN ........................................................ 13
(112)  LIQUIDATION TRUST .................................. 13
(113)  LIQUIDATION TRUST ADVISORY COMMITTEE ... 13
(114)  LIQUIDATION TRUST AGREEMENT ................ 13
(115)  LIQUIDATION TRUSTEE ............................... 13
(116)  LITIGATION CLAIMS ................................... 13
(117)  NET PROCEEDS .......................................... 14
(118)  NEW COMMON STOCK ................................ 14
(119)  NEW WARRANTS ........................................ 14
(120)  NON-DEBTOR-HELD INTEREST ................... 14
(121)  OAC ........................................................ 14
(122)  OAKWOOD ................................................ 14
(123)  OFC ........................................................ 14
(124)  OFC AND OIC TAX CLAIMS ....................... 14
(125)  OIC ......................................................... 14
(126)  OLD COMMON STOCK ................................ 14
(127)  OMI ........................................................ 15
(128)  OMI TRUST 1995-B ................................. 15
(129)  OMI TRUST 1996-A ................................. 15
(130)  OMI TRUST 1996-B ................................. 15
(131)  OMI TRUST 1996-C ................................. 15

(132)  OMI Trust 1997-A                                          15
(133)  OMI Trust 1997-B                                          15
(134)  OMI Trust 1997-C                                          15
(135)  OMI Trust 1997-D                                          15
(136)  OMI Trust 1998-A                                          16
(137)  OMI Trust 1998-B                                          16
(138)  OMI Trust 1998-C                                          16
(139)  OMI Trust 1998-D                                          16
(140)  OMI Trust 1999-A                                          16
(141)  OMI Trust 1999-B                                          16
(142)  OMI Trust 1999-C                                          16
(143)  OMI Trust 1999-D                                          16
(144)  OMI Trust 1999-E                                          16
(145)  OMI Trust 2000-A                                          17
(146)  OMI Trust 2000-B                                          17
(147)  OMI Trust 2000-C                                          17
(148)  OMI Trust 2000-D                                          17
(149)  OMI Trust 2001-B                                          17
(150)  OMI Trust 2001-C                                          17
(151)  OMI Trust 2001-D                                          17
(152)  OMI Trust 2001-E                                          17
(153)  OMI Trust 2002-A                                          18
(154)  OMI Trust 2002-B                                          18
(155)  OMI Trust 2002-C                                          18
(156)  OSHC                                                      18
(157)  Other Secured and Setoff Claim                           18
(158)  Other Unsecured Claims                                   18
(159)  Person                                                    18
(160)  Petition Date                                             18
(161)  Plan                                                      18
(162)  Plan Supplement                                           18
(163)  PNC                                                       18
(164)  Prepetition Loan Agreement                               18
(165)  Priority Non-Tax Claim                                    19
(166)  Priority Tax Claim                                        19
(167)  Proof of Claim                                            19
(168)  Purchase Agreement                                        19
(169)  Purchase Consideration                                    19
(170)  Purchased Business                                        19
(171)  Quarterly Distribution Date                               19
(172)  Ratable, Ratably or Ratable Share                         19
(173)  Record Date                                               19
(174)  REMIC Guarantee Claims                                    19
(175)  REMIC Trustee                                             19
(176)  REMIC Trusts                                              19
(177)  Reorganized Sale Debtors                                  20
(178)  Reorganized Sale OKWD                                     20

| | | |
|---|---|---|
| (179) | REORGANIZED SALE DEBTORS CAPITALIZATION AMOUNT | 20 |
| (180) | REORGANIZED STAND ALONE DEBTORS | 20 |
| (181) | REORGANIZED STAND ALONE OAKWOOD | 20 |
| (182) | RESECURITIZATION NOTE | 20 |
| (183) | RESECURITIZATION NOTE PUT OPTION | 20 |
| (184) | RESECURITIZATION TRUST | 20 |
| (185) | RESECURITIZATION TRUSTEE | 21 |
| (186) | RESIDUAL REMIC CERTIFICATES | 21 |
| (187) | SALE OPTION | 21 |
| (188) | SCHEDULE OF ASSETS AND LIABILITIES | 21 |
| (189) | SECURED CLAIM | 21 |
| (190) | SECURED TAX CLAIM | 21 |
| (191) | SENIOR NOTES | 21 |
| (192) | SENIOR NOTES CLAIM | 21 |
| (193) | SENIOR NOTES INDENTURE | 21 |
| (194) | SENIOR NOTES INDENTURE TRUSTEE | 21 |
| (195) | SERVICING AGREEMENTS | 22 |
| (196) | SOLICITATION PROCEDURES ORDER | 22 |
| (197) | STAND ALONE OPTION | 22 |
| (198) | STAND ALONE VOTING TRUST | 22 |
| (199) | STAND ALONE VOTING TRUST AGREEMENT | 22 |
| (200) | STAND ALONE VOTING TRUSTEE | 22 |
| (201) | STATEMENT OF FINANCIAL AFFAIRS | 22 |
| (202) | SUBSERVICING AGREEMENTS | 22 |
| (203) | THOMAS SECURED CLAIM | 22 |
| (204) | TRANSFER | 22 |
| (205) | U.S. BANK SECURED CLAIM | 22 |
| (206) | U.S. GOVERNMENT OBLIGATIONS | 22 |
| (207) | UNCLAIMED PROPERTY | 23 |
| (208) | UNIMPAIRED | 23 |
| (209) | UNITED STATES TRUSTEE | 23 |
| (210) | UNSECURED CLAIM | 23 |
| (211) | WARRANT AGREEMENT | 23 |
| (212) | X REMIC CERTIFICATES | 23 |
| 1.2 | RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW. | 23 |
| (a) | Rules of Interpretation. | 23 |
| (b) | Computation of Time. | 24 |
| (c) | Governing Law. | 24 |
| ARTICLE II. | METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS AND GENERAL PROVISIONS | 24 |
| 2.1 | GENERAL RULES OF CLASSIFICATION. | 24 |
| 2.2 | HOLDERS OF CLAIMS ENTITLED TO VOTE. | 25 |
| 2.3 | ACCEPTANCE BY IMPAIRED CLASSES. | 25 |
| 2.4 | NON-CONSENSUAL CONFIRMATION. | 25 |

|  | 2.5 | ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND FEE CLAIMS. | 25 |
|  | 2.6 | SPECIAL PROVISION REGARDING UNIMPAIRED CLAIMS. | 25 |
|  | 2.7 | INTENTIONALLY OMITTED. | 25 |
|  | 2.8 | BAR DATES FOR ADMINISTRATIVE CLAIMS. | 25 |
|  | 2.9 | BAR DATE FOR FEE CLAIMS. | 26 |
| **ARTICLE III.** | | **UNCLASSIFIED CLAIMS** | 26 |
|  | 3.1 | ADMINISTRATIVE CLAIMS. | 26 |
|  | 3.2 | PRIORITY TAX CLAIMS. | 27 |
|  | 3.3 | FEE CLAIMS. | 27 |
|  | 3.4 | OFC AND OIC TAX CLAIMS. | 27 |
| **ARTICLE IV.** | | **CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND INTERESTS** | 28 |
|  | 4.1 | SUMMARY. | 28 |
|  | 4.2 | CLASS 1 (PRIORITY NON-TAX CLAIMS). | 29 |
|  | 4.3 | CLASS 2A (SECURED TAX CLAIMS). | 29 |
|  | 4.4 | CLASS 2B (1997 BONDS SECURED CLAIMS). | 30 |
|  | 4.5 | CLASS 2C (1998 BONDS SECURED CLAIMS). | 30 |
|  | 4.6 | CLASS 2D (AUTO SECURED CLAIMS). | 31 |
|  | 4.7 | CLASS 2E (CAROLINA SECURED CLAIMS). | 31 |
|  | 4.8 | CLASS 2F (FIRST AMERICAN SECURED CLAIMS). | 32 |
|  | 4.9 | CLASS 2G (FOOTHILL SECURED CLAIMS). | 32 |
|  | 4.10 | INTENTIONALLY OMITTED. | 33 |
|  | 4.11 | INTENTIONALLY OMITTED. | 33 |
|  | 4.12 | CLASS 2J (THOMAS SECURED CLAIMS). | 33 |
|  | 4.13 | CLASS 2K (U.S. BANK SECURED CLAIMS). | 34 |
|  | 4.14 | CLASS 2L (OTHER SECURED AND SETOFF CLAIMS). | 34 |
|  | 4.15 | CLASS 3 (CONVENIENCE CLAIMS). | 35 |
|  | 4.16 | CLASS 4A (SENIOR NOTES CLAIMS). | 36 |
|  | 4.17 | CLASS 4B (JUNIOR NOTES CLAIMS). | 36 |
|  | 4.18 | CLASS 4C (REMIC GUARANTEE CLAIMS). | 36 |
|  | 4.19 | CLASS 4D (LITIGATION CLAIMS). | 37 |
|  | 4.20 | CLASS 4E (OTHER UNSECURED CLAIMS). | 37 |
|  | 4.21 | INTENTIONALLY OMITTED. | 38 |
|  | 4.22 | CLASS 6A (NON-DEBTOR-HELD INTERESTS). | 38 |
|  | 4.23 | INTENTIONALLY OMITTED. | 38 |
| **ARTICLE V.** | | **CONDITIONS PRECEDENT** | 38 |
|  | 5.1 | CONDITIONS TO CONFIRMATION. | 38 |
|  |  | (a) *Under the Sale Option.* | 38 |
|  |  | (b) *Under the Stand Alone Option.* | 41 |
|  | 5.2 | CONDITIONS TO CONSUMMATION. | 42 |
|  |  | (a) *Under the Sale Option.* | 42 |
|  |  | (b) *Under the Stand Alone Option.* | 43 |
|  | 5.3 | WAIVER OF CONDITIONS. | 44 |

(vi)

| | | |
|---|---|---|
| 5.4 | EFFECT OF NONOCCURRENCE OF THE CONDITIONS TO CONSUMMATION. | 44 |
| **ARTICLE VI.** | **IMPLEMENTATION** | 44 |
| 6.1 | PLAN IMPLEMENTATION UNDER THE SALE OPTION. | 44 |
| | | 45 |
| (a) | *Consummation of Sale Transaction.* | 45 |
| (b) | *Authorization of the Sale Transaction.* | 45 |
| (c) | *Revesting and Transfer of Assets.* | 45 |
| (d) | *Merger of Debtors and Vesting of Assets in Reorganized Sale Debtors.* | 46 |
| (e) | *Treatment of Old Common Stock, Interests and Beneficial Interest in the Liquidation Trust.* | 46 |
| (f) | *Considerations Regarding the Additional Debtors.* | 46 |
| (g) | *Distributions of Cash.* | 47 |
| 6.2 | PLAN IMPLEMENTATION UNDER THE STAND ALONE OPTION. | 47 |
| | | 47 |
| (a) | *Vesting of Assets.* | 47 |
| (b) | *Amended and Restated Certificates of Incorporation.* | 47 |
| (c) | *Amended and Restated Bylaws.* | 48 |
| (d) | *New Securities.* | 48 |
| (e) | *Directors.* | 48 |
| (f) | *Officers.* | 49 |
| (g) | *Employment Contracts and Professional Retentions.* | 49 |
| (h) | *Corporate Action and Other Documents and Actions.* | 49 |
| (i) | *Approval of the Exit Facility.* | 49 |
| (j) | *Distributions of Cash.* | 50 |
| (k) | *Distributions of Proceeds from the Liquidation Trust.* | 50 |
| 6.3 | PROVISIONS CONCERNING PLAN IMPLEMENTATION UNDER BOTH THE SALE OPTION AND THE STAND ALONE OPTION. | 50 |
| | | 50 |
| (a) | *Substantive Consolidation.* | 51 |
| (b) | *Creation of the Liquidation Trust.* | 52 |
| (c) | *Federal Income Tax Treatment of the Trust for the Liquidation Trust Assets.* | 54 |
| (d) | *Appointment of Liquidation Trustee* | 54 |
| (e) | *The Liquidation Trust Advisory Committee.* | 55 |
| (f) | *Causes of Actions and Defenses.* | 56 |
| (g) | *Termination of the Final DIP Agreement.* | 56 |
| (h) | *Dissolution of the Creditors' Committee.* | 56 |
| **ARTICLE VII.** | **EFFECTS OF PLAN CONFIRMATION** | |

| 7.1 | DISCHARGE. | 56 |
| 7.2 | RETENTION OF CAUSES OF ACTION/RESERVATION OF RIGHTS. | 57 |
| 7.3 | POST-CONSUMMATION EFFECT OF EVIDENCE OF CLAIMS OR INTERESTS. | 57 |
| 7.4 | TREATMENT OF FUTURE CLAIMS. | 58 |
| 7.5 | LIMITED RELEASES BY DEBTORS. | 58 |
| 7.6 | TERM OF INJUNCTIONS OR STAYS. | 59 |
| 7.7 | EXCULPATION. | 59 |
| 7.8 | INJUNCTION. | 59 |
| 7.9 | WAIVER OF CERTAIN CLAIMS. | 60 |
| 7.10 | INTENTIONALLY OMITTED. | 61 |
| 7.11 | RELEASE OF LIENS AND PERFECTION OF LIENS. | 61 |
| 7.12 | INSURANCE PRESERVATION. | 62 |

| **ARTICLE VIII.** | **GENERAL PROVISIONS REGARDING TREATMENT OF CLAIMS AND INTERESTS AND DISTRIBUTIONS UNDER THE PLAN** | **62** |

| 8.1 | SPECIAL CONSIDERATIONS FOR DISTRIBUTIONS TO CLASSES 4A, 4B AND 4C. | 62 |
| 8.2 | DISPUTED CLAIM RESERVES AND STAND ALONE VOTING TRUST. | 63 |
| (a) | *Establishment of Disputed Claim Reserves for Cash Distributions.* | 63 |
| (b) | *Establishment of the Stand Alone Voting Trust for New Common Stock and New Warrant Distribution.* | 63 |
| (c) | *Amounts to Be Reserved.* | 63 |
| (d) | *Distribution.* | 64 |
| (e) | *Termination of Disputed Claim Reserve or Stand Alone Voting Trust.* | 64 |
| (f) | *Limitation of Liability for Funding the Disputed Claim Reserve.* | 64 |
| 8.3 | TRANSMITTAL OF DISTRIBUTIONS AND NOTICES. | 65 |
| 8.4 | UNCLAIMED DISTRIBUTIONS. | 65 |
| 8.5 | SETOFFS. | 65 |
| 8.6 | WITHHOLDING TAXES AND EXPENSES OF DISTRIBUTION. | 65 |
| 8.7 | ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST. | 66 |
| 8.8 | DISPUTED IDENTITY OF HOLDER. | 66 |
| 8.9 | TRANSFERS OF CLAIMS. | 66 |
| 8.10 | METHOD OF CASH DISTRIBUTIONS. | 67 |
| 8.11 | DE MINIMIS DISTRIBUTIONS. | 67 |
| 8.12 | NO DISTRIBUTION IN EXCESS OF ALLOWED AMOUNT OF CLAIM. | 67 |
| 8.13 | EXEMPTION FROM CERTAIN TRANSFER TAXES. | 67 |

**ARTICLE IX.**  **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**  68

    9.1  ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.  68
    9.2  BAR DATE FOR REJECTION DAMAGES.  69
    9.3  PROCEDURES FOR THE DETERMINATION OF CURE AMOUNTS.  69

**ARTICLE X.**  **DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS**  70

    10.1  OBJECTIONS TO CLAIMS AND INTERESTS.  70
    10.2  ESTIMATION OF CLAIMS OR INTERESTS.  70
    10.3  AMENDMENTS TO CLAIMS OR INTERESTS.  71
    10.4  AUTHORITY TO SETTLE DISPUTED CLAIMS OR INTERESTS.  71
    10.5  NO RECOURSE.  71

**ARTICLE XI.**  **ADMINISTRATIVE PROVISIONS**  72

    11.1  RETENTION OF JURISDICTION.  72
    11.2  INTENTIONALLY OMITTED.  74
    11.3  AMENDMENTS.  74
        (a)  *Preconfirmation Amendment.*  74
        (b)  *Postconfirmation/Preconsummation Amendment Not Requiring Resolicitation.*  75
        (c)  *Postconfirmation/Preconsummation Amendment Requiring Resolicitation.*  75
    11.4  SEVERABILITY OF PLAN PROVISIONS.  75
    11.5  SUCCESSORS AND ASSIGNS.  75
    11.6  EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS.  76
    11.7  PLAN SUPPLEMENT.  76
    11.8  CONFIRMATION ORDER AND PLAN CONTROL.  76
    11.9  PAYMENT OF STATUTORY FEES.  76
    11.10  WITHDRAWAL OF PLAN.  76
    11.11  PAYMENT DATES.  77
    11.12  NOTICES.  77
    11.13  NO ADMISSIONS.  78

**ARTICLE XII.**  **CONFIRMATION REQUEST**  79

# INTRODUCTION

The Chapter 11 Cases of Oakwood Homes Corporation, Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, Oakwood MHD4, LLC, Oakwood Financial Corporation, Oakwood Investment Corporation and Oakwood Servicing Holdings Co., LLC, have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. The Plan is proposed by the Debtors. Reference is made to the Disclosure Statement for a discussion of, among other things, the Debtors' history, businesses, historical financial information and properties, and for a summary of the Plan. All creditors entitled to vote on the Plan should review the Disclosure Statement and the terms of the Plan before voting to accept or reject the Plan. In addition, there are other agreements and documents which have been or will be filed as the Plan Supplement which are referenced in the Plan and/or the Disclosure Statement and will be available for review. No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved by the Bankruptcy Court, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE L

### DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**1.1    Definitions.**

The capitalized terms set forth below shall have the following meanings:

(1)    **1997 Bonds Secured Claim** means that portion of the Claim of Wells Fargo Bank, N.A. arising under loan agreements with Elkhart County, Indiana respecting certain variable rate demand economic development bonds, but only to the extent that it is a Secured Claim secured by a Letter of Credit Mortgage on Debtor HBOS Manufacturing, LP's plant in Elkhart County, Indiana.

(2)    **1997-A Guarantee** means the Limited Guarantee by Oakwood, dated February 1, 1997, of the B-Piece REMIC Certificates issued by OMI Trust 1997-A.

(3)    **1997-B Guarantee** means the Limited Guarantee by Oakwood, dated May 1, 1997, of the B-Piece REMIC Certificates issued by OMI Trust 1997-B.

(4)    **1997-C Guarantee** means the Limited Guarantee by Oakwood, dated August 1, 1997, of the B-Piece REMIC Certificates issued by OMI Trust 1997-C.

(5)    **1997-D Guarantee** means the Limited Guarantee by Oakwood, dated November 1, 1997, of the B-Piece REMIC Certificates issued by OMI Trust 1997-D.

1

(6)    **1998 Bonds Secured Claim** means that portion of the Claim of Wells Fargo Bank, N.A. arising under loan agreements with Kosciusko County, Indiana respecting certain variable rate demand economic development bonds, but only to the extent that it is a Secured Claim secured by a Letter of Credit and Mortgage on Debtor HBOS Manufacturing, LP's plant in Kosciusko County, Indiana.

(7)    **1998-B Guarantee** means the Limited Guarantee by Oakwood, dated May 1, 1998, of the B-Piece REMIC Certificates issued by OMI Trust 1998-B.

(8)    **1998-C Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 1998-C.

(9)    **1998-D Guarantee** means the Limited Guarantee by Oakwood, dated October 1, 1998, of the B-Piece REMIC Certificates issued by OMI Trust 1998-D.

(10)    **1999-A Guarantee** means the Limited Guarantee by Oakwood, dated January 1, 1999, of the B-Piece REMIC Certificates issued by OMI Trust 1999-A.

(11)    **1999-B Guarantee** means the Limited Guarantee by Oakwood, dated April 1, 1999, of the B-Piece REMIC Certificates issued by OMI Trust 1999-B.

(12)    **1999-C Limited Guarantee** means the Limited Guarantee by Oakwood, dated June 1, 1999, of the B-Piece REMIC Certificates issued by OMI Trust 1999-C.

(13)    **1999-C Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 1999-C.

(14)    **1999-D Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 1999-D.

(15)    **1999-E Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 1999-E.

(16)    **2000-A Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 2000-A.

(17)    **2000-B Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 2000-B.

(18)    **2001-B Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 2001-B.

(19)    **2001-C Guarantee** means the Guarantee by Oakwood, dated August 10, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 2001-C.

(20)    **2001-D Guarantee** means the Guarantee by Oakwood, dated January 10, 2002, of the B-Piece REMIC Certificates issued by OMI Trust 2001-D.

(21)    **2001-E Guarantee** means the Guarantee by Oakwood, dated November 1, 2001, of the B-Piece REMIC Certificates issued by OMI Trust 2001-E.

(22)    **2002-A Guarantee** means the Guarantee by Oakwood, dated February 1, 2002, of the B-Piece REMIC Certificates issued by OMI Trust 2002-A.

(23)    **2002-B Guarantee** means the Guarantee by Oakwood, dated May 1, 2002, of the B-Piece REMIC Certificates issued by OMI Trust 2002-B.

(24)    **Administrative Claim** means: (a) a DIP Claim; (b) a Claim, other than a Fee Claim, for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation (i) the actual, necessary costs and expenses incurred after the Petition Date for preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services rendered) and (ii) all fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code; (c) cure costs associated with the assumption or assumption and assignment of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code; or (d) any Claim based upon a seller's common law right to reclaim goods as used in section 546(c) of the Bankruptcy Code pursuant to the Bankruptcy Court's Order Establishing Procedures With Respect To Reclamation Claims (D.I. 36) entered on November 19, 2002 (y) that has been granted priority under section 546(c)(2)(A) of the Bankruptcy Code or (z) which the Debtors, in their reasonable discretion, elect to treat as though such priority has been granted. Notwithstanding the foregoing, Administrative Claims shall not include any Intercompany Claims.

(25)    **Administrative Claim Bar Date Order** means the Bankruptcy Court's order (D.I. 2148) which established the bar date for the filing of certain Administrative Claims arising between the Petition Date and September 30, 2003.

(26)    **Affiliate Debtor(s)** means, in the singular or plural form, the following debtors and debtors-in-possession under the Bankruptcy Code in Chapter 11 Case Nos. 02-13390 through 02-13395, 02-13397 through 02-13404 and 04-10743 through 04-10747, pending in the Bankruptcy Court: Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, Oakwood MHD4, LLC, Oakwood Financial Corporation, Oakwood Investment Corporation and Oakwood Servicing Holdings Co., LLC.

(27)    **Allowed Claim or Interest** means a Claim or Interest to the extent (a) such Claim or Interest is scheduled by a Debtor pursuant to the Bankruptcy Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined or disputed; or (b) a proof of such Claim has been timely filed, or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable Final Orders of the Bankruptcy Court, or late filed with leave of the Bankruptcy Court, and either (i) is not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court or (ii) has otherwise been

3

allowed by a Final Order.  An Allowed Claim or Allowed Interest: (y) includes a previously Disputed Claim or Interest to the extent such Disputed Claim or Interest becomes allowed when the context so requires; and (z) shall be net of any valid setoff or recoupment amount based on a valid offset or recoupment right.  Unless otherwise expressly provided herein, in the Confirmation Order or in another Final Order of the Bankruptcy Court, the term "Allowed Claim" or "Allowed Interest" shall not, for the purposes of computation of distributions under the Plan, include (i) any non-compensatory penalties, fines, punitive damages, exemplary damages, multiple damages, treble damages or any other claims or obligations that do not compensate for actual losses incurred or (ii) any other amounts not allowable under the Bankruptcy Code or applicable law.

(28)    **Allowed [Class Designation] Claim or Interest** means an Allowed Claim or Allowed Interest in the specified Class.  For example, an Allowed Convenience Claim is an Allowed Claim in the Class designated herein as Class 3.

(29)    **Amended and Restated Bylaws** mean the Reorganized Stand Alone Debtors' bylaws which shall be substantially in the form set forth in the Plan Supplement.

(30)    **Amended and Restated Certificates of Incorporation** means the Reorganized Stand Alone Debtors' certificates of incorporation, LLC agreements or similar organizational documents in effect under the laws of the appropriate states, as amended by the Plan, which shall be substantially in the form set forth in the Plan Supplement.

(31)    **Approval Hearing** means the Approval Hearing as set forth in the Bid Procedures Order.

(32)    **Assets** means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible (including contract rights), wherever situated and by whomever possessed), including the goodwill related thereto, operated, owned or leased by the Debtors that constitute property of the Estates within the purview of section 541 of the Bankruptcy Code, including without limitation, any and all claims, causes of action or rights of the Debtors under federal, state or foreign law, letters of credit issued for or on behalf of the Debtors and the proceeds thereof and monies deposited to secure the performance of any contract or lease by the Debtors or any affiliate thereof.

(33)    **Auto Secured Claim** means that portion of the Claim of Citizens Federal S&L and other lenders, but only to the extent that it is a Secured Claim secured by eight (8) automobiles owned by Debtor Suburban Home Sales, Inc.

(34)    **Avoidance Actions** mean any claims, rights, defenses or other causes of action arising under any section of chapter 5 of the Bankruptcy Code, including, without limitation, sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or under similar or related state or federal statues and common law, including state fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute such actions.

(35)    **B-2 REMIC Guarantees** means collectively, the 1997-A Guarantee, the 1997-B Guarantee, the 1997-C Guarantee, the 1997-D Guarantee, the 1998-B Guarantee, the

1998-C Guarantee, the 1998-D Guarantee, the 1999-A Guarantee, the 1999-B Guarantee, the 1999-C Limited Guarantee, the 1999-C Guarantee, the 1999-D Guarantee, the 1999-E Guarantee, the 2000-A Guarantee, the 2000-B Guarantee, the 2001-B Guarantee, the 2001-C Guarantee, the 2001-D Guarantee, the 2001-E Guarantee, the 2002-A Guarantee and the 2002-B Guarantee.

(36)    **B-Piece REMIC Certificates** means the B-2 certificates issued by the REMIC Trusts.

(37)    **Ballot** means the ballot distributed to each eligible Holder of a Claim or Interest by the Balloting Agent, on which ballot such Holder may, among other things, vote for or against the Plan.

(38)    **Ballot Deadline** means the date and time set by the Bankruptcy Court by which the Balloting Agent must receive all Ballots.

(39)    **Balloting Agent** means the entity designated by the Bankruptcy Court to distribute, collect and tabulate Ballots from Holders, or any successor Claims Agent. Initially, the Balloting Agent is BSI.

(40)    **Bankruptcy Code** means title 11 of the United States Code, as now in effect or hereafter amended.

(41)    **Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference made pursuant to section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware.

(42)    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as now in effect or hereafter amended.

(43)    **Bar Date Order** means the Bankruptcy Court's Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (D.I. 370), dated January 7, 2003 which established the bar date for the filing of proofs of Unsecured Claims as March 27, 2003.

(44)    **Berkshire** means Berkshire Hathaway Inc., a corporation incorporated under the laws of Delaware.

(45)    **Bid Procedures Order** means the Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 Approving Bidding Procedures, Break-Up Fee, Performance of Pre-Closing Obligations, and Form and Manner of Notice Thereof with Respect to Proposed Sale Pursuant to Plan of Reorganization (D.I. 2652).

(46)    **BSI** means Bankruptcy Services LLC.

(47)  **Business Day** means any day except a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

(48)  **Buyer** means Clayton Homes, Inc. or its designee or its designees, as set forth in the Purchase Agreement.

(49)  **Carolina Secured Claim** means that portion of the Claim of Carolina First Bank arising under a note dated December 27, 2001, but only to the extent that it is a Secured Claim secured by land owned by Debtor Oakwood Mobile Homes, Inc. and located at 3200 Earle E. Morris, Jr. Hwy, Piedmont, South Carolina.

(50)  **Cash** means cash and Cash Equivalents, including but not limited to bank deposits, checks, treasury notes and other marketable securities.

(51)  **Cash Equivalents** means equivalents of cash in the form of readily marketable securities or instruments issued by a person other than the Debtors or Reorganized Sale Debtors, including, without limitation, U.S. Government Obligations, commercial paper of domestic corporations carrying a Moody's Rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest-bearing certificates of deposit or similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than Two Hundred Million U.S. Dollars ($200,000,000.00), having maturities of no more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

(52)  **Causes of Action** mean any and all claims, rights, defenses, offsets, recoupments, actions in law or equity or otherwise, causes of action, choses in action, suits, damages, rights to legal or equitable remedies, judgments, third-party claims, counterclaims and cross-claims, including, but not limited, to: all Avoidance Actions and all other claims in avoidance, recovery, subordination or other actions against any Persons, including, but not limited to, those actions described in the Disclosure Statement as amended, the Schedules of Assets and Liabilities as amended from time to time, the Statement of Financial Affairs as amended from time to time and the Plan as amended, whether arising under the Bankruptcy Code or federal, state, or common law, but regardless of whether any of the foregoing matters are subject to pending litigation or proceedings at the Confirmation Date or brought after that date; provided, however, that under the Sale Option, Causes of Action do not include those claims, rights, defenses, offsets, recoupments, actions in equity or other causes of action that are transferred to the Buyer pursuant to the Purchase Agreement.

(53)  **Chapter 11 Case** means the chapter 11 case of each Debtor pending before the Bankruptcy Court.

(54)  **Claim** means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, including but not limited to any liability, Interest, Lien, encumbrance or any other "debt" (as that term is defined in section 101(12) of the Bankruptcy Code), from or against the Debtors, their Estates, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, or arising from any agreement of the

Debtors entered into or obligation of any kind of the Debtors incurred before the Effective Date, or from any conduct of the Debtors occurring prior to the Effective Date or that otherwise arose before the Effective Date (including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the date of commencement of the applicable Chapter 11 Case).

(55)    **Claims Agent** means the entity designated by the Bankruptcy Court to act as the claims agent in the Chapter 11 Cases, or any successor claims agent.  As of the date of the Plan, the Claims Agent is BSI.

(56)    **Claims/Interests Objection Deadline** means the last day for filing objections to Claims, including but not limited to Administrative Claims, and Interests as provided in Article X of the Plan.

(57)    **Class** means a group of Claims or Interests described in Articles III and IV of the Plan.

(58)    **Confirmation Date** means the date the Bankruptcy Court enters the Confirmation Order on its docket.

(59)    **Confirmation Hearing** means the hearing or hearings pursuant to which the Bankruptcy Court considers the confirmation of this Plan.

(60)    **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(61)    **Convenience Claim** means the Claims of a Holder of one or more Allowed Unsecured Claims that, pursuant to section 1122(b) of the Bankruptcy Code, otherwise would be Allowed Other Unsecured Claims that have aggregate Face Amounts of: (i) $5,000.00 or less unless the Holder has properly made the Convenience Class Opt-Out Election on a Ballot properly cast by the Ballot Deadline to opt out of Class 3; or (ii) more than $5,000.00 if the Holder has properly made the Convenience Class Opt-In Election on a Ballot properly cast by the Ballot Deadline to opt into Class 3.

(62)    **Convenience Class Election** means a Convenience Class Opt-In Election and/or a Convenience Class Opt-Out Election.

(63)    **Convenience Class Opt-In Election** means the election available to a Holder of one or more Allowed Other Unsecured Claims with aggregate Face Amounts in excess of $5,000.00 to opt into Class 3 and have such Claim(s) treated as a Convenience Claim; *provided, however,* that the Holder of such Allowed Other Unsecured Claim(s) has agreed to reduce the Face Amount of such Claim(s) for purposes of voting and distributions under the Plan to a single Claim in an amount equal to or less than $5,000.00.

(64)    **Convenience Class Opt-Out Election** means the election available to a Holder of one or more Allowed Unsecured Claims that, pursuant to section 1122(b) of the Bankruptcy Code, otherwise would be a Convenience Claim that has an aggregate Face Amount

7

of $5,000.00 or less to opt out of Class 3 and have such Claim treated as an Other Unsecured Claim.

(65) **Creditors' Committee** means the Official Committee of Unsecured Creditors in the Chapter 11 Cases, as appointed by the United States Trustee and reconstituted from time to time.

(66) **Debtor-Held Interest** means an Interest in Oakwood or an Affiliate Debtor when the Holder is another Debtor.

(67) **Debtor(s)** mean, in the singular form, Oakwood or any one of the Affiliate Debtors and, in the plural form, all of Oakwood and the Affiliate Debtors.

(68) **DIP Claim** means a Claim of a DIP Lender arising under the Final DIP Agreement and the Final DIP Order.

(69) **DIP Lenders** collectively means Greenwich Capital Financial Products, Inc. and the other financial institutions (including Berkshire or one of its designees or affiliates) lending under the Final DIP Agreement.

(70) **Disallowed** means a Claim or Interest or any portion thereof that (a) has been disallowed by a Final Order, (b) is scheduled at zero or as contingent, disputed or unliquidated and as to which no Proof of Claim has been timely filed pursuant to the Bar Date Order or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or (c) is not scheduled by the Debtors in the Schedules of Assets and Liabilities and as to which (i) no Proof of Claim has been timely filed pursuant to the Bar Date Order or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order, or (ii) no request for payment of an Administrative Claim or Fee Claim has been timely filed by the applicable deadline pursuant to Sections 2.8 and 2.9 of the Plan or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order.

(71) **Disclosure Statement** means the disclosure statement that relates to this Plan that was approved by the Bankruptcy Court (D.I. 2050), as such Disclosure Statement may be amended, modified, or supplemented, including the supplemental disclosure statement (D.I. 3538) approved by the Bankruptcy Court by the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code (and all exhibits and schedules annexed thereto or referred to therein).

(72) **Disclosure Statement Order** means the order of the Bankruptcy Court approving the Disclosure Statement, as supplemented, as containing adequate information pursuant to section 1125 of the Bankruptcy Code (D.I. 3543).

(73) **Disputed Amount** means an amount equal to the total of that portion (including, when appropriate, the whole) of a Claim or Interest that is a Disputed Claim or Interest, including that portion of the Face Amount of a Disputed Claim or Interest which is not an Allowed Claim or Interest or a Disallowed Claim or Interest.

(74) **Disputed Claim or Interest** means that portion (including, when appropriate, the whole) of a Claim or Interest that is not an Allowed Claim or Interest or Disallowed Claim or Interest and (i) to which an objection has been timely filed or (ii) before the time that an objection has been or may be filed if: (a) the amount or classification of the Claim or Interest specified in the relevant proof of Claim or Interest exceeds the amount or is different from the classification of any corresponding Claim or Interest scheduled by the relevant Debtor in its Schedules of Assets and Liabilities; (b) any corresponding Claim or Interest scheduled by the relevant Debtor has been scheduled as disputed, contingent or unliquidated; or (c) no corresponding Claim or Interest has been scheduled by the relevant Debtor in its Schedules of Assets and Liabilities.

(75) **Disputed Claims Reserve** shall have the meaning ascribed to it in Section 6.3(c)(ii) of the Plan.

(76) **Distribution Address** means (a) the address indicated on any notice of appearance filed by a Person or his authorized agent prior to the Effective Date, (b) if no notice of appearance has been filed, then the address indicated on a properly filed Proof of Claim or, absent such a Proof of Claim, the address set forth in the relevant Schedule of Assets and Liabilities for that Person or register maintained for registered securities, or (c) for REMIC Guarantee Claims, the address set forth in Section 8.3 of the Plan.

(77) **Distribution Date** means (i) initially, the Initial Distribution Date, and (ii) subsequently, the Quarterly Distribution Dates or such other dates as the Liquidation Trust may establish from time to time to make any distribution.

(78) **Effective Date** means: (a) if no stay of the Confirmation Order is in effect, the first Business Day after the date all of the conditions set forth in the Plan have been satisfied or waived as set forth in the Plan, or such later date as may reasonably be agreed to by the Debtors, the Creditors' Committee and the Buyer (under the Sale Option) or Berkshire (under the Stand Alone Option); or (b) if a stay of the Confirmation Order is in effect, on the first Business Day (or such later date as may reasonably be agreed by the Debtors, the Creditors' Committee and the Buyer (under the Sale Option) or Berkshire (under the Stand Alone Option)) after the later of: (i) the date such stay is vacated; and (ii) the date each condition set forth in the Plan has been satisfied or waived as set forth in the Plan.

(79) **Estate** means the relevant estate created in each of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code, both individually and collectively, including the consolidated Estates of the Debtors pursuant to the Plan and the Confirmation Order.

(80) **Estimation Order** means a Final Order of the Bankruptcy Court, pursuant to Rule 3018 of the Bankruptcy Rules, which may be the Confirmation Order, estimating for voting, distribution or any other proper purposes under the Bankruptcy Code (under section 502(c) of the Bankruptcy Code) the aggregate (and if applicable, individual) Face Amount of Disputed Claims, whether classified or unclassified under this Plan.

(81)   **Excluded Assets** mean those Assets that, under the Sale Option, will not be Transferred to the Buyer on the Effective Date, as provided in the Purchase Agreement. For the avoidance of doubt, the Causes of Action are Excluded Assets.

(82)   **Excluded Sale Debtor Assets** mean the following Excluded Assets: (a) all policies of insurance held by the Debtors and their non-debtor affiliates; and (b) all Excluded Assets owned by OFC and OIC.

(83)   **Excluded Sale Trust Assets** mean all Excluded Assets other than the Excluded Sale Debtor Assets.

(84)   **Executory Contract Schedule** means the schedule of executory contracts and unexpired leases designated by the Debtors for assumption, under the Sale Option, or rejection, under the Stand Alone Option, as of the Effective Date of the Plan, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code and Section 9.1 of this Plan, which shall be in substantially the form contained in the Plan Supplement.

(85)   **Exit Facility** means the financing or financings obtained by the Debtors pursuant to the Exit Facility Agreement under the Stand Alone Option.

(86)   **Exit Facility Agreement** means, under the Stand Alone Option, that certain financing agreement obtained by the Debtors which is substantially in the form set forth in the Plan Supplement.

(87)   **Exit Facility Lender** means the lender or lenders providing the Exit Facility under the Stand Alone Option.

(88)   **Face Amount** means: (a) with respect to any Claim for which a Proof of Claim is filed, an amount equal to: (i) the liquidated amount, if any, set forth therein; or (ii) any other amount set forth in an Estimation Order or order allowing such a Claim; or (b) with respect to any Claim scheduled in the relevant Debtor's Schedules of Assets and Liabilities, but for which no Proof of Claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent and liquidated.

(89)   **Fee Claim** means: (a) a Claim of a professional person retained by order of the Bankruptcy Court for compensation and/or reimbursement of expenses pursuant to section 327, 328, 330 or 331 of the Bankruptcy Code in connection with the Chapter 11 Cases or (b) a Claim of any professional or other party-in-interest seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), 503(b)(5) or 503(b)(6) of the Bankruptcy Code.

(90)   **Fee Order** means the Bankruptcy Court's Administrative Order, Pursuant To Sections 331 And 105 Of The Bankruptcy Code, Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals [D.I. 60] dated December 18, 2002 (D.I. 277), in the Chapter 11 Cases, as may have been amended or supplemented from time to time.

(91)    **Final DIP Agreement** means the Amended and Restated Debtor-In-Possession Financing And Security Agreement, dated as of December 31, 2003, by and among the Debtors and Greenwich Capital Financial Products, Inc., as agent, and all other supporting and related agreements and documents, as amended, whenever finalized and signed, as authorized by the Final DIP Order.

(92)    **Final DIP Order** means the Bankruptcy Court's Final Order Pursuant To 11 U.S.C. §§ 105, 362 And 364, And Bankruptcy Rules 2002, 4001 And 9014 (a) Approving Replacement Debtor-In-Possession Financing With Administrative Expense Superpriority And Secured By Senior Liens, (b) Granting Senior Liens And Superpriority Administrative Expense Status And (c) Granting Other Relief (D.I. 328) dated December 31, 2002 as amended and restated by the Bankruptcy Court's Final Order Pursuant To 11 U.S.C. §§ 105, 362 And 364, And Bankruptcy Rules 2002, 4001 And 9014 (a) Approving Replacement Debtor-In-Possession Financing With Administrative Expense Superpriority And Secured By Senior Liens, (b) Granting Senior Liens And Superpriority Administrative Expense Status And (c) Granting Other Relief (D.I. 3346) dated January 15, 2004.

(93)    **Final Order** means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified or amended, and as to which: (a) the time to appeal or seek review has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for review, rehearing, remand or certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided, however,* that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules or law governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

(94)    **First American Secured Claim** means that portion of the Claim of First American Title on behalf of Yuet and Toy Wong arising under a note dated July 8, 1981, but only to the extent that it is a Secured Claim secured by property owned by Debtor HBOS Manufacturing, LP and located at 6258 Northwest Grand Ave., Glendale, Arizona 85301.

(95)    **Foothill** collectively means Foothill Capital Corporation and certain other lenders (including Wells Fargo Bank, N.A.) under the Prepetition Loan Agreement.

(96)    **Foothill Secured Claim** means that portion of the Claim of Foothill arising under the Prepetition Loan Agreement, but only to the extent that it is a Secured Claim secured by an escrow deposit established pursuant to the Bankruptcy Court's Order Adjourning Hearing On Foothill Capital Corp.'s As Agent For Itself & Certain DIP Lenders, Notice Of Payoff & Setting Dates By Which Briefs Are Due (D.I. 471), dated January 23, 2003; and the agreement executed pursuant to that order.

(97)    **Future Claim** means any Claim against a Debtor that (a) arises out of or relates to pre-Confirmation Date actions, omissions, events, occurrences, or failures, (b) did not manifest itself sufficiently prior to the Confirmation Date to provide the Holder of the Claim with a Constitutionally sufficient opportunity to file proof of such Claim or otherwise assert

rights with respect to such Claim in the Debtors' Chapter 11 cases, <u>and</u> (c) did not "arise" for purposes of applicable non-bankruptcy law until after the Confirmation Date.

(98)    **Holder** means a Person holding an Interest or a Claim.

(99)    **Impaired** shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

(100)    **Initial Distribution Date** means (a) with respect to Administrative Claims, Priority Non-Tax Claims, Priority Tax Claims and Convenience Claims, the date that is the later of (i) the Effective Date (or as soon thereafter as reasonably practicable) and (ii) the date (or as soon thereafter as is reasonably practicable) such Claims become Allowed Claims or otherwise become payable under the Plan; (b) with respect to Fee Claims, the date (or as soon thereafter as reasonably practicable) that such Claims (i) are allowed by Final Order of the Bankruptcy Court or (ii) become Allowed Claims after the Effective Date; and (c) with respect to the Secured Claims, the Junior Notes Claims, the Senior Notes Claims, the REMIC Guarantee Claims, the Litigation Claims, the Other Unsecured Claims and the Interests (subject to the priority scheme set forth in the Plan), the date as soon as reasonably practicable after the Effective Date or the date they become Allowed Claims. With respect to Secured Claims, occurrence of the Distribution Date shall be subject, if applicable, to the Estates' receipt of the Net Proceeds of the sale of the relevant collateral.

(101)    **Initial Stand Alone Trust Assets** means the Causes of Action and $1,000,000 in Cash.

(102)    **Insider** shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

(103)    **Intercompany Claim** means a Claim of any Debtor against another Debtor, whether arising before or after the Petition Date, including, without limitation, any Claim by OAC against OSHC for damages arising from rejection of the Subservicing Agreements.

(104)    **Interest** means any equity security, including Old Common Stock, within the meaning of section 101(16) of the Bankruptcy Code, in a Debtor. For purposes of voting and distributions under the Plan, the defined term Interest shall also include a Claim against a Debtor that is subject to subordination under section 510(b) of the Bankruptcy Code.

(105)    **Interested Party Professionals** means the following professionals, and only the following professionals, of the Debtors, the Creditors' Committee or members and <u>ex officio</u> members of the Creditors' Committee: Morris, Nichols, Arsht & Tunnell; Rayburn, Cooper & Durham, P.A.; Hunton & Williams; Kennedy Covington Lobdell & Hickman L.L.P.; FTI Consulting, Inc.; PricewaterhouseCoopers LLP; Akin Gump Strauss Hauer & Feld LLP; McCarter & English, LLP; Deloitte & Touche LLP; Alvarez & Marsal; Stites & Harbison, PLLC; Faegre & Benson LLP; Seward & Kissel LLP; Richards, Layton & Finger, P.C.; Morgan Lewis & Bockius LLP; Prime Locations, LLC; The Core Network; Andrew Davidson & Co., Inc.; Miller Buckfire Lewis Ying & Co., LLC; Munger, Tolles & Olson LLP; Young Conaway Stargatt & Taylor, LLP; and King & Spalding LLP.

(106)  **JPMorgan** means JPMorgan Chase Bank, formerly known as The Chase Manhattan Bank.

(107)  **Junior Notes** mean the 8% Reset Debentures in the original principal amount of $17 million due June 1, 2007, pursuant to an Indenture and a First Supplemental Indenture, both dated March 1, 1992, and the 8% Reset Debentures in the original principal amount of $23 million due June 1, 2007, pursuant to a Second Supplemental Indenture dated July 15, 1992.

(108)  **Junior Notes Claim** means an Unsecured Claim of the Junior Notes Indenture Trustee under the Junior Notes Indenture, or an Unsecured Claim of any Holder of Junior Notes for the payment of any principal, premium, if any, and interest owing and unpaid as of the Petition Date in respect of such Junior Notes.

(109)  **Junior Notes Indenture** means the Indenture and First Supplemental Indenture both dated March 1, 1992 and the Second Supplemental Indenture dated July 15, 1992, between the Debtors and First Union National Bank, f/k/a Delaware Trust Company, with respect to the Junior Notes, as the same may have been amended and/or supplemented from time to time.

(110)  **Junior Notes Indenture Trustee** means U.S. Bank Trust, N.A., as the indenture trustee under the Junior Notes Indenture, or any successor indenture trustees under the Junior Notes Indenture.

(111)  **Lien** has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code (but a lien that has or may be avoided pursuant to an Avoidance Action or any other Cause of Action shall not constitute a Lien).

(112)  **Liquidation Trust** means the trust created on the Effective Date pursuant to this Plan and the Liquidation Trust Agreement.

(113)  **Liquidation Trust Advisory Committee** means the advisory board that is to be created pursuant to Section 6.3 of the Plan.

(114)  **Liquidation Trust Agreement** means that certain agreement which is to govern the Liquidation Trust, substantially in the form set forth in the Plan Supplement.

(115)  **Liquidation Trustee** means the trustee appointed pursuant to the Plan and the Liquidation Trust Agreement.

(116)  **Litigation Claims** means: (a) all Claims against the Debtors asserted under lawsuits or complaints which are pending as of the commencement of the Chapter 11 Cases in any court, including, without limitation, state or federal court; (b) all Claims against the Debtors subject to mediation or arbitration which are pending as of the commencement of the Chapter 11 Cases that could potentially be asserted under lawsuits or complaints in any court; or (c) all Claims raised or made to the Debtors by any Person, including, without limitation, offices of state attorneys general, related to matters arising prior to commencement of the Chapter 11

Cases that could have been asserted under lawsuits or complaints in any court or could have been subject to mediation or arbitration.

(117)  **Net Proceeds** means the Cash consideration received from the sale, Transfer, or collection of property of the Estates or the conversion of such property to Cash in some other manner as contemplated in, or reasonably within the scope of, this Plan including the Purchase Consideration, whether occurring prior to or after the Effective Date, less the reasonable, necessary and customary expenses attributable to such sale, Transfer, collection or conversion, including costs of curing defaults under executory contracts that are assigned, paying personal property or other taxes accruing in connection with such sale, Transfer or conversion of such property, brokerage fees and commissions, collection costs, reasonable attorneys' fees and expenses, and any applicable taxes or other claims of any governmental authority in connection with such property and any escrows or accounts established to hold funds for purchase price adjustments, indemnification claims or other purposes in connection with such sale, Transfer or collection; provided, however, that upon the release to the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) of funds from such escrows or accounts, such funds shall become Net Proceeds of the relevant sale, Transfer or collection.

(118)  **New Common Stock** means, under the Stand Alone Option, the 20,000,000 shares of common stock of Reorganized Stand Alone Oakwood to be authorized in accordance with the Plan and Reorganized Stand Alone Oakwood's Amended and Restated Certificate of Incorporation, having a par value of $0.01 per share.

(119)  **New Warrants** means, under the Stand Alone Option, warrants to purchase 1,000,000 shares of New Common Stock pursuant to the terms of the Warrant Agreement, under the Stand Alone Option.

(120)  **Non-Debtor-Held Interest** means an Interest in Oakwood when the Holder is not a Debtor.

(121)  **OAC** means Oakwood Acceptance Corporation, LLC.

(122)  **Oakwood** means Oakwood Homes Corporation.

(123)  **OFC** means Oakwood Financial Corporation.

(124)  **OFC and OIC Tax Claims** mean all contingent unliquidated Claims (a) against OFC for federal and state income taxes arising out of its ownership of certain of the REMIC Residual Certificates; and (b) against OIC for federal and state income taxes arising out of its ownership of certain of the Residual REMIC Certificates.

(125)  **OIC** means Oakwood Investment Corporation.

(126)  **Old Common Stock** means the pre-confirmation common stock of, or other equity interest in, however derivative, Oakwood and outstanding or held in treasury as of the Record Date.

(127)  **OMI** means Oakwood Mortgage Investors, Inc.

(128)  **OMI Trust 1995-B** means the trust formed pursuant to the Series 1995-B Pooling and Servicing Agreement, dated as of October 1, 1995, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as Servicer, and JPMorgan as successor in interest to the Chase Manhattan Trust Company, National Association, as trustee.

(129)  **OMI Trust 1996-A** means the trust formed pursuant to the Series 1996-A Pooling and Servicing Agreement, dated as of February 1, 1996, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as Servicer, and JPMorgan as successor in interest to the Chase Manhattan Trust Company, National Association, as trustee.

(130)  **OMI Trust 1996-B** means the trust formed pursuant to the Series 1996-B Pooling and Servicing Agreement, dated as of July 1, 1996, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as Servicer, and JPMorgan as successor in interest to PNC, as trustee.

(131)  **OMI Trust 1996-C** means the trust formed pursuant to the Series 1996-C Pooling and Servicing Agreement, dated as of October 1, 1995, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as Servicer, and JPMorgan as successor in interest to PNC, as trustee.

(132)  **OMI Trust 1997-A** means the trust formed pursuant to the Series 1997-A Pooling and Servicing Agreement, dated as of February 1, 1997, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(133)  **OMI Trust 1997-B** means the trust formed pursuant to the Series 1997-B Pooling and Servicing Agreement, dated as of May 1, 1997, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(134)  **OMI Trust 1997-C** means the trust formed pursuant to the Series 1997-C Pooling and Servicing Agreement, dated as of August 1, 1997, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(135)  **OMI Trust 1997-D** means the trust formed pursuant to the Series 1997-D Pooling and Servicing Agreement, dated as of November 1, 1997, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(136)  **OMI Trust 1998-A** means the trust formed pursuant to the Series 1998-A Pooling and Servicing Agreement, dated as of February 1, 1998, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as Servicer, and JPMorgan as successor in interest to PNC, as trustee.

(137)  **OMI Trust 1998-B** means the trust formed pursuant to the Series 1998-B Pooling and Servicing Agreement, dated as of May 1, 1998, as amended December 11, 2000 and September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, November 1995 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(138)  **OMI Trust 1998-C** means the trust formed pursuant to the Series 1998-C Pooling and Servicing Agreement, dated as of August 1, 1998, as amended December 12, 2000, September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, July 1998 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(139)  **OMI Trust 1998-D** means the trust formed pursuant to the Series 1998-D Pooling and Servicing Agreement, dated as of October 1, 1998, as amended April 29, 1999 and September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, July 1998 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(140)  **OMI Trust 1999-A** means the trust formed pursuant to the Series 1999-A Pooling and Servicing Agreement, dated as of January 1, 1999, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, July 1998 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(141)  **OMI Trust 1999-B** means the trust formed pursuant to the Series 1999-B Pooling and Servicing Agreement, dated as of April 1, 1999, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, July 1998 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(142)  **OMI Trust 1999-C** means the trust formed pursuant to the Series 1999-C Pooling and Servicing Agreement, dated as of June 1, 1999, as amended November 1, 2000, December 12, 2000, September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(143)  **OMI Trust 1999-D** means the trust formed pursuant to the Series 1999-D Pooling and Servicing Agreement, dated as of August 1, 1999, as amended December 12, 2000, September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(144)  **OMI Trust 1999-E** means the trust formed pursuant to the Series 1999-E Pooling and Servicing Agreement, dated as of November 1, 1999, as amended December 11,

2000, September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(145) **OMI Trust 2000-A** means the trust formed pursuant to the Series 2000-A Pooling and Servicing Agreement, dated as of March 1, 2000, as amended December 11, 2000, September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(146) **OMI Trust 2000-B** means the trust formed pursuant to the Series 2000-B Pooling and Servicing Agreement, dated as of June 1, 2000, as amended December 11, 2000, September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(147) **OMI Trust 2000-C** means the trust formed pursuant to the Series 2000-C Pooling and Servicing Agreement, dated as of September 1, 2000, as amended December 1, 2000, December 14, 2000 and September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as Servicer, and Wells Fargo Bank Minnesota, National Association, as trustee.

(148) **OMI Trust 2000-D** means the trust formed pursuant to the Series 2000-D Pooling and Servicing Agreement, dated as of December 1, 2000, as amended September 28, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 1999 Edition, among OMI, OAC, as Servicer, and Wells Fargo Bank Minnesota, National Association, as trustee.

(149) **OMI Trust 2001-B** means the trust formed pursuant to the Series 2001-B Pooling and Servicing Agreement, dated as of February 1, 2001, as amended September 28, 2001 and August 10, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, February 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(150) **OMI Trust 2001-C** means the trust formed pursuant to the Series 2001-C Pooling and Servicing Agreement, dated as of May 1, 2001, as amended October 2, 2001, August 10, 2001 and December 12, 2001, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(151) **OMI Trust 2001-D** means the trust formed pursuant to the Series 2001-D Pooling and Servicing Agreement, dated as of August 1, 2001, as amended December 12, 2001 and January 10, 2002, and incorporating the Standard Terms to Pooling and Servicing Agreement, May 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(152) **OMI Trust 2001-E** means the trust formed pursuant to the Series 2001-E Pooling and Servicing Agreement, dated as of November 1, 2001, and incorporating the Standard

Terms to Pooling and Servicing Agreement, September 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(153)  **OMI Trust 2002-A** means the trust formed pursuant to the Series 2002-A Pooling and Servicing Agreement, dated as of February 1, 2002, and incorporating the Standard Terms to Pooling and Servicing Agreement, September 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(154)  **OMI Trust 2002-B** means the trust formed pursuant to the Series 2002-B Pooling and Servicing Agreement, dated as of May 1, 2002, and incorporating the Standard Terms to Pooling and Servicing Agreement, September 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(155)  **OMI Trust 2002-C** means the trust formed pursuant to the Series 2002-C Pooling and Servicing Agreement, dated as of August 1, 2002, and incorporating the Standard Terms to Pooling and Servicing Agreement, September 2001 Edition, among OMI, OAC, as servicer, and JPMorgan as successor in interest to PNC, as trustee.

(156)  **OSHC** means Oakwood Servicing Holdings Co., LLC.

(157)  **Other Secured and Setoff Claim** means any Secured Claim that is not: (a) a DIP Claim; (b) the 1997 Bonds Secured Claim; (c) the 1998 Bonds Secured Claim; (d) the Auto Secured Claim; (e) the Carolina Secured Claim; (f) the First American Secured Claim; (g) the Foothill Secured Claim; (h) the Thomas Secured Claim; (i) the U.S. Bank Secured Claim; or (j) a Secured Tax Claim.

(158)  **Other Unsecured Claims** means an Unsecured Claim that is not: (a) a Convenience Claim; (b) a REMIC Guarantee Claim; (c) a Senior Notes Claim; (d) a Junior Notes Claim; (e) a Litigation Claim; (f) an Administrative Claim; (g) a Fee Claim; (h) a Priority Tax Claim; or (i) a Priority Non-Tax Claim.

(159)  **Person** shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

(160)  **Petition Date** means November 15, 2002.

(161)  **Plan** means this Plan of Reorganization, dated as of the date set forth on the first page hereof, for each of the Debtors, together with any amendments or modifications hereto as the Debtors may file hereafter in accordance with the terms of the Plan.

(162)  **Plan Supplement** means the Bankruptcy Court filing specified in Section 11.7 of the Plan, the content of which is incorporated herein by reference.

(163)  **PNC** means PNC Bank National Association.

(164)  **Prepetition Loan Agreement** means that Loan and Security Agreement dated January 22, 2002 among the Debtors and Foothill, as amended pursuant to the First

Amendment to Loan Agreement dated July 2002 and the Second Amendment to Loan Agreement dated July 31, 2002.

(165)   **Priority Non-Tax Claim** means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code that is not: (i) an Administrative Claim; (ii) a Priority Tax Claim; or (iii) a Fee Claim.

(166)   **Priority Tax Claim** means a Claim for taxes entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

(167)   **Proof of Claim** means a proof of claim that is timely filed and in compliance with the Bankruptcy Rules and the Bar Date Order.

(168)   **Purchase Agreement** means that certain Asset Purchase Agreement, dated as of November 24, 2003, by and among the Debtors and certain non-debtor affiliates and Buyer, as attached as an exhibit to the Disclosure Statement, pursuant to which the Buyer will purchase the Purchased Business under the Sale Option.

(169)   **Purchase Consideration** means the consideration to be paid by the Buyer pursuant to the Purchase Agreement under the Sale Option.

(170)   **Purchased Business** means, under the Sale Option, all of the Assets to be Transferred to the Buyer on the Effective Date pursuant to the Purchase Agreement. For the avoidance of doubt, the Purchased Business does not include the Excluded Assets.

(171)   **Quarterly Distribution Date** means the first Business Day after the end of each quarterly calendar period (*i.e.*, March 31, June 30, September 30, and December 31 of each calendar year) following the Effective Date.

(172)   **Ratable, Ratably or Ratable Share** means, at any time, the proportion that the Face Amount of a Claim in a particular Class or group of Classes (in the case of Class 4) bears to the aggregate Face Amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class or group of Classes (in the case of Class 4), unless the Plan otherwise provides.

(173)   **Record Date** means the Confirmation Date.

(174)   **REMIC Guarantee Claims** mean all of the Unsecured Claims arising from the B-2 REMIC Guarantees and the Resecuritization Note Put Option.

(175)   **REMIC Trustee** means JPMorgan in its capacity as trustee, indenture trustee, successor trustee, securities intermediary, verification agent, paying agent, as applicable, and Resecuritization Trustee, for the holders of notes and certificates, including Holders of the B-Piece REMIC Certificates and the Resecuritization Note, issued by each of the REMIC Trusts and the Resecuritization Trust and any duly appointed successor or successors.

(176)   **REMIC Trusts** mean the following non-Debtor Real Estate Mortgage Investment Conduit Securitization Trusts: the OMI Trust 1995-B, the OMI Trust 1996-A, the

OMI Trust 1996-B, the OMI Trust 1996-C, the OMI Trust 1997-A, the OMI Trust 1997-B, the OMI Trust 1997-C, the OMI Trust 1997-D, the OMI Trust 1998-A, the OMI Trust 1998-B, the OMI Trust 1998-C, the OMI Trust 1998-D, the OMI Trust 1999-A, the OMI Trust 1999-B, the OMI Trust 1999-C, the OMI Trust 1999-D, the OMI Trust 1999-E, the OMI Trust 2000-A, the OMI Trust 2000-B, the OMI Trust 2000-C, the OMI Trust 2000-D, the OMI Trust 2001-B, the OMI Trust 2001-C, the OMI Trust 2001-D, the OMI Trust 2001-E, the OMI Trust 2002-A, the OMI Trust 2002-B and the OMI Trust 2002-C.

(177) **Reorganized Sale Debtors** means, under the Sale Option, (a) Reorganized Sale OKWD, (b) the Affiliate Debtors and OSHC as merged into Reorganized Sale OKWD on or after the Effective Date, (c) OFC and (d) OIC on and after the Effective Date.

(178) **Reorganized Sale OKWD** means, under the Sale Option, Oakwood on and after the Effective Date.

(179) **Reorganized Sale Debtors Capitalization Amount** means, under the Sale Option, those Assets as may be identified in the Plan Supplement and determined pursuant to an order or orders of the Bankruptcy Court (which may be the Confirmation Order) to be appropriate to fund the post-Effective Date operation of the Reorganized Sale Debtor, including the payment of all insurance premiums and the resolution of Future Claims.

(180) **Reorganized Stand Alone Debtors** means, under the Stand Alone Option, Reorganized Stand Alone Oakwood and the Affiliate Debtors on and after the Effective Date as reincorporated or otherwise established.

(181) **Reorganized Stand Alone Oakwood** means, under the Stand Alone Option, Oakwood on and after the Effective Date as reincorporated or otherwise established.

(182) **Resecuritization Note** means the Class A note issued by the Resecuritization Trust secured, in part, by certain B-Piece REMIC Certificates and X REMIC Certificates issued by the OMI Trust 1998-C, the OMI Trust 1999-C, the OMI Trust 1999-D, the OMI Trust 1999-E, the OMI Trust 2000-A, the OMI Trust 2000-B, the OMI Trust 2001-B, the OMI Trust 2001-C, the OMI Trust 2001-D, the OMI Trust 2001-E, the OMI Trust 2002-A and the OMI Trust 2002-B.

(183) **Resecuritization Note Put Option** means Oakwood's obligation to the holder of the Resecuritization Note to purchase the Resecuritization Note on each payment date under the Resecuritization Note, beginning with the payment date occurring in September 2011 and ending with the payment date occurring in September 2012.

(184) **Resecuritization Trust** means the Oakwood Mortgage Resecuritization Trust 2001 formed pursuant to the Amended and Restated Trust Agreement, dated as of February 1, 2002, as amended and supplemented by the Trust Agreement Amendment and Supplement, dated as of March 1, 2002, and the Trust Agreement Amendment and Supplement, dated as of June 1, 2002, among OMI, as depositor, OAC, as securities administrator, and the Resecuritization Trustee.

(185)  **Resecuritization Trustee** means JPMorgan in its capacity as trustee and securities intermediary of the Resecuritization Trust.

(186)  **Residual REMIC Certificates** means the Class R REMIC Certificates representing the residual interests in the REMIC Trusts.

(187)  **Sale Option** means the implementation of the Plan pursuant to Section 6.1 and other attendant provisions of the Plan.

(188)  **Schedule of Assets and Liabilities** means, as amended, supplemented or modified, a Debtor's schedule of assets and liabilities filed with the Bankruptcy Court on January 31, 2003 (D.I. 516, 518, 521, 524, 526, 528, 531, 533, 535, 539, 541, 543) pursuant to sections 521(1) and 1106(a)(2) of the Bankruptcy Code.

(189)  **Secured Claim** means: (a) that portion of a Claim that is secured by a valid, perfected and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to an Avoidance Action, in or upon any right, title or interest of any of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) any Claim that is subject to an offset right pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to a valid setoff, in the case of each of (a) and (b) as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code. Such defined term shall not include for voting or distribution purposes any such Claim that has been or will be paid in connection with the cure of defaults under an assumed executory contract or unexpired lease under section 365 of the Bankruptcy Code.

(190)  **Secured Tax Claim** means a Claim for taxes to the extent that it is a Secured Claim under state or federal law, excluding any Claim that is an Administrative Claim or Priority Tax Claim.

(191)  **Senior Notes** mean the 7.875% Senior Notes in the aggregate principal amount of $125 million due March 2004 and the 8.125% Senior Notes in the aggregate principal amount of $175 million due March 2009 pursuant to an Indenture and First Supplemental Indenture, both dated March 2, 1999.

(192)  **Senior Notes Claim** means the Unsecured Claim of the Senior Notes Indenture Trustee under the Senior Notes Indenture, or the Claim of any Holder of Senior Notes for the payment of any principal, premium, if any, and interest owing and unpaid as of the Petition Date in respect of such Senior Notes.

(193)  **Senior Notes Indenture** means the Indenture and First Supplemental Indenture, both dated March 2, 1999, between the Debtors and Bank One, N.A., f/k/a The First National Bank of Chicago, with respect to the Senior Notes, as the same may have been amended from time to time.

(194)  **Senior Notes Indenture Trustee** means U.S. Bank Trust, N.A., as the current indenture trustee under the Senior Notes Indenture, or any successor indenture trustee(s) to U.S. Bank Trust, N.A. under the Senior Notes Indenture.

21

(195) **Servicing Agreements** means the servicing agreements assumed by OAC and assigned to OHSC under section 365 of the Bankruptcy Court as authorized by Final Orders entered by the Bankruptcy Court (D.I. 369, D.I. 424 and D.I. 425).

(196) **Solicitation Procedures Order** means the Order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (D.I. 3543).

(197) **Stand Alone Option** means the implementation of the Plan pursuant to Section 6.2 and other attendant provisions of the Plan.

(198) **Stand Alone Voting Trust** means the trust created on the Effective Date pursuant to the Plan and the Stand Alone Voting Trust Agreement.

(199) **Stand Alone Voting Trust Agreement** means that certain agreement which is to govern the Stand Alone Voting Trust, substantially in the form set forth in the Plan Supplement.

(200) **Stand Alone Voting Trustee** means the trustees appointed pursuant to the Plan and the Stand Alone Voting Trust Agreement.

(201) **Statement of Financial Affairs** means, as amended, supplemented or modified, a Debtor's statement of financial affairs filed with the Bankruptcy Court on January 31, 2003 (D.I. 515, 517, 520, 522, 525, 527, 530, 532, 534, 537, 540, 542) pursuant to sections 521(1) and 1106(a)(2) of the Bankruptcy Code.

(202) **Subservicing Agreements** means the subservicing agreements between OSHC and OAC, as amended, approved by Orders of the Bankruptcy Court (D.I. 369, D.I. 424 and D.I. 425).

(203) **Thomas Secured Claim** means that portion of the Claim of Lecil V. and Tommie Jane Thomas arising under a note dated January 15, 1993, but only to the extent that it is a Secured Claim secured by property owned by Debtor HBOS Manufacturing, LP and located at 508 Palmer Road, Rockwell, North Carolina.

(204) **Transfer** shall have the meaning ascribed to such term in section 101(54) of the Bankruptcy Code.

(205) **U.S. Bank Secured Claim** means that portion of the Claim of U.S. Bank National Association arising under a note dated April 2, 1991, but only to the extent that it is a Secured Claim secured by property owned by Debtor HBOS Manufacturing, LP and located in Albany, Linn County, Oregon.

(206) **U.S. Government Obligations** means securities that are direct obligations of, or obligations guaranteed by, the United States of America for the timely payment of which obligation or guarantee the full faith and credit of the United States of America is pledged, or funds consisting solely of such securities.

22

(207)  **Unclaimed Property** means any Cash or other distributable property unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto in respect of such Holder's Allowed Claim. Unclaimed Property shall, without limitation, include: (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, notwithstanding efforts by the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) to locate such address which were commercially reasonable under the circumstances. Distributions of cash that otherwise would be payable under the Plan to a Holder but for Section 9.14 of the Plan that never, collectively, exceed fifty dollars ($50.00) as described in Section 9.14 and for which a request is not made within the one (1) year deadline shall become Unclaimed Property.

(208)  **Unimpaired** shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

(209)  **United States Trustee** means the Office of the United States Trustee for the District of Delaware.

(210)  **Unsecured Claim** means any Claim, arising pre-petition, that is not: (a) an Administrative Claim; (b) a Priority Non-Tax Claim; (c) a Priority Tax Claim; (d) a Fee Claim; (e) a Secured Claim; (f) an Intercompany Claim; or (g) an Interest.

(211).  **Warrant Agreement** means that certain agreement governing exercise of the New Warrants, in substantially the form set forth in the Plan Supplement.

(212)  **X REMIC Certificates** mean those certain Class X "pass-through" asset-backed securities that have been issued by the OMI Trust 1998-C, the OMI Trust 1999-C, the OMI Trust 1999-D, the OMI Trust 1999-E, the OMI Trust 2000-A, the OMI Trust 2000-B, the OMI Trust 2001-B, the OMI Trust 2001-C, the OMI Trust 2001-D, the OMI Trust 2001-E, the OMI Trust 2002-A, the OMI Trust 2002-B and the OMI Trust 2002-C.

**1.2**    **Rules of Interpretation, Computation of Time and Governing Law.**

(a)    **Rules of Interpretation.**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or an exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an exhibit is inconsistent with the terms of the exhibit, the terms of the Plan shall control unless the Purchase Agreement is inconsistent with the Plan, in which case the Purchase Agreement shall control; (e) unless otherwise specified, all references in

the Plan to articles, sections, clauses and exhibits are references to articles, sections, clauses and exhibits of or to the Plan; (f) the words "herein" and "hereto" and other words of similar import refer to this Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors, assigns and affiliates; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with any other provision in this Section; (j) any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein; and (k) any reference to the "Liquidation Trustee" shall be deemed to include a reference to the "Liquidation Trust" and any reference to the "Liquidation Trust" shall be deemed to include a reference to the "Liquidation Trustee" unless the context otherwise requires.

(b)    **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(c)    **Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

## ARTICLE II.

## METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS

## AND GENERAL PROVISIONS

### 2.1    General Rules of Classification.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

24

**2.2    Holders of Claims Entitled to Vote.**

Each Holder of an Allowed Claim and each Holder of a Claim that has been temporarily allowed for voting purposes by Order under Bankruptcy Rule 3018(a), which Claim is in an Impaired Class of Claims, shall be entitled to vote separately to accept or reject the Plan as provided in the Solicitation Procedures Order. Any Unimpaired Class of Claims shall be deemed to have accepted the Plan. Any Class of Claims or Interests that will not receive or retain any property on account of such Claims or Interests shall be deemed to have rejected the Plan.

**2.3    Acceptance by Impaired Classes.**

An Impaired Class of Claims shall have accepted the Plan if all of the necessary conditions of the Bankruptcy Code and Bankruptcy Rules have been satisfied.

**2.4    Non-Consensual Confirmation.**

To the extent necessary, the Debtors hereby request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Subject to section 1127 of the Bankruptcy Code, the Debtors reserve the right to modify the Plan to the extent that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, provided such modifications are consistent with Article XI of the Plan.

**2.5    Administrative Claims, Priority Tax Claims and Fee Claims.**

Administrative Claims, Fee Claims, Priority Tax Claims and OFC and OIC Tax Claims (to the extent that OFC and OIC are included in this Plan) have not been classified and are excluded from the Classes set forth in Article IV in accordance with section 1123(a)(1) of the Bankruptcy Code.

**2.6    Special Provision Regarding Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing herein shall affect the rights and defenses, both legal and equitable, of the Liquidation Trust and the Reorganized Stand Alone Debtors, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims and the right to assert Avoidance Actions against any Holders of an Unimpaired Claim.

**2.7    Intentionally Omitted.**

**2.8    Bar Dates for Administrative Claims.**

Respecting Administrative Claims subject to the Administrative Claim Bar Date Order, a Holder of such Administrative Claim must have complied with the provisions of such order to be eligible to receive distributions under the Plan on account of such Administrative Claim.

25

To be eligible to receive distributions under the Plan on account of an Administrative Claim that is not subject to the Administrative Claim Bar Date Order and that is not a Fee Claim, all requests for payment of such Administrative Claims must be made by Proof of Administrative Claim filed with the Claims Agent so as to be received on or before 4:00 p.m. (Eastern Time) on the date that is the first Business Day after the date that is twenty (20) days after the Effective Date, unless otherwise agreed to by the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option). Amendments to such Claims shall be governed by the provisions set forth in Section 10.3 of the Plan.

**Any Holder of an Administrative Claim that does not assert such Claim in accordance with this Section 2.8, shall have its Claim be deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, the Reorganized Stand Alone Debtors, the Reorganized Sale Debtors, the Liquidation Trust, the Estates or any of their property. Any such Claim shall be discharged and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.**

**2.9     Bar Date for Fee Claims.**

All final applications for payment of Fee Claims shall be filed with the Bankruptcy Court and served on or before the first Business Day that is sixty (60) days after the Effective Date or such other date as otherwise agreed by the Liquidation Trust (under the Sale Option) or the Reorganization Stand Alone (under the Stand Alone Option).

**Any Holder of a Fee Claim that does not assert such Claim in accordance with this Section 2.9 shall have its Claim be deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, the Reorganized Stand Alone Debtors, the Reorganized Sale Debtors, the Liquidation Trust, the Estates or any of their property. Any such Claim shall be discharged and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.**

### ARTICLE III.

### UNCLASSIFIED CLAIMS

**3.1     Administrative Claims.**

Subject to the terms herein, and unless the Holder of an Allowed Administrative Claim agrees to receive other, less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid 100% of the unpaid allowed amount of such Administrative Claim in Cash on or as soon as reasonably practicable after the Initial Distribution Date. Notwithstanding the immediately preceding sentence: (i) under the Stand Alone Option, any Allowed Administrative Claims for goods sold or services rendered representing liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, subject to compliance with any applicable bar date, shall be paid in the ordinary course in accordance with the terms and conditions of any agreements relating thereto; (ii) Allowed Administrative

Claims of the United States Trustee for fees pursuant to section 1930(a)(6) of title 28 of the United States Code shall be paid in accordance with the applicable schedule for payment of such fees; and (iii) all Allowed DIP Claims arising from the Final DIP Agreement shall be paid in accordance with the Final DIP Agreement and the Final DIP Order.

### 3.2    Priority Tax Claims.

Subject to the terms herein, and unless the Holder of an Allowed Priority Tax Claim agrees to receive other, less favorable treatment, each Holder of an Allowed Priority Tax Claim shall be paid 100% of such Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the Initial Distribution Date; provided, however, that, under the Stand Alone Option, the Reorganized Stand Alone Debtors may opt to make distributions for any Allowed Priority Tax Claim over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim as provided in section 1129(a)(9)(C) of the Bankruptcy Code. If the Reorganized Stand Alone Debtors elect this option as to any Allowed Priority Tax Claim, then the payment of such Allowed Priority Tax Claim shall be made in equal semi-annual installments with the first installment due on the later of: (i) the Initial Distribution Date; (ii) 30 calendar days after the date on which an order allowing such Allowed Priority Tax Claim becomes a Final Order; or (iii) such other time as may be agreed to by the Holder of such Allowed Priority Tax Claim and the Reorganized Stand Alone Debtors. Each installment shall include simple interest on the unpaid portion of such Allowed Priority Tax Claim, without penalty of any kind, at the statutory rate of interest provided for such taxes under applicable non-bankruptcy law; provided, however, that the Reorganized Stand Alone Debtors shall reserve the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Allowed Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty. Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in section 507(a)(8)(G) of the Bankruptcy Code) shall be Disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Estates or any of their respective property.

### 3.3    Fee Claims.

Subject to the terms herein, and unless the Holder of an Allowed Fee Claim agrees to receive other, less favorable treatment, each Holder of an Allowed Fee Claim shall receive 100% of the unpaid allowed amount of such Claim in Cash on or as soon as reasonably practicable after the Initial Distribution Date.

### 3.4    OFC and OIC Tax Claims.

To the extent that OFC and OIC are included under this Plan, all OFC and OIC Tax Claims shall be Unimpaired and shall continue to be valid and fully enforceable against Reorganized Sale Debtor after the Effective Date.

# ARTICLE IV.

## CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND INTERESTS

4.1    **Summary.**

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2A | Secured Tax Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2B | 1997 Bonds Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2C | 1998 Bonds Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2D | Auto Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2E | Carolina Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2F | First American Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2G | Foothill Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2J | Thomas Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2K | U.S. Bank Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 2L | Other Secured and Setoff Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 3 | Convenience Claims | Impaired | Entitled to Vote |
| Class 4A | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 4B | Junior Notes Claims | Impaired | Entitled to Vote |
| Class 4C | REMIC Guarantee Claims | Impaired | Entitled to Vote |
| Class 4D | Litigation Claims | Impaired | Entitled to Vote |

28

| Class 4E | Other Unsecured Claims | Impaired | Entitled to Vote |
|----------|------------------------|----------|------------------|

| Class 6A | Non-Debtor-Held Interests | Impaired | Entitled to Vote |
|----------|---------------------------|----------|------------------|

**4.2    Class 1 (Priority Non-Tax Claims).**

<u>Classification</u>: Class 1 shall consist of all Priority Non-Tax Claims.

<u>Treatment</u>: Subject to the terms herein, and unless the Holder of an Allowed Priority Non-Tax Claim agrees to receive other, less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall be paid 100% of the unpaid amount of such Allowed Priority Non-Tax Claim in Cash on or as soon as reasonably practicable after the Initial Distribution Date.

<u>Voting</u>: Class 1 is an Unimpaired Class, and Holders of Class 1 Claims are not entitled to vote.

**4.3    Class 2A (Secured Tax Claims).**

<u>Classification</u>: Class 2A shall consist of all Secured Tax Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

<u>Treatment</u>: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, each Holder of an Allowed Secured Tax Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed Secured Tax Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor lien priorities; (c) the reinstatement of the Claim in accordance with section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

<u>Voting</u>: Class 2A is an Unimpaired Class, and Holders of Class 2A Claims are not entitled to vote.

**4.4    Class 2B (1997 Bonds Secured Claims).**

Classification: Class 2B shall consist of all 1997 Bonds Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, the Holder of the Allowed 1997 Bonds Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed 1997 Bonds Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

Voting: Class 2B is an Unimpaired Class, and Holders of Class 2B Claims are not entitled to vote.

**4.5    Class 2C (1998 Bonds Secured Claims).**

Classification: Class 2C shall consist of all 1998 Bonds Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, a Holder of an Allowed 1998 Bonds Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed 1998 Bonds Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made

on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

Voting: Class 2C is an Unimpaired Class, and Holders of Class 2C Claims are not entitled to vote.

### 4.6    Class 2D (Auto Secured Claims).

Classification: Class 2D shall consist of all Auto Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, a Holder of an Allowed Auto Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed Auto Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

Voting: Class 2D is an Unimpaired Class, and Holders of Class 2D Claims are not entitled to vote.

### 4.7    Class 2E (Carolina Secured Claims).

Classification: Class 2E shall consist of all Carolina Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, a Holder of an Allowed Carolina Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed Carolina Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set

up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

Voting: Class 2E is an Unimpaired Class, and Holders of Class 2E Claims are not entitled to vote.

### 4.8 Class 2F (First American Secured Claims).

Classification: Class 2F shall consist of all First American Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, the Holder of the Allowed First American Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed First American Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

Voting: Class 2F is an Unimpaired Class, and Holders of the Class 2F Claims are not entitled to vote.

### 4.9 Class 2G (Foothill Secured Claims).

Classification: Class 2G shall consist of all Foothill Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

**Treatment**: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, a Holder of an Allowed Foothill Secured Claim shall receive (a) under the Sale Option, 100% of the unpaid amount of such Allowed Claim in accordance with section 5.03 of the Purchase Agreement; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (b) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (c) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (d) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (e) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date.

**Voting**: Class 2G is an Unimpaired Class, and Holders of Class 2G Claims are not entitled to vote.

**4.10    Intentionally Omitted.**

**4.11    Intentionally Omitted.**

**4.12    Class 2J (Thomas Secured Claims).**

**Classification**: Class 2J shall consist of all Thomas Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

**Treatment**: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, a Holder of an Allowed Thomas Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed Thomas Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable upon the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

**Voting**: Class 2J is an Unimpaired Class, and Holders of Class 2J Claims are not entitled to vote.

33

**4.13    Class 2K (U.S. Bank Secured Claims).**

Classification: Class 2K shall consist of all U.S. Bank Secured Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, a Holder of an Allowed U.S. Bank Secured Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed U.S. Bank Secured Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral).

Voting: Class 2K is an Unimpaired Class, and Holders of Class 2K Claims are not entitled to vote.

**4.14    Class 2L (Other Secured and Setoff Claims).**

Classification: Class 2L shall consist of all Other Secured and Setoff Claims, to the extent (i) validly perfected under applicable non-bankruptcy law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code and (ii) otherwise enforceable against the Debtors' Estates or the property thereof.

Treatment: Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, each Holder of an Allowed Other Secured and Setoff Claim shall receive (i) under the Sale Option, 100% of the unpaid amount of such Allowed Other Secured and Setoff Claim in Cash; or (ii) under the Stand Alone Option, at the option of the Reorganized Stand Alone Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor Lien priorities; (c) the reinstatement of the Claim in accordance with the provisions of section 1124(2) of the Bankruptcy Code; (d) the indubitable equivalent of such Claim in accordance with section 1129(b)(2)(A)(iii) of the Bankruptcy Code; (e) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Reorganized Stand Alone Debtors; and (f) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such distribution, if required, shall be made

on or as soon as reasonably practicable after the Initial Distribution Date (subject, if applicable, to the receipt by the Reorganized Stand Alone Debtors or the Liquidation Trust of the Net Proceeds of the sale of the relevant collateral). To the extent a Claim is partially an Allowed Other Secured and Setoff Claim based on an offset right and partially an Allowed Claim of another type, such Other Secured and Setoff Claim shall be deemed to have been (x) setoff only to the extent of the allowed amount of the allowed, liquidated, nondisputed, noncontingent claim owing to the Debtors, Liquidation Trust, the Reorganized Sale Debtors or the Reorganized Stand Alone Debtors and (y) a Claim classified in another relevant Class for any excess of such Claim over the amount so set off. If a Claim is a fully Secured Claim based on an offset right, the allowance of such Claim shall not affect any obligations or liabilities due and payable (at such time) to the Debtors, Liquidation Trust, the Reorganized Sale Debtors or the Reorganized Stand Alone Debtors that are in an amount in excess of the amount validly offset and the payment, in full and in cash, of all amounts due and owing as of the Effective Date to the Debtors, Liquidation Trust, the Reorganized Sale Debtors or the Reorganized Stand Alone Debtors and the turnover of any property of the Debtors, Liquidation Trust, the Reorganized Sale Debtors or the Reorganized Stand Alone Debtors held by such claimant on account of any unliquidated, disputed or contingent right of setoff shall be a precondition of the allowance of such Other Secured and Setoff Claim.

Voting: Class 2L is an Unimpaired Class, and Holders of Class 2L Claims are not entitled to vote.

### 4.15    Class 3 (Convenience Claims).

Classification: Class 3 shall consist of all Convenience Claims.

Treatment: Subject to the terms herein and unless the Holder of an Allowed Class 3 Claim makes a Convenience Class Opt-Out Election or agrees to receive other, less favorable treatment, a Holder of an Allowed Claim in this Class, including Holders of Other Unsecured Claims making a Convenience Class Opt-In Election, shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, 25% of the unpaid amount of such Allowed Class 3 Claim in Cash on or as soon as reasonably practicable after the Initial Distribution Date.

Voting: Class 3 is an Impaired Class, and Holders of Class 3 Claims are entitled to vote. The Convenience Class Election must be made at the time of balloting for voting to accept or reject the Plan and clearly indicated on the Holder's Ballot and any such election for treatment as a Convenience Claim through a Convenience Class Opt-In Election shall count as a vote for the Plan; provided, however, that, if any Claim that is otherwise eligible for the Convenience Class Election is a Disputed Claim at the time of balloting, the Convenience Class Election may be made in a Final Order allowing such Claim. Once a Convenience Class Election has been made with respect to a Claim, such election shall be irrevocable; provided, however, that a Convenience Class Election can be changed or made upon the written consent of the Debtors, prior to the Effective Date, and the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option), after the Effective Date. Whether a Holder of a Claim has properly made a Convenience Class Election shall have no effect on whether such Claim is or may become a Disputed Claim or an Allowed Claim.

### 4.16    Class 4A (Senior Notes Claims).

Classification: Class 4A shall consist of all Senior Notes Claims.

Treatment: Subject to the terms herein and unless the Holder of an Allowed Class 4A Claim who is the beneficial holder of such Class 4A Claim agrees to receive other, less favorable treatment, such Holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim: (i) under both the Sale Option and the Stand Alone Option, a beneficial interest in the Liquidation Trust in a proportion Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E; and (ii) under the Stand Alone Option, a portion of the 10,000,000 shares of New Common Stock to be issued pursuant to the Plan, in an amount that is Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E. Such distributions, shall be made on or as soon as reasonably practicable after the Initial Distribution Date, subject to the establishment of appropriate reserves for Disputed Claims in accordance with the provisions of the Plan, including reserves of New Common Stock held by the Stand Alone Voting Trust.

Voting: Class 4A is an Impaired Class, and Holders of Allowed Class 4A Claims who are the beneficial holders of such Class 4A Claims are entitled to vote.

### 4.17    Class 4B (Junior Notes Claims).

Classification: Class 4B shall consist of all Junior Notes Claims.

Treatment: Subject to the terms herein and unless a Holder of an Allowed Class 4B Claim who is the beneficial holder of such Class 4B Claim agrees to receive other, less favorable treatment, such Holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim: (i) under both the Sale Option and the Stand Alone Option, a beneficial interest in the Liquidation Trust in a proportion Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E; and (ii) under the Stand Alone Option, a portion of the 10,000,000 shares of New Common Stock to be issued pursuant to the Plan, in an amount that is Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E. Such distributions, shall be made on or as soon as reasonably practicable after the Initial Distribution Date, subject to the establishment of appropriate reserves for Disputed Claims in accordance with the provisions of the Plan, including reserves of New Common Stock held by the Stand Alone Voting Trust.

Voting: Class 4B is an Impaired Class, and Holders of Allowed Class 4B Claims who are the beneficial holders of such Class 4B Claims are entitled to vote.

### 4.18    Class 4C (REMIC Guarantee Claims).

Classification: Class 4C shall consist of all REMIC Guarantee Claims.

Treatment: Subject to the terms herein and unless a Holder of an Allowed Class 4C Claim agrees to receive other, less favorable treatment, such Holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange

for such Claim: (i) under both the Sale Option and the Stand Alone Option, a beneficial interest in the Liquidation Trust in a proportion Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E; and (ii) under the Stand Alone Option, a portion of the 10,000,000 shares of New Common Stock to be issued pursuant to the Plan, in an amount that is Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E. Such distributions, shall be made on or as soon as reasonably practicable after the Initial Distribution Date, subject to the establishment of appropriate reserves for Disputed Claims in accordance with the provisions of the Plan, including reserves of New Common Stock held by the Stand Alone Voting Trust. This treatment shall not prohibit the surrender of REMIC Certificates or interests therein to the Liquidation Trust (under the Sale Option) or the Reorganized Sale Debtors (under the Stand Alone Option) in connection with the resolution of Disputed Class 4C Claims.

Voting: Class 4C is an Impaired Class, and Holders of Allowed Class 4C Claims who are the beneficial holders of such Class 4C Claims are entitled to vote.

### 4.19   Class 4D (Litigation Claims).

Classification: Class 4D shall consist of all Litigation Claims.

Treatment: Subject to the terms herein and unless a Holder of an Allowed Class 4D Claim agrees to receive other, less favorable treatment, such Holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim: (i) under both the Sale Option and the Stand Alone Option, a beneficial interest in the Liquidation Trust in a proportion Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E; and (ii) under the Stand Alone Option, a portion of the 10,000,000 shares of New Common Stock to be issued pursuant to the Plan, in an amount that is Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E. Such distributions, shall be made on or as soon as reasonably practicable after the Initial Distribution Date, subject to the establishment of appropriate reserves for Disputed Claims in accordance with the provisions of the Plan, including reserves of New Common Stock held by the Stand Alone Voting Trust.

Voting: Class 4D is an Impaired Class, and Holders of Allowed Class 4D Claims are entitled to vote.

### 4.20   Class 4E (Other Unsecured Claims).

Classification: Class 4E shall consist of all Other Unsecured Claims.

Treatment: Subject to the terms herein and unless a Holder of an Allowed Class 4E Claim makes a Convenience Class Opt-In Election or agrees to receive other, less favorable treatment, such Holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim: (i) under both the Sale Option and the Stand Alone Option, a beneficial interest in the Liquidation Trust in a proportion Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E; and (ii) under the Stand Alone Option, a portion of the 10,000,000 shares of New Common Stock to

37

be issued pursuant to the Plan, in an amount that is Ratable to other Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E. Such distributions, shall be made on or as soon as reasonably practicable after the Initial Distribution Date, subject to the establishment of appropriate reserves for Disputed Claims in accordance with the provisions of the Plan, including reserves of New Common Stock held by the Stand Alone Voting Trust.

Voting: Class 4E is an Impaired Class, and Holders of Allowed Class 4E Claims are entitled to vote.

### 4.21    Intentionally Omitted.

### 4.22    Class 6A (Non-Debtor-Held Interests).

Classification: Class 6 shall consist of all Non-Debtor-Held Interests.

Treatment: Subject to the terms herein and unless the Holder of an Allowed Class 6A Interest agrees to receive other, less favorable treatment, such Holder of an Allowed Interest in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Interest: (i) under the Sale Option, retention of its Interest in Oakwood; or (ii) under the Stand Alone Option, a portion of the New Warrants to be issued pursuant to the Plan, in an amount that is Ratable to other Allowed Interests in Class 6A. Such distributions shall be made on or as soon as reasonably practicable upon the Initial Distribution Date, subject to the establishment of appropriate reserves under the Stand Alone Option for Disputed Interests in accordance with the provisions of the Plan; provided, however, that no distribution shall be made to Holders of Allowed Class 6A Interests if any of Class 4A, Class 4B, Class 4C, Class 4D or Class 4E does not accept the Plan.

Voting: Class 6A is an Impaired Class, and all Holders of Allowed Class 6A Claims are entitled to vote.

### 4.23    Intentionally Omitted.

## ARTICLE V.

## CONDITIONS PRECEDENT

### 5.1    Conditions to Confirmation.

####    (a)    Under the Sale Option.

Unless this condition is waived in accordance with the Plan, the Confirmation Order and the Plan Supplement must be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, the Buyer and Berkshire, and the Confirmation Order shall:

(i)    order, find, and decree that the Purchase Agreement and all other documents necessary to consummate the sale of the Purchased Business to the Buyer, including the documents

substantially in the form set forth in the Plan Supplement, are approved in all respects and that all parties thereto are authorized and directed to perform all of their obligations thereunder;

(ii)    order, find, and decree that the sale of the Purchased Business to the Buyer pursuant to the Plan and the Purchase Agreement, including, without limitation, OSHC's rejection of the Subservicing Agreements, OSHC's assumption of the Servicing Agreements, and OSHC's assignment of the Servicing Agreements to Buyer (but only if such Subservicing Agreements and Servicing Agreement are not already the subjects of a separate order or orders of the Bankruptcy Court): (a) is in the best interests of all of the Debtors' constituencies, (b) maximizes the value of the Debtors' business enterprises, (c) is approved pursuant to Bankruptcy Code sections 105, 363, 365, 1123, and 1129, and (d) that the Buyer has acted in good faith for the purposes of Bankruptcy Code sections 363(m) and 365;

(iii)    order, find and decree that the Confirmation Order shall supersede any orders of the Court issued prior to the Confirmation Date to the extent that those prior orders may be inconsistent with the Confirmation Order;

(iv)    order and decree that the Estates of the Debtors shall be substantively consolidated but only to the extent set forth in the Plan;

(v)    authorize the implementation of the Plan in accordance with its terms;

(vi)    provide that any transfers effected or mortgages or other security documents entered into or to be effected or entered into under the Plan shall be and are exempt from any state, city, or other municipality transfer taxes, mortgage recording taxes, and any other stamp or similar taxes pursuant to Bankruptcy Code section 1146(c);

(vii)    approve in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan;

(viii)    provide that all executory contracts or unexpired leases assumed by the Debtors and assigned during the Chapter 11 Cases or under the Plan shall remain in full force and effect for the benefit of the assignee thereof notwithstanding any provisions in any contract or lease (including provisions of the kinds described in Bankruptcy Code section 365(b)(2) and (f)) that prohibit assignment or transfer thereof or that enable or require termination or modification of such contract or lease upon assignment thereof);

(ix)    provide that (A) all executory contracts and unexpired leases of any Debtor that are listed in the Purchase Agreement as

39

executory contracts and unexpired leases to be assumed and assigned thereunder shall be deemed assumed by the Debtor that is a party thereto and assigned to the Buyer; and (B) effective as of the Petition Date, all other executory contracts and unexpired leases of the Debtors are subject to the treatment provided in Article IX of the Plan;

(x)     provide that with respect to all assumptions and all assignments described or authorized in the preceding paragraph, all such contracts or leases shall remain in full force and effect for the benefit of the Buyer, the Reorganized Sale Debtors or the Liquidation Trust, as applicable, notwithstanding any provisions in any contract or lease (including provisions of the kinds described in Bankruptcy Code section 365(b)(2) and (f)) that prohibit assignment or transfer thereof or that enable or require termination or modification of such contract or lease upon assignment thereof;

(xi)    establish the Liquidation Trust consistent with the terms of the Liquidation Trust Agreement and the Plan;

(xii)   order, find and decree that the Transfers of Assets by the Debtors to the Buyer, the Reorganized Sale Debtors or the Liquidation Trust: (A) are or shall be legal, valid, and effective transfers of property; (B) vest or shall vest the transferee with good title to such property free and clear of all Liens, Claims, encumbrances, and Interests of any Person, except as expressly provided in the Plan, Purchase Agreement or Confirmation Order; (C) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law; and (D) do not and shall not subject the Buyer, the Reorganized Sale Debtors or the Liquidation Trust to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including any laws affecting successor or transferee liability or fraudulent conveyance or transfer laws;

(xiii)  find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(xiv)   order, find and decree that, unless otherwise explicitly stated in the Plan, all Claims related to the Debtors not otherwise discharged or released under the Plan, if any, shall become solely the responsibility of the Reorganized Sale Debtors and shall not be the responsibility or liability of the Liquidation Trust or the Buyer;

(xv)    approve, in all respects, the Plan Supplement;

40

(xvi)  find that the provisions of Bankruptcy Code sections 1145 and 1146(c) apply to the transactions contemplated hereunder, if applicable; and

(xvii)  appoint a Person to serve as the responsible officer and director for each of the Reorganized Sale Debtors empowered to take action without requiring the vote or consent of the Holders of Old Common Stock in accordance with applicable law.

**(b)**    **Under the Stand Alone Option.**

Unless this condition is waived in accordance with the Plan, the Confirmation Order and the Plan Supplement must be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee and Berkshire, and the Confirmation Order shall:

(i)    include a provision authorizing the Reorganized Debtors to adopt and file their respective Amended and Restated Certificates of Incorporation and Amended and Restated Bylaws;

(ii)    order, find and decree that the Confirmation Order shall supersede any orders of the Court issued prior to the Confirmation Date to the extent that those prior orders may be inconsistent with the Confirmation Order;

(iii)    order and decree that the Estates of the Debtors shall be substantively consolidated but only to the extent set forth in the Plan;

(iv)    include a provision authorizing the issuance of the New Common Stock and New Warrants, if necessary;

(v)    establish the Liquidation Trust consistent with the terms of the Liquidation Trust Agreement and the Plan;

(vi)    establish the Stand Alone Voting Trust consistent with the terms of the Stand Alone Voting Trust Agreement and the Plan;

(vii)    order, find and decree that the Transfers of Assets by the Debtors to the Reorganized Stand Alone Debtors or the Liquidation Trust: (A) are or shall be legal, valid, and effective transfers of property; (B) vest or shall vest the transferee with good title to such property free and clear of all Liens, Claims, encumbrances, and Interests of any Person, except as expressly provided in the Plan, Purchase Agreement or Confirmation Order; (C) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law; and (D) do not and shall not subject the Reorganized Stand Alone Debtors or the Liquidation Trust to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including any laws affecting successor or transferee liability;

(viii)    find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(ix)    order, find and decree that, unless otherwise explicitly stated in the Plan, all claims related to the Debtors not otherwise discharged or released under the Plan, if any, shall become solely the responsibility of the Reorganized Stand Alone Debtors and shall not be the responsibility or liability of the Liquidation Trust;

(x)    find that confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Stand Alone Debtors or the need for further financial reorganization, expect as specifically provided in the Plan;

(xi)    approve, in all respects, the Plan Supplement;

(xii)    approve in all respects the other settlements, transactions, and agreements to be effectuated pursuant to the Plan, including the Exit Facility Agreement; and

(xiii)    find that the provisions of Bankruptcy Code sections 1145 and 1146(c) apply to the transactions contemplated hereunder, if applicable.

**5.2    Conditions to Consummation.**

**(a)    Under the Sale Option.**

The Debtors intend to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry and shall be a Final Order. Notwithstanding the foregoing, the Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the conditions set forth below is satisfied or waived (if and to the extent permitted by the Plan) by the Debtors, the Creditors' Committee, the Buyer and Berkshire (such waivers shall not be unreasonably withheld):

(i)    after the entry of the Confirmation Order, no modifications shall have been made to the Plan except in accordance with its provisions with respect to its modification;

(ii)    the Confirmation Date shall have occurred and the Confirmation Order, in a form consistent with Section 5.1(a), shall have been signed by the judge presiding over the Chapter 11 Cases and shall have become a Final Order;

(iii)    all conditions precedent to the confirmation of the Plan in Section 5.1(a) of the Plan shall have been satisfied and shall continue to be satisfied;

(iv)    all actions, documents, and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date, including any actions, documentation or agreements necessary for the release of any collateral pursuant to Section 5.03 of the Purchase Agreement, shall be reasonably satisfactory to the Debtors, the Creditors' Committee and (to the extent required by the Purchase Agreement) the Buyer, and such actions, documents, and agreements shall have been effected or executed and delivered. All documents to be contained in the Plan Supplement shall be completed and in final form and, as applicable, executed by the parties thereto and all conditions precedent contained in any of the foregoing shall have been satisfied or waived;

(v)    all conditions to the closing under the Purchase Agreement shall have been satisfied or waived in accordance therewith, and the closing is prepared to occur on the Effective Date; and

(vi)    the Debtors shall have sufficient Cash on hand (or will have sufficient Cash immediately upon the closing of the Purchase Agreement) to make distributions of Cash required pursuant to the Plan on the Initial Distribution Date and to fund reasonably anticipated expenses of the Liquidation Trust.

**(b)    Under the Stand Alone Option.**

The Debtors intend to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry and shall be a Final Order. Notwithstanding the foregoing, the Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the conditions set forth below is satisfied or waived (if and to the extent permitted by the Plan) by the Debtors, the Creditors' Committee and Berkshire (such waivers shall not be unreasonably withheld):

(i)    after the entry of the Confirmation Order, no modifications shall have been made to the Plan except in accordance with its provisions with respect to its modification;

(ii)    the Confirmation Date shall have occurred and the Confirmation Order, in a form consistent with Section 5.1(b), shall have been signed by the judge presiding over the Chapter 11 Cases and shall have become a Final Order;

(iii)    all conditions precedent to the confirmation of the Plan in Section 5.1(b) of the Plan shall have been satisfied and shall continue to be satisfied;

(iv)    all actions, documents, and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date shall be reasonably satisfactory to the

Debtors, the Creditors' Committee and Berkshire, and such actions, documents, and agreements shall have been effected or executed and delivered. All documents to be contained in the Plan Supplement shall be completed and in final form and, as applicable, executed by the parties thereto and all conditions precedent contained in any of the foregoing shall have been satisfied or waived;

(v)    the Debtors shall have sufficient Cash on hand (or investments projected by the Debtors to provide timely Cash) to make distributions of Cash required pursuant to the Plan on the Initial Distribution Date and to fund reasonably anticipated expenses of the Liquidation Trust;

(vi)    the Debtors have established the Liquidation Trust; and

(vii)    the Debtors have entered into the necessary agreements and may commence borrowing under the Exit Facility.

**5.3    Waiver of Conditions.**

The waiver of any condition set forth in this Article V may be made without further notice or order of the Bankruptcy Court.

**5.4    Effect of Nonoccurrence of the Conditions to Consummation.**

If each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived in accordance with the Plan on or before the first Business Day that is more than ninety (90) days after the Confirmation Date, or such later date as shall be agreed by the Debtors, the Creditors' Committee and Berkshire, the Debtors may schedule a status hearing with the Bankruptcy Court. If the Confirmation Order is ultimately vacated, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute an admission, a waiver or release of any Claims against or Interests in any of the Debtors.

## ARTICLE VI.

## IMPLEMENTATION

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means of execution and implementation of the Plan. The Sale Option shall be implemented unless the Purchase Agreement is terminated by its terms; provided, however, that the Debtors may not terminate the Purchase Agreement, and thereby consummate the Plan pursuant to the Stand Alone Option, without the consent of the Creditors' Committee, which consent shall not be unreasonably withheld. If the Purchase Agreement is terminated by its terms, the Plan will be implemented according to the Stand Alone Option.

### 6.1    Plan Implementation under the Sale Option.

#### (a)    Consummation of Sale Transaction.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Purchase Agreement and the transactions to be entered into, and actions to be taken, thereunder pursuant to sections 363, 365, 1123, 1129, 1145 and 1146(c) of the Bankruptcy Code. The Debtors shall sell and Transfer the Purchased Business to the Buyer in accordance with the Purchase Agreement.

#### (b)    Authorization of the Sale Transaction.

The confirmation of this Plan shall authorize the consummation of all transactions contemplated by the Purchase Agreement with no requirement of any further authorization by the boards of directors, shareholders, members, managers, partners or general partners of any of the Debtors. Upon confirmation, the appropriate officers of the Debtors shall be authorized to execute any and all documents and perform any and all acts necessary and appropriate to consummate all transactions contemplated by the Purchase Agreement.

#### (c)    Revesting and Transfer of Assets.

Pursuant to Bankruptcy Code section 1141(b), the assets and property of the Estates and of the Debtors shall vest or revest, such that: (i) on the Effective Date, the Purchase Consideration, less the Reorganized Sale Debtors Capitalization Amount, and the Excluded Sale Trust Assets, including any value associated with Debtor Suburban Home Sales, Inc. to the extent such value is an Excluded Asset, shall vest in the Liquidation Trust; and (ii) on the Effective Date, the Excluded Sale Debtor Assets and the Reorganized Sale Debtors Capitalization Amount shall vest or revest in the Reorganized Sale Debtors; provided, however, that the Liquidation Trust may abandon or otherwise not accept any Excluded Sale Trust Assets that the Liquidation Trust believes, in good faith, have no value to the Liquidation Trust. Any Excluded Sale Trust Assets which the Liquidation Trust abandons or otherwise does not accept shall not vest or revest in the Liquidation Trust and shall vest or revest in the Reorganized Sale Debtors.

As of the Effective Date, all Assets vested or revested in the Liquidation Trust or the Reorganized Sale Debtors, and all assets and property dealt with by the Plan, including all Assets transferred to the Buyer pursuant to the Purchase Agreement, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan or in the Confirmation Order. Any property of any non-debtor affiliates of the Debtors, and any Claims and Liens against any non-debtor affiliates of the Debtors or their respective properties shall not be affected or impaired by the operation of the Plan, the Confirmation Order, or otherwise except as specifically provided herein.

Additionally, as of the Effective Date, under the Sale Option, all of the Estates' rights, benefits, duties and obligations under the Purchase Agreement arising after the closing of the Purchase Agreement shall be assumed by, assigned to and vest in the Liquidation Trust.

45

(d)    **Merger of Debtors and Vesting of Assets in Reorganized Sale Debtors.**

The Debtors' anticipate that, on the Effective Date, the Reorganized Sale Debtors may or may not each remain organized as they were prior to the Petition Date under the applicable state law of each of their respective jurisdictions of organization, except to the extent a different corporate structure is determined to benefit the Reorganized Sale Debtors or the Liquidation Trust and/or such entities have not previously been merged, liquidated or dissolved in accordance with applicable law prior to the Effective Date. Pursuant to the Plan, each of the surviving Reorganized Sale Debtors will be governed by an independent and disinterested Person selected by the Debtors with the consent of the Creditors' Committee and Berkshire, which consent shall not be unreasonably withheld, and identified in the Plan Supplement, as each Reorganized Sale Debtors' sole officer, director or similar appropriate capacity under state law; provided, however, that an outstanding Fee Claim shall not render a Person ineligible to serve as the sole officer and director of any of the Reorganized Sale Debtors. Such individual shall be empowered to take all necessary and appropriate corporate actions without further meetings or voting by shareholders, members, partners, or holders of ownership interests. If Oakwood Financial Corporation is not a debtor under the Bankruptcy Code as of the Effective Date, Reorganized Sale OKWD shall retain the stock of Oakwood Financial Corporation. If Oakwood Financial Corporation is a debtor under the Bankruptcy Code on the Effective Date, its plan of reorganization shall provide for the ownership of its stock by the Reorganized Sale Debtors.

(e)    **Treatment of Old Common Stock, Interests and Beneficial Interest in the Liquidation Trust.**

On the Effective Date, the shares of Old Common Stock shall remain outstanding pursuant to the terms of the Plan; provided, however, that the rights of Holders of Old Common Stock may be altered to effectuate the purposes of the Plan. The Reorganized Sale Debtors likely will be dissolved in accordance with state law, in which event the shares of Old Common Stock shall not be transferable, shall not be listed on any exchange, and no periodic reports will be filed with the Securities and Exchange Commission. The beneficial interests of the Liquidation Trust issued pursuant to the Plan shall be issued pursuant to the exemption from securities registration contained in section 1145 of the Bankruptcy Code. Any securities issued or transferred by the Reorganized Sale Debtors or the Liquidation Trust shall be issued or transferred pursuant to the exemption from securities registration contained in section 1145 of the Bankruptcy Code and shall be exempt from taxes pursuant to section 1146(c) of the Bankruptcy Code.

(f)    **Considerations Regarding the Additional Debtors.**

In order to consummate the sale under the Purchase Agreement three more entities wholly owned by the Debtors—Oakwood Financial Corporation, Oakwood Investment Corporation and Oakwood Servicing Holdings Co., LLC. (and potentially other similar entities) may become debtors and may file motions and plans of reorganization to facilitate certain transfers. These entities are special purpose entities with limited activities and their filings and bankruptcy cases, even if substantively consolidated with the Debtors, would not have a material effect on distributions to creditors.

46

Pursuant to the Plan or a separate motion, OHSC shall, under sections 105, 363 and 365 of the Bankruptcy Code, as of the Effective Date, (i) reject the Subservicing Agreements, (ii) assume the Servicing Agreements, and (iii) assign the Servicing Agreements to the Buyer in accordance with Section 4.13 of the Purchase Agreement. To the extent the Subservicing Agreements and Servicing Agreement are not already the subjects of a separate order or orders of the Bankruptcy Court, the Plan shall constitute a motion for authority to reject the Subservicing Agreements and to assume and assign the Servicing Agreements in accordance with Section 4.13 of the Purchase Agreement.

(g)    **Distributions of Cash.**

The Liquidation Trust shall be responsible for making all distribution of Cash to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Class 1 Claims, Allowed Class 2 Claims and Allowed Class 3 Claims, subject to appropriate reserves as described in Section 8.2 of the Plan.

6.2    **Plan Implementation under the Stand Alone Option.**

(a)    **Vesting of Assets.**

Pursuant to section 1141(b) of the Bankruptcy Code, except for the Initial Stand Alone Trust Assets, as otherwise provided in the Plan, property of the Estates and of the Debtors shall revest, such that: (i) on the Effective Date, the Initial Stand Alone Trust Assets shall vest in the Liquidation Trust; and (ii) on the Effective Date, all of the Assets other than the Initial Stand Alone Trust Assets shall vest or revest in the Reorganized Stand Alone Debtors.

As of the Effective Date, all Assets vested or revested in the Liquidation Trust or the Reorganized Stand Alone Debtors, and all assets and property dealt with by the Plan, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan or in the Confirmation Order. Any property of any non-debtor affiliates of the Debtors, and any Claims and Liens against any non-debtor affiliates of the Debtors or their respective properties shall not be affected or impaired by the operation of the Plan, the Confirmation Order, or otherwise except as specifically provided herein.

From and after the Effective Date, the Reorganized Stand Alone Debtors may operate their businesses and use, acquire, and dispose of property without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the guidelines and requirements of the United States Trustee, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

(b)    **Amended and Restated Certificates of Incorporation.**

Upon the Effective Date, the Reorganized Stand Alone Debtors shall file their Amended and Restated Certificates of Incorporation, as set forth in the Plan Supplement, with the offices of the Secretary of State of the state that governs their respective entities in accordance with the respective state law. Each Amended and Restated Certificate of Incorporation will, among other things, provide for the prohibition of the issuance of non-voting

47

equity securities to the extent required by section 1123(a) of the Bankruptcy Code, and with respect to Reorganized Stand Alone Oakwood, authorize 20,000,000 shares of New Common Stock. After the Effective Date, the Reorganized Stand Alone Debtors may amend and restate their Amended and Restated Certificates of Incorporation and other constituent documents as permitted by applicable law.

> (c)    **Amended and Restated Bylaws.**

The Reorganized Stand Alone Debtors shall adopt and effect the Amended and Restated Bylaws, as set forth in the Plan Supplement.

> (d)    **New Securities.**

On the Effective Date, Reorganized Stand Alone Oakwood shall issue, in accordance with the provisions of this Plan and the registration rights agreement in the Plan Supplement, 10,000,000 shares of the New Common Stock, which shall constitute 100% of the total number of shares of such New Common Stock to be issued and outstanding on or immediately after the Effective Date, and the New Warrants to be distributed pursuant to the terms of the Plan. The Reorganized Stand Alone Debtors shall endeavor in good faith to list the New Common Stock on a national exchange as soon as reasonably practicable. The New Warrants, as provided in the Warrant Agreement, shall have a seven year maturity and an exercise price initially computed for an initial market value of New Common Stock, which would result in 100% recovery to the Holders of Class 4A, 4B, 4C, 4D and 4E Claims as provided for in the Warrant Agreement. The exercise price will increase annually at the risk free rate (30-year Treasury rate) until their expiration. The shares of New Common Stock and New Warrants issued pursuant to the Plan shall be issued pursuant to the exemption from securities registration contained in section 1145 of the Bankruptcy Code and shall be exempt from taxes pursuant to section 1146(c) of the Bankruptcy Code.

> (e)    **Directors.**

Upon the Effective Date, the operation of each of the Reorganized Stand Alone Debtors shall become the general responsibility of their respective boards of directors (or their equivalents) who shall, thereafter, have the responsibility for the management, control and operation of each of the Reorganized Stand Alone Debtors. The initial board of directors for Reorganized Stand Alone Oakwood shall be comprised of five (5) directors, all of whom are disinterested under the Bankruptcy Code and independent under applicable securities law; provided, however, that an outstanding Fee Claim shall not render a Person ineligible to serve on the initial board of directors; provided further, however, that the chief executive officer of the Reorganized Stand Alone Debtors may be named to the initial board of directors. The initial board of directors shall be designated by the Creditors' Committee, which such designations shall be reasonably acceptable to the Debtors and Berkshire and shall be included by the Debtors in the Plan Supplement, prior to the Effective Date. If, prior to the Confirmation Hearing, the Creditors' Committee does not so designate an initial board of directors, or designates an incomplete initial board of directors, the existing members of the board of directors of Oakwood, before the Confirmation Hearing, shall so designate those remaining undesignated directorships.

The initial boards of directors of the reorganized Affiliate Debtors shall be the same as that of Reorganized Stand Alone Oakwood unless otherwise designated by the board of directors of Reorganized Stand Alone Oakwood. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the names of each of the director nominees shall be disclosed prior to the entry of any Confirmation Order. All such directors shall be deemed elected, and those directors not continuing in office shall be deemed removed therefrom, effective on the Effective Date, pursuant to the Confirmation Order. Such directors' tenure and the manner of selection of new directors shall be initially as provided in the Amended and Restated Certificates of Incorporation and the Amended and Restated Bylaws.

### (f)    Officers.

On the Effective Date, the existing officers of each of the Debtors shall be retained and shall remain as officers of the Reorganized Stand Alone Debtors and shall continue to serve until such time as they may resign, be removed or be replaced by the board of directors of each of the Reorganized Stand Alone Debtors.

### (g)    Employment Contracts and Professional Retentions.

From and after the Effective Date, the Reorganized Stand Alone Debtors may enter into employment contracts with their respective officers, agents or employees. The Reorganized Stand Alone Debtors may, among other things, retain any employee, professional, consultant, or claims, notice or disbursing agents as it shall deem necessary to comply with the provisions of this Plan, including those Persons that have served as employees, professionals, consultants or agents during the Chapter 11 Cases.

### (h)    Corporate Action and Other Documents and Actions.

The adoption of the Amended and Restated Certificates of Incorporation, the Amended and Restated Bylaws, the selection of directors and officers for the Reorganized Stand Alone Debtors, the issuance and distribution of the New Common Stock and New Warrants, the execution and delivery of any contract, instrument, release, document or agreement, and any other matter provided for under the Plan involving the corporate action to be taken by or required of any of the Reorganized Stand Alone Debtors shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by stockholders or directors of any of the Debtors or Reorganized Stand Alone Debtors.

### (i)    Approval of the Exit Facility.

Entry of the Confirmation Order shall, to the extent necessary, authorize and approve, without any further action by the Debtors, the Exit Facility Agreement and the transactions to be entered into, and actions to be taken thereunder, pursuant the Bankruptcy Code.

(j)     **Distributions of Cash.**

The Reorganized Stand Alone Debtors shall be responsible for making all distributions of Cash to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Class 1 Claims, Allowed Class 2 Claims and Allowed Class 3 Claims, subject to appropriate reserves as described in Section 8.2 of the Plan.

(k)     **Distributions of Proceeds from the Liquidation Trust.**

The Reorganized Stand Alone Debtors shall be responsible for directing the Liquidation Trust with respect to the creation of reserves, as described in Section 8.2 of the Plan, and the distribution of the assets of the Liquidation Trust to Holders of Allowed Claims from Classes 4A, 4B, 4C, 4D and 4E.

6.3     **Provisions Concerning Plan Implementation under Both the Sale Option and the Stand Alone Option.**

(a)     **Substantive Consolidation.**

(i)     **Effect of Substantive Consolidation.**

On the Effective Date, the Estates shall be substantively consolidated for all purposes related to the Plan (but only for those purposes) including voting, confirmation, distributions and claim determinations. The substantive consolidations of the Estates shall have the following effects: (i) all assets and liabilities of the Debtors shall be treated as though they were merged for purposes of distribution; (ii) all prepetition and postpetition cross-corporate guarantees of the Debtors shall be eliminated; (iii) all Claims based upon guarantees of collection, payment or performance made by one or more Debtors as to the obligations of another Debtor or of any other Person shall be discharged, released and of no further force and effect; (iv) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of the Estate; (v) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the Estate; (vi) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Estate in the consolidated Chapter 11 Cases and shall be deemed a single obligation of the relevant Estate under the Plan on and after the Confirmation Date; and (vii) the Chapter 11 Cases of the Affiliate Debtors shall be closed and the consolidated Estate be administered through Oakwood's Chapter 11 Case.

In connection with, and as a result of, the substantive consolidation of the Debtors' Estates and Chapter 11 Cases as provided in the Plan, on the occurrence of the Effective Date all Intercompany Claims shall be (i) released, (ii) contributed to capital, (iii) dividended or (iv) remain Unimpaired, depending on the tax consequences, and Holders of Intercompany Claims shall not be entitled to, and shall not, receive or retain any property or interest in property on account of such Claims, except to the extent potential tax consequences otherwise dictate. Notwithstanding this Section 6.3, on the Effective Date, all Debtor Holders of Debtor-Held Interests in any of the Debtors shall either (i) retain such Debtor-Held Interest, in

which case the Debtor Holding an Interest in an Affiliate Debtor shall continue to hold such Debtor-Held Interest in the corresponding Reorganized Subsidiary or (ii) receive new equity in the appropriate reorganized Affiliate Debtor upon the cancellation of the old equity.

        The substantive consolidation provided for herein shall not, other than for purposes related to the Plan and distributions to be made hereunder, affect the legal and corporate structures of the Debtors or the Non-Debtor-Held Interests, the rights and defenses of the Liquidation Trust and the Reorganized Stand Alone Debtors pertaining to the Causes of Action, and any obligations under any executory contract or unexpired leases assumed in the Plan or otherwise in the Chapter 11 Cases.

        (ii)    **Plan as Motion for Approval of Substantive Consolidation.**

        The Plan shall serve as a motion seeking entry of an order substantively consolidating the Estates as provided herein.

        (b)    **Creation of the Liquidation Trust.**

        The Liquidation Trustee shall sign the Liquidation Trust Agreement and accept the Liquidation Trust assets on behalf of the beneficiaries thereof, and the Liquidation Trust will then be deemed created and effective without any further action of the directors or shareholders of the Debtors. The Liquidation Trust shall be established for the sole purpose of liquidating its assets, with no objective to continue or engage in the conduct of a trade or business. The beneficiaries of the Liquidation Trust shall be bound by the Liquidation Trust Agreement. Interests in the Liquidation Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law. The Liquidation Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidation Trustee, in consultation with the Liquidation Trust Advisory Committee, to extend such term as applicable law shall allow.

        The Liquidation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code and in other prudent investments, as authorized by the Liquidation Trust Advisory Committee; provided, however, that such investment are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

        The Liquidation Trustee shall be the exclusive trustee of the assets of the Liquidation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust assets; (b) pay taxes or other obligations incurred by the trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants (including those Persons that have served as employees, professionals, consultants or claims, noticing and disbursing agents during the Chapter 11 Cases) to advise and assist in the administration, prosecution and distribution of trust assets; (d)

calculate and implement distributions of trust assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of that agreement, all Claims and Causes of Action vested in the Liquidation Trust; (f) under the Sale Option, resolve issues involving Claims and Interests pursuant to Article X hereof; (g) under the Sale Option, enter into and perform any and all obligations of the disputed ownership fund escrow account agreement (the "Disputed Ownership Fund Escrow Agreement"); and (h) under the Sale Option, perform any and all duties and obligations arising under the Purchase Agreement and any other agreements executed or entered into pursuant to the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

All costs and expenses associated with the administration of the Liquidation Trust, including reasonable compensation for the Liquidation Trustee and, as set forth in the Liquidation Trust Agreement, the Liquidation Trust Advisory Committee, shall be the responsibility of and paid by the Liquidation Trust in accordance with the Liquidation Trust Agreement. Under the Sale Option, the Liquidation Trust is the successor to the Debtors' rights to books and records under the Purchase Agreement. Under the Stand Alone Option, the Reorganized Stand Alone Debtors shall cooperate with the reasonable requests of the Liquidation Trustee in furtherance of the Liquidation Trustee's responsibility to recover trust assets and shall afford reasonable access during normal business hours, upon reasonable notice, to personnel and books and records of the Reorganized Stand Alone Debtors to representatives of the Liquidation Trust to enable the Liquidation Trustee to perform the Liquidation Trustee's tasks under the Liquidation Trust Agreement and the Plan. The Reorganized Stand Alone Debtors will not be required to make expenditures in response to unreasonable requests.

The Liquidation Trust shall be responsible for filing all federal, state and local tax returns for the Liquidation Trust. The Liquidation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Liquidation Trust shall be subject to any such withholding and reporting requirements. The Liquidation Trust shall provide reports to holders of interests in the Liquidation Trust as the Liquidation Trust Advisory Committee deems appropriate.

(c)     **Federal Income Tax Treatment of the Trust for the Liquidation Trust Assets.**

For federal income tax purposes, it is intended that the Liquidation Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries (i.e., the Holders of Allowed Claims in Classes 4A, 4B, 4C, 4D and 4E). Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors of an undivided interest in each of the assets of the Liquidation Trust and then contributed such interests to the Liquidation Trust.

(i)     **Liquidation Trust Assets Treated as Owned by Holders of Allowed Claims.**

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trust, and the Holders of Allowed Claims in Classes 4A, 4B, 4C, 4D and 4E) shall treat the transfer of assets to the Liquidating Trust for the benefit of the

Holders of Allowed Claims in Classes 4A, 4B, 4C, 4D and 4E, as (A) a transfer of the assets of the Liquidation Trust directly to the Holders of Allowed Claims in Classes 4A, 4B, 4C, 4D and 4E, followed by (B) the transfer by such Holders to the Liquidation Trust of the assets of the Liquidation Trust in exchange for beneficial interests in the Liquidation Trust. Accordingly, the Holders of such Allowed Claims shall be treated for federal income tax purposes as the grantors and owners of their respective share of the assets of the Liquidation Trust.

(ii)    Tax Reporting.

The Liquidation Trust shall file returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 6.3(c). The Liquidation Trust also shall annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns. The Liquidation Trust's taxable income, gain, loss, deduction or credit will be allocated (subject to Section 8.2 of the Plan, relating to Disputed Claims) to the Holders of Allowed Claims in Classes 4A, 4B, 4C, 4D and 4E in accordance with their relative beneficial interests in the Liquidation Trust.

As soon as possible after the Effective Date, the Liquidation Trust shall make a good faith valuation of the assets of the Liquidation Trust, and such valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidation Trust, and the Holders of Allowed Claims in Classes 4A, 4B, 4C, 4D and 4E) for all federal income tax purposes. The Liquidation Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidation Trust that are required by any governmental unit.

Notwithstanding anything else in the Plan, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Liquidation Trust shall (i) treat any assets allocable to, or retained on account of, Disputed Claims as held by one or more discrete trusts for federal income tax purposes (the "Disputed Claims Reserve"), consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Tax Code (sections 641 et. seq.), (ii) treat as taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Liquidation Trust that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a distribution from the Disputed Claims Reserve any increased amounts distributed by the Liquidation Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Disputed Claims Reserve determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable law, shall report consistent with the foregoing for state and local income tax purposes. All Holders of Claims in Classes 4A, 4B, 4C, 4D and 4E shall report, for tax purposes, consistent with the foregoing.

The Liquidation Trustee shall be responsible for payments, out of the Liquidation Trust Assets, of any taxes imposed on the trust or its assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed

53

Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Liquidation Trustee as a result of the resolutions of such Disputed Claims.

The Liquidation Trustee may request an expedited determination of Taxes of the Debtors and of the Liquidation Trust, including the Disputed Claims Reserve under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors and the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

(iii)    Dissolution.

The Liquidation Trustee shall be discharged and the Liquidation Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the assets of the Liquidation Trust have been liquidated, and (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made, but in no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidation Trust.

(d)    Appointment of Liquidation Trustee

The Liquidation Trustee for the Liquidation Trust shall be an independent and disinterested Person designated by the Creditors' Committee with the consent of the Debtors and Berkshire, whose approval shall not be unreasonably withheld, and identified in the Plan Supplement; provided, however, that an outstanding Fee Claim shall not render a Person ineligible to serve as the Liquidation Trustee.

(e)    The Liquidation Trust Advisory Committee.

On the Effective Date, the Liquidation Trust Advisory Committee shall be formed pursuant to the Liquidation Trust Agreement. The Liquidation Trust Advisory Committee shall be comprised of five (5) members, consisting of WL Ross & Co. LLC, Aegon USA Investment Management, LLC, and three (3) independent and disinterested members to be appointed by the Creditors' Committee with the consent of the Debtors and Berkshire, whose approval shall not be unreasonably withheld; provided, however, that an outstanding Fee Claim shall not render a Person ineligible to serve on the Liquidation Trust Advisory Committee. The three (3) independent and disinterested members shall be identified in the Plan Supplement. If WL Ross & Co. LLC or Aegon USA Investment Management, LLC subsequently determine that they are no longer interested in serving as members of the Liquidation Trust Advisory

54

Committee, the Creditors' Committee will select replacement members, to be identified in the Plan Supplement, with the consent of the Debtors and Berkshire, whose approval shall not be unreasonably withheld (reasonableness shall be determined in light of the balance between Holders of REMIC Guarantee Claims and Holders of other Claims in connection with the ongoing litigation concerning the Class 4C Claims). If, as of the Confirmation Date, the Creditors' Committee has not appointed the three (3) independent and disinterested members of the Trust Advisory Committee, until at least three (3) members are so appointed, the Debtors, before the Confirmation Hearing, shall so designate those remaining undesignated members of the Trust Advisory Committee. The Liquidation Trustee shall make such reports to and seek such advice from, if any, the Liquidation Trust Advisory Committee as required under the Liquidation Trust Agreement. The Liquidation Trust Advisory Committee may, by majority vote, authorize the Liquidation Trustee to invest the corpus of the Liquidation Trust in prudent investments other than those described in section 345 of the Bankruptcy Code.

The Liquidation Trust Advisory Committee's role with respect to issues involving Claims and Interests pursuant to Article X of the Plan will be handled only by the three (3) independent and disinterested members of the five (5) member Board. The Liquidation Trust Advisory Committee shall have only consultation rights with respect to the decisions of the Liquidation Trustee in managing the Liquidation Trust. In the event that the Liquidation Trust Advisory Committee disagrees with any intended actions or inaction of the Trustee, it shall have (a) the right to seek an order from the Bankruptcy Court compelling the Liquidation Trustee to act or cease acting in accordance with the order and (b) the right to remove the Liquidation Trustee if the Liquidation Trust Advisory Committee believes that the intended actions or inaction rise to the level of gross negligence or willful misconduct. In the event of the resignation or removal of the Liquidation Trustee, the Liquidation Trust Advisory Committee shall, by majority vote or order of the Bankruptcy Court, designate a person to serve as successor Liquidation Trustee.

The Liquidation Trust Advisory Committee shall be entitled to retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants (including without limitation claims, noticing and disbursing agents) to advise and assist the Liquidation Trust Advisory Committee in the furtherance of its duties, including those Persons that have served as employees, professionals, consultants or agents during the Chapter 11 Cases.

The Liquidation Trust Advisory Committee may, at its discretion, require a fidelity bond from the Liquidation Trustee in such reasonable amount as may be agreed to by majority vote of the Liquidation Trust Advisory Committee.

(f)     **Causes of Actions and Defenses.**

Prosecution and settlement of all Causes of Action, including Avoidance Actions, shall be the sole responsibility of the Liquidation Trust, pursuant to this Plan, and the Confirmation Order; provided, however, that, under the Stand Alone Option, Avoidance Actions pertaining to the secured status of any Disputed Secured Claim shall be vested in the Reorganized Stand Alone Debtors. Subject to the foregoing proviso, the Liquidation Trustee shall have all rights, powers, and interests of the Debtors, as debtors in possession, to pursue,

settle or abandon such Causes of Action as a representative of the Estates pursuant to section 1123(b)(3) of the Bankruptcy Code. All Causes of Action, including Avoidance Actions, are reserved and preserved to the extent set forth in Section 7.2 of the Plan and shall not be impacted or affected in any way by the substantive consolidation of the Estates.

    (g)    **Termination of the Final DIP Agreement.**

Subject to the payment in full of all amounts owed under the Final DIP Agreement or other such treatment as agreed to by the Debtors and the DIP Lenders, on the Effective Date, the obligations arising under the Final DIP Agreement shall be deemed to have terminated. All amounts due and owing, if any, under the Final DIP Agreement shall be paid in full on the Effective Date as Allowed Administrative Claims, and all liens, mortgages and security interests granted under the Final DIP Agreement shall automatically be extinguished without the need for any filings or further actions under the state or federal laws, and all authorities shall be authorized to accept the Confirmation Order and notice of Effective Date as a release or satisfaction of all such liens, mortgages and security interests.

    (h)    **Dissolution of the Creditors' Committee.**

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of any continuing duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention and employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate, except with respect to (i) all Fee Claims, (ii) any appeals of the Confirmation Order, and (iii) any estate litigation commenced by the Creditors' Committee pending on the Effective Date not resolved by the Plan.

## ARTICLE VII.

## EFFECTS OF PLAN CONFIRMATION

**7.1    Discharge.**

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors and all successors in interest, including, without limitation, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors and the Buyer, shall be discharged from, and the Confirmation Order shall operate as a permanent injunction against, the commencement or continuation of any action, the employment of any process, or any act to collect, recover, offset or recoup, right to sue, on account of any Claim or Interest, from or against the Debtors, their Estates and any and all successors in interest (including, without limitation, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors and the Buyer), and the Debtors', their Estates', and all successors' liability in respect thereof shall be extinguished completely, and the Debtors and all successors in interest (including, without limitation, the Liquidation Trust, the Reorganized Sale

Debtors, the Reorganized Stand Alone Debtors and the Buyer) shall be released and discharged from any Claim or Interest of a kind specified in section 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not a Proof of Claim is filed or deemed filed under section 501 of the Bankruptcy Code, such Claim is allowed under section 502 of the Bankruptcy Code, or the Holder of such Claim or Interest has accepted the Plan.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, as of the Effective Date, the Confirmation Order will be a judicial determination of a discharge of all Claims or Interests against the Debtors and a termination of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor or its successors at any time and shall act as res judicata or collateral estoppel as against third parties, but not as to the Debtors, their Estates or any and all successors in interest.

**7.2     Retention of Causes of Action/Reservation of Rights.**

Except as expressly provided for in the Plan or the Confirmation Order, any and all Causes of Action of any kind or nature whatsoever, against third parties arising before the Effective Date, whether known or unknown and regardless of whether the existence of same has been disclosed, including, without limitation, Avoidance Actions and the right to enforce the terms and conditions of the Purchase Agreement, the Final DIP Agreement and the Exit Facility Agreement, that the Debtors may have on or before the Effective Date shall survive confirmation of the Plan and shall be reserved and preserved.

Except as expressly provided for in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to (i) be res judicata or the basis for estoppel of, (ii) create any other defense to the prosecution to judgment on the merits of, (iii) be a waiver of or (iv) be a relinquishment of any Causes of Action, including Avoidance Actions and the right to enforce the terms and conditions of the Purchase Agreement, Exit Facility Agreement or Final DIP Agreement, which the Debtors had on or before the Effective Date, against or with respect to any Causes of Action left unaltered or unimpaired by the Plan. On and after the Effective Date, the Liquidation Trust shall have, retain, reserve and be entitled to assert, prosecute, settle or abandon all such Causes of Action which the Debtors had on or before the Effective Date; and all of the Liquidation Trust's legal and equitable rights respecting any Causes of Action, including Avoidance Actions and the right to enforce the terms and conditions of the Purchase Agreement, Exit Facility Agreement or Final DIP Agreement after the Effective Date. For the avoidance of doubt, under the Stand Alone Option, nothing in this Section 7.2 shall be interpreted as empowering the Liquidation Trust with respect to Claims resolution responsibilities reserved for the Reorganized Stand Alone Debtors in Article X of the Plan.

**7.3     Post-Consummation Effect of Evidence of Claims or Interests.**

Outstanding notes and other instruments, including, but not limited to, all Junior Notes, Senior Notes, B-2 REMIC Guarantees, and the Resecuritization Note Put Option, and all related documentation, evidencing a Claim against any of the Debtors and all obligations of the Debtors under or in respect of any of the foregoing shall be cancelled and any rights thereunder terminated. Effective upon the Effective Date, such notes and other instruments represent only

the right to participate in the distributions, if any, contemplated by the Plan to the extent that such Claim is an Allowed Claim under the Plan. Under the Stand Alone Option, the outstanding Old Common Stock and other instruments evidencing Interests in the Debtors shall, effective upon the Effective Date, represent only the right to participate in the distributions, if any, contemplated by the Plan to the extent that such Interest is an Allowed Interest under the Plan. Under the Stand Alone Option, the outstanding Old Common Stock and other instruments evidencing Interests in the Debtors shall be deemed cancelled without any further action of the Debtors.

Notwithstanding the previous paragraph, (i) except to the extent the Plan affects the B-2 REMIC Guarantees and the Resecuritization Note Put Option, nothing contained in this Plan shall affect the rights and obligations of the REMIC Trusts and the Resecuritization Trust under the applicable REMIC Trust and the Resecuritization Trust transaction documents or impair, amend or adversely affect the REMIC Trusts and the Resecuritization Trust and the rights of each REMIC Trustee and the Resecuritization Trustee thereunder relating to the B-Piece REMIC Certificates or the X REMIC Certificates, and (ii) the Senior Notes Indenture and Junior Notes Indenture shall continue in effect for purposes of permitting the Senior Notes Indenture Trustee and the Junior Notes Indenture Trustee to make distributions pursuant to the Plan and to perform such necessary functions with respect thereto. No party, including but not limited to the Debtors, the Liquidation Trust, the Reorganized Sale Debtors or the Reorganized Stand Alone Debtors, shall have any obligation to recognize any transfer of the B-2 REMIC Guarantees, the Resecuritization Note, the Junior Notes, the Senior Notes or the Interests occurring after the Confirmation Date. This provision shall not prohibit the surrender of REMIC Certificates or interests therein to the Liquidation Trust (under the Sale Option) or the Reorganized Sale Debtors (under the Stand Alone Option) in connection with the resolution of Disputed Class 4C Claims. Termination of the Junior Notes Indenture and the Senior Notes Indenture shall not impair the rights of the Junior Notes Indenture Trustee and the Senior Notes Indenture Trustee, as the case may be, to enforce their charging liens, established in law or pursuant to the Junior Notes Indenture and the Senior Notes Indenture, against property that would otherwise be distributed pursuant to this Plan to Holders of the Junior Notes or the Senior Notes.

### 7.4    Treatment of Future Claims.

Unless otherwise explicitly provided for under the Plan, all Future Claims shall be solely the responsibility and liability of the Reorganized Sale Debtors (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) and shall not be the responsibility or liability of the Liquidation Trust or the Buyer.

### 7.5    Limited Releases By Debtors.

As of the Effective Date, the Debtors shall be deemed to have waived and released the Debtors, the Creditors' Committee, Berkshire and the Buyer, and each of those parties' officers, directors, members, ex officio members, and the Interested Party Professionals, from any and all Causes of Action of the Debtors (including claims which the Debtors otherwise have legal power to assert, compromise or settle in connection their Chapter 11 Cases) arising on

58

or before the Effective Date; provided, however, that this provision shall not operate as a waiver or release of any Causes of Action (a) in respect to any loan, advance or similar payment by the Debtors to such parties, (b) in respect of any contractual obligation owed to any of the Debtors by such parties, including, without limitation, the obligations arising under the Purchase Agreement, the Final DIP Agreement and the Exit Facility Agreement, (c) in respect to any Causes of Action based upon the willful misconduct or gross negligence of such parties, (d) to the extent based upon or attributable to such parties gaining in fact a personal profit to which such parties were not legally entitled, including, without limitation, profits made from the purchase or sale of equity securities of Oakwood which are recoverable by Oakwood or its successors pursuant to section 16(b) of the Securities Exchange Act of 1934, as amended and (e) that is an Avoidance Action; provided further, however, that this provision shall not operate as a waiver or release of any right that any party in interest may have to object to any Claim, including Fee Claims, or any Interest and shall not otherwise operate as a waiver or release of any objection to Claims or Interests pending as of the Effective Date, regardless of whether such objection was brought by the Debtors or any other party in interest.

### 7.6    Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date after which the discharge provisions and permanent injunctions of the Plan and the Bankruptcy Code will be given full force and effect.

### 7.7    Exculpation.

The Debtors, the Creditors' Committee, Berkshire and the Buyer, and each of those parties' officers, directors, members, ex officio members, and the Interested Party Professionals shall neither have nor incur any liability, in any form, to any Holder of a Claim or Interest, or a governmental entity on behalf of a Holder of a Claim or Interest, for any act or omission in connection with or arising out of their involvement in the filing and conduct of the Chapter 11 Cases, including the type or value of distributions, if any, reserved under the Plan for Holders of Interest, the solicitation of votes for acceptance or rejection of the Plan, the pursuit of confirmation and consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for any liabilities which may arise under the statutes or regulations administered by the Securities and Exchange Commission or from any willful misconduct or gross negligence, and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and applicable law.

### 7.8    Injunction.

*Confirmation of this Plan shall have the effect of, among other things, permanently enjoining all Persons who have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in any of the Debtors against any of the Debtors, with respect to any such Claim or Interest from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan):  (a)*

59

*commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Buyer or any of their property; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Buyer or any of their property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Buyer or any of their property; (d) asserting any right of setoff, directly or indirectly, against any obligation due the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Buyer or any of their property, except as contemplated or allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (f) prosecuting or otherwise asserting any Claim or Interest, including any right, claim or cause of action, released pursuant to the Plan. Additionally, unless otherwise explicitly stated in the Plan, the injunction contemplated by this Section shall prohibit the assertion against the Liquidation Trust of all Claims or Interests, if any, related to the Debtors, that are not otherwise discharged or released by the Plan or the Confirmation Order.*

**7.9    Waiver of Certain Claims.**

Subject to the occurrence of the Initial Distribution Date, and except as otherwise expressly provided in the Plan or Confirmation Order, all Holders of Junior Notes Claims, Senior Notes Claims and REMIC Guarantee Claims and Junior Notes Indenture Trustees, the Senior Notes Indenture Trustees, the REMIC Trustees and the Resecuritization Trustee shall all be deemed, by virtue of their receipt of distributions and/or other treatment contemplated under the Plan, to have forever covenanted with each other to waive, release and not to assert, sue, or otherwise seek any recovery from each other or the Debtors, the Creditors' Committee, and each of those parties' officers, directors, members, ex officio members and the Interested Party Professionals, whether for tort, contract, violations of federal or state securities laws, or otherwise, based upon any claim, right or cause of action related to the construction and enforcement of the Junior Notes Indenture, the Senior Notes Indenture or any obligations under the B-2 REMIC Guarantees and the Resecuritization Note Put Option or any alleged priority or subordination in respect of distributions received on account of Junior Notes Claims, Senior Notes Claims or REMIC Guarantee Claims; provided further, however, that this provision shall not operate as a waiver or release of any right that any party in interest may have to object to any Claim, including Fee Claims, or any Interest and shall not otherwise operate as a waiver or release of any objection to Claims or Interests pending as of the Effective Date, regardless of whether such objection was brought by the Debtors or any other party in interest.

**7.10    Intentionally Omitted.**

**7.11    Release of Liens and Perfection of Liens.**

Except as otherwise specifically provided in the Plan or in any agreement, instrument or document created in connection with the Plan: (a) each Holder of (i) a Secured Claim, (ii) a Claim that is purportedly secured and/or (iii) a judgment, personal property or ad valorem tax, mechanics' or similar Secured Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, on or immediately before the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been filed: (1) turn over and release to the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer, as the case may be, any and all property of the Debtors or the Estates that secures or purportedly secures such Claim, or such Lien and/or Claim which shall automatically, and without further action by the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer, be deemed released; and (2) execute such documents and instruments as the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer require(s) to evidence such Claim Holder's release of such property or Lien, and if such Holder violates the Confirmation Order and this Plan by refusing to execute appropriate documents or instruments, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer may, in its or their discretion, file a copy of the Confirmation Order which shall serve to release any Claim Holder's rights in such property; and (b) on the Effective Date, all right, title and interest in such property shall revert, vest or revest in accordance with this Plan, free and clear of all Claims and Interests, including, without limitation, Liens, escrows, charges, pledges, encumbrances and/or security interests of any kind; provided, however, that the physical turnover of property described (1), above, is necessary and required only to the extent the Holder is in possession or control of the property that secures or purportedly secures such Claim.

Without limiting the automatic release provisions of the immediately preceding paragraph: (a) no distribution hereunder shall be made to or on behalf of any Claim Holder unless and until such Holder executes and delivers to the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer (respecting property to be Transferred to the Buyer under the Sale Option) such release of Liens or otherwise turns over and releases such Cash, pledge or other possessory Liens; (b) such Holder that fails to execute and deliver such release of Liens within ninety (90) days after the Effective Date shall be deemed to have no Claim against the Debtors, the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer or their assets or property in respect of such Claim and shall not participate in any distribution hereunder; and (c) the Estates, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or the Buyer (respecting property to be Transferred to the Buyer under the Sale Option), who shall be deemed to be appointed as attorney-in-fact for all such Holders of Lien Claims for the purpose of releasing such Liens, shall be authorized to use, and all authorities shall be required to accept, the Confirmation Order and the notice of Effective Date as satisfaction of all Liens.

Notwithstanding the foregoing two Paragraphs, any Lien securing a Claim of a Holder, to the extent that it is valid, perfected and unavoidable, (a) under the Stand Alone Option, remains attached to the property that secures or purportedly secures such Claim or (b) under the Sale Option, attaches to the proceeds of the Transaction (or other relevant Net Proceeds) resulting from the property that secures or purportedly secures such Claim; provided, however, that such Liens are immediately released in accordance with the foregoing two Paragraphs when the Claim of such a Holder becomes (y) a Disallowed Claim or (z) an Allowed Claim and payment on the Allowed Claim is made.

### 7.12    Insurance Preservation.

Nothing in the Plan, including any releases, shall diminish or impair the Debtors' ability to enforce any insurance policies or other policies of insurance that may cover insurance Claims or other Claims against the Debtors, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or any other Person. All such insurance policies or other policies of insurance that may cover Future Claims or other Claims against the Debtors, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors or any other Person shall remain in full force and effect. Under the Sale Option, to the extent requested by the Liquidation Trust, and otherwise appropriate under the circumstances, all policies of insurance vest in or otherwise purchased by the Reorganized Sale Debtors shall list the Liquidation Trust as co-insured.

## ARTICLE VIII.

## GENERAL PROVISIONS REGARDING TREATMENT OF CLAIMS AND

## INTERESTS AND DISTRIBUTIONS UNDER THE PLAN

### 8.1    Special Considerations for Distributions to Classes 4A, 4B and 4C.

Distributions for the benefit of beneficial holders of Senior Notes, Junior Notes, B-2 REMIC Guarantees and the Resecuritization Note shall be made to the Senior Notes Indenture Trustee, the Junior Notes Indenture Trustee, the individual REMIC Trustees and the Resecuritization Trustee, as applicable. The Senior Notes Indenture Trustee, the Junior Notes Indenture Trustee, the individual REMIC Trustees and the Resecuritization Trustee shall, in turn, promptly administer the distributions to the beneficial Holders of Allowed Claims in Classes 4A, 4B and 4C, as applicable, in accordance with the Plan and applicable transaction documents. None of the Senior Notes Indenture Trustee, the Junior Notes Indenture Trustee, the individual REMIC Trustees and the Resecuritization Trustee shall be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court; and in the event that such parties are so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be paid from the distributions to the beneficial Holders of Senior Notes Claims, Junior Notes Claims and REMIC Guarantee Claims. Additionally, to the extent necessary to satisfy the charging liens of the Senior Notes Indenture Trustee, the Junior Notes Indenture Trustee, the REMIC Trustee and the Resecuritization Trustee and satisfy the fees and expenses of the Senior Notes Indenture Trustee, the Junior Notes Indenture Trustee, the REMIC Trustee and the Resecuritization Trustee, under the Stand Alone Option, at the

62

request of the Senior Notes Indenture Trustee, the Junior Notes Indenture Trustee, the REMIC Trustee or the Resecuritization Trustee, up to $750,000.00 in Cash will be paid to the Holders of Senior Notes Claims and Junior Notes Claims and up to $750,000.00 in Cash will be paid to the Holders of REMIC Guarantee Claims, in lieu of an identical value of New Common Stock (maintaining a Pro Rata distribution to all Allowed Claims), in order to pay the fees and expenses of such trustees.

8.2    Disputed Claim Reserves and Stand Alone Voting Trust.

(a)    Establishment of Disputed Claim Reserves for Cash Distributions.

On the Initial Distribution Date (or on any other date on which distributions for any particular Class (or group of Classes in the case of Class 4) of Claims are made pursuant to the Plan by the Liquidation Trust), and in connection with making all distributions required to be made on any such date under the Plan, the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) shall establish, for record keeping purposes only, a separate Disputed Claim reserve on account of distributions of Cash for each of the relevant Classes (or group of Classes in the case of Class 4), as necessary pursuant to the Plan.

(b)    Establishment of the Stand Alone Voting Trust for New Common Stock and New Warrant Distribution.

Under the Stand Alone Option, on the Effective Date, there shall be established the Stand Alone Voting Trust pursuant to the Stand Alone Voting Trust Agreement. The purpose of the Stand Alone Voting Trust shall be to hold the New Common Stock and New Warrants, if applicable, in reserve for Disputed Claims or Interests for each of the relevant Classes (or group of Classes in the case of Class 4), as necessary pursuant to the Plan. Pursuant to the Stand Alone Voting Trust Agreement, there will be three (3) independent and disinterested Persons designated as the Stand Alone Voting Trustees by the Creditors' Committee with the consent of the Debtors and Berkshire, whose approval shall not be unreasonably withheld, and identified in the Plan Supplement; provided, however, that an outstanding Fee Claim shall not render a Person ineligible to serve as a Stand Alone Voting Trustee. The Reorganized Stand Alone Debtors shall be responsible for and shall indemnify the Stand Alone Voting Trust for any reasonable costs of administration, including, without limitation, the payment of fees earned by the Stand Alone Voting Trustees under the Stand Alone Voting Trust Agreement and reasonable professional costs. Upon allowance of any Disputed Claim or Interest for which New Common Stock or New Warrants is held in the Stand Alone Voting Trust, an appropriate amount of such New Common Stock or New Warrants shall promptly be released to the Reorganized Stand Alone Debtors for distribution to the Holder of the Allowed Claim or Interest pursuant to the terms of the Plan.

(c)    Amounts to Be Reserved.

The Liquidation Trust and/or the Stand Alone Voting Trust shall reserve the Ratable proportion of all Cash, New Common Stock, New Warrants or other property

allocated for distribution on account of each Disputed Claim based upon the asserted amount of each such Disputed Claim, or such lesser amount as may be agreed to by the Holder of the Claim on one hand and the Liquidation Trust or the Stand Alone Voting Trust on the other hand, as applicable, or as may otherwise be determined by order of the Bankruptcy Court. All Cash or other property allocable to the relevant Class (or group of Classes in the case of Class 4) hereunder shall be distributed by the Liquidation Trust to the relevant Disputed Claim reserve on the Initial Distribution Date (or such other date on which distributions for any particular Class of Claims are made pursuant to the Plan). All New Common Stock or New Warrants allocable to the relevant Class (or group of Classes in the case of Class 4) hereunder shall be distributed by the Stand Alone Voting Trustees to the Stand Alone Voting Trust on the Initial Distribution Date (or such other date on which distributions for any particular Class of Claims are made pursuant to the Plan). To the extent that the property placed in a Disputed Claim reserve consists of Cash, that Cash shall be deposited in an interest-bearing account at a qualified institution, consistent with the Liquidation Trust Agreement.

**(d)    Distribution.**

Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed on the first Quarterly Distribution Date after the Claim is Allowed. Distributions shall be made only to the extent of the aggregate distributions that the Holder of any such Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to amounts held in the Disputed Reserves). No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date. Distributions to each Holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class (or group of Classes in the case of Class 4) of Claims in which the Claim is classified.

**(e)    Termination of Disputed Claim Reserve or Stand Alone Voting Trust.**

Each Disputed Claim reserve shall be closed and extinguished by the Liquidation Trustee when all distributions and other dispositions of Cash or other property required to be made therefrom under the Plan and the Liquidation Trust Agreement have been made. Upon closure of a Disputed Claim reserve, all Cash and other property held in that Disputed Claim reserve shall revest in the Liquidation Trust and such Cash and property shall be Ratably distributed to the other Holders of Allowed Claims in the Class (or group of Classes) in respect of which such Disputed Claims reserve was created. The Stand Alone Voting Trust shall be closed and extinguished by the Stand Alone Voting Trustees when all distributions of New Common Stock and New Warrants required to be made under the Plan have been made.

**(f)    Limitation of Liability for Funding the Disputed Claim Reserve.**

Except as expressly set forth in the Plan, the Liquidation Trust shall have no duty to fund the Disputed Reserves.

**8.3    Transmittal of Distributions and Notices.**

Any property or notice which a Person is or becomes entitled to receive pursuant to the Plan may be delivered by regular mail, postage prepaid, in an envelope addressed to that Person's Distribution Address. Property distributed in accordance with this Section shall be deemed delivered to such Person regardless of whether such property is actually received by that Person.

A Holder of a Claim or Interest may designate a different Distribution Address by notifying, after the Effective Date, the Liquidation Trustee and prior to the Effective Date, the Debtors, of that address in writing. Any change of Distribution Address must be provided to the Liquidation Trustee or Debtors, as applicable, by registered mail in order to be effective. Such notification shall be effective only upon receipt.

Distributions and Notices to the Holders of REMIC Guarantee Claims shall be delivered by regular mail, postage prepaid, in an envelope addressed to JPMorgan Chase Bank, 4 New York Plaza, 15th Floor, New York, NY 10004, Attention: James R. Lewis, Esq., Tel: (212) 623-6759, Fax: (212) 623-6165.

**8.4    Unclaimed Distributions.**

Unclaimed Property shall be forfeited by the Holder entitled thereto, whereupon all rights, titles and interests in and to the Unclaimed Property shall immediately and irrevocably revest in the Estate of the Reorganized Debtors or the Liquidation Trust, as appropriate, the Holder of the Allowed Claim previously entitled to such Unclaimed Property shall cease to be entitled thereto, and such Unclaimed Property shall be Ratably distributed to the other Holders of Allowed Claims in the same Class (or group of Classes). A Claim and the Unclaimed Property distributed on account of such Claim shall not escheat to any federal, state or local government or other entity by reason of the failure of its Holder to claim a distribution in respect of such Claim.

**8.5    Setoffs.**

The Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) may, but shall not be required to, setoff against any Claim (for purposes of determining the allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against such claimant.

**8.6    Withholding Taxes and Expenses of Distribution.**

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Holders of Claims or Interests shall be required to provide any information necessary to effect the

65

withholding of such taxes. In addition, all distributions under the Plan shall be net of the actual and reasonable costs of making such distributions.

### 8.7    Allocation of Plan Distributions between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 8.8    Disputed Identity of Holder.

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution, the Liquidation Trustee may, in lieu of making such distribution to such Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court order or by written agreement among the interested parties to such dispute; provided, however, that if the dispute remains unresolved by Final Order for more than ninety (90) days after the relevant Distribution Date, the property which is the subject of the dispute shall irrevocably become Unclaimed Property.

### 8.9    Transfers of Claims.

As of the close of business on the Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the Holders of record of any of the Claims or Interests. No party, including but not limited to the Debtors, the Liquidation Trust (under the Sale Option) and the Reorganized Stand Alone Debtors (under the Stand Alone Option), shall have any obligation to recognize any transfer of the Claims or Interests occurring after the Record Date unless notice of the transfer of such Claim or Interest, in form and substance satisfactory to the Debtors, the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option), as appropriate, shall have been received by the Debtors or the Liquidation Trustee, as appropriate, prior to the Record Date. Subject to the immediately preceding sentence, only those Holders of record stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable, shall be entitled to be recognized for all purposes hereunder.

66

**8.10    Method of Cash Distributions.**

Any Cash payment to be made by the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) pursuant to the Plan may be made, at the sole discretion of the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option), by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**8.11    *De Minimis* Distributions.**

No Cash payment in an amount less than fifty dollars ($50.00) shall be made by the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) to any Holder of a Claim or Interest unless a request therefor is made in writing to the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) prior to one (1) year after the Effective Date. Cash that otherwise would be payable under the Plan but for this Section 8.11 shall be reserved and distributed with future distributions, if any, that, collectively, exceed fifty dollars ($50.00). Distributions of cash that otherwise would be payable under the Plan to a Holder but for this Section 9.14 that never, collectively, exceed fifty dollars ($50.00) as described in the foregoing sentence and for which a request is not made within the one (1) year deadline shall become Unclaimed Property.

**8.12    No Distribution in Excess of Allowed Amount of Claim.**

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the allowed amount of such Claim.

**8.13    Exemption from Certain Transfer Taxes.**

Pursuant to section 1146(c) of the Bankruptcy Code: (a) the issuance, transfer or exchange of any securities, instruments or documents; (b) the creation or release of any other Lien, mortgage, deed of trust or other security interest; or (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale of any assets of the Debtors or the Estates, including the Purchase Agreement, any deeds, releases, bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under section 1146(c) of the Bankruptcy Code.

# ARTICLE IX.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1     Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Under the Sale Option, on the Effective Date, and to the extent permitted by applicable law, (a) any and all executory contracts and unexpired leases of any Debtor that are listed on Sections 1.09(a) or 1.09(b) of Sellers' Disclosure Schedule as being assumed and assigned to the Buyer pursuant to the Purchase Agreement shall be deemed assumed and assigned to the Buyer pursuant to the Plan in accordance with the Purchase Agreement and (b) (i) such contracts or leases as are listed on the Executory Contract Schedule filed by the Debtors (which may be modified by the Liquidation Trust up to sixty (60) days after the Effective Date), (ii) the Servicing Agreements, and (iii) any and all executory contracts or unexpired leases assumed prior to entry of the Confirmation Order shall be deemed assumed pursuant to the provisions of section 365 and section 1123 of the Bankruptcy Code as of the Effective Date. All other executory contracts and unexpired leases of each of the Debtors shall be deemed rejected in accordance with the provisions of section 365 and section 1123 of the Bankruptcy Code; provided, however, that any and all executory contracts or unexpired leases which are the subject of separate motions filed pursuant to section 365 of the Bankruptcy Code by the Debtors prior to the commencement of the Confirmation Hearing shall not be deemed rejected and shall be treated as so ordered by the Bankruptcy Court in an order entered pursuant to the motion. Subject to the aforementioned proviso, the Confirmation Order shall constitute an order of the Court approving all such assumption and assignments and rejections pursuant to section 365 of the Bankruptcy Code subject to the occurrence of the Effective Date.

Under the Stand Alone Option, on the Effective Date, and to the extent permitted by applicable law, (a) such contracts or leases as are listed on the Executory Contract Schedule filed by the Debtors, which may be modified by the Reorganized Stand Alone Debtors up to sixty (60) days after the Effective Date, and (b) any and all executory contracts or unexpired leases rejected prior to entry of the Confirmation Order shall be rejected pursuant to the provisions of section 365 and section 1123 of the Bankruptcy Code as of the Effective Date, if not already rejected as of a prior date. All other executory contracts and unexpired leases of each of the Debtors shall be deemed assumed in accordance with the provisions of section 365 and section 1123 of the Bankruptcy Code as of the Effective Date; provided, however, that any and all executory contracts or unexpired leases which are the subject of separate motions filed pursuant to section 365 of the Bankruptcy Code by the Debtors prior to the commencement of the Confirmation Hearing shall not be deemed assumed and shall be treated as so ordered by the Bankruptcy Court in an order entered pursuant to the motion. Subject to the aforementioned proviso, the Confirmation Order shall constitute an order of the Court approving all such assumption and assignments and rejections pursuant to section 365 of the Bankruptcy Code. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Stand Alone Debtors in the ordinary course of their businesses.

### 9.2    Bar Date for Rejection Damages.

If the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 4E; provided, however, that the Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Liquidation Trust, their successors or properties, unless a proof of such Claim is filed and served on the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) and the Claims Agent within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease which may include, if applicable, the Confirmation Order.

### 9.3    Procedures for the Determination of Cure Amounts.

Unless otherwise noted in the Executory Contract Schedule or the Purchase Agreement, or any schedule thereto, the cure amount pursuant to section 365(b)(1) of the Bankruptcy Code for any executory contracts or unexpired leases shall be $0.00. Any dispute regarding (i) the nature or amount of any payment necessary to satisfy the listed cure amount under the contract or lease to be assumed or assumed and assigned, (ii) the ability of the Debtors, the Buyer or any other assignee, as the case may be, to provide "adequate assurance of future performance," within the meaning of section 365 of the Bankruptcy Code, under the contract or lease to be assumed or assumed and assigned or (iii) any other matter pertaining to assumption or assumption and assignment under section 365 of the Bankruptcy Code shall be forever barred and shall not be enforceable against the Debtors, the Liquidation Trust, the Reorganized Sale Debtor, the Reorganized Stand Alone Debtors, their successors or properties, unless a motion or objection, as appropriate, is filed and served on the Debtors (prior to the Effective Date), the Liquidation Trust and the Buyer (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) within thirty (30) days after the date of notice of proposed assumption or assumption and assignment, or such later date as allowed by the Bankruptcy Court. The Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option), and not the Buyer, shall be responsible for paying any cure costs associated with the assumption and assignment of any executory contract or unexpired lease assumed and assigned to the Buyer, whether pursuant to the Plan or pursuant to any other order of the Bankruptcy Court. The Liquidation Trust (under the Sale Option) and the Reorganized Stand Alone Debtors (under the Stand Alone Option) shall have the right to dispute any asserted cure amounts, including any amounts noted in the Executory Contract Schedule or the Purchase Agreement.

# ARTICLE X.

## DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS

### 10.1   Objections to Claims and Interests.

The Claims/Interests Objection Deadline shall be six (6) months after the Effective Date; provided, however, that the last day for filing Avoidance Actions against a Holder of a Claim or Interest shall be November 15, 2004. Notwithstanding any of the foregoing, the Reorganized Stand Alone Debtors or the Liquidation Trustee, as appropriate, may request from the Bankruptcy Court an extension of the Claims/Interests Objection Deadline, which such extended date shall become the new Claims/Interests Objection Deadline.

The Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) have the exclusive responsibility for reviewing and objecting to the allowance of any Claim or Interest filed in the Chapter 11 Cases. The Liquidation Trust or the Reorganized Stand Alone Debtors, as appropriate, shall have until the Claims/Interests Objection Deadline to file objections to the Claims and Interest in the Chapter 11 Cases. All objections shall be litigated to a Final Order; provided, however, that the Liquidation Trust or the Reorganized Stand Alone Debtors, as the case may be, may compromise and settle any objections to Claims or Interests, subject to the provisions of this Article X without further order of the Bankruptcy Court; and further provided, however, that distributions may be made to a Holder of a Claim or Interest prior to the expiration of the Claims/Interests Objection Deadline if the Liquidation Trustee or the Reorganized Stand Alone Debtors, as appropriate, reasonably believes that no basis exists for objection to such Holder's Claim or Interest. Notwithstanding the foregoing, nothing in this Plan shall be interpreted to operate as a waiver or release of (x) any right that any party in interest may have to object to (a) any Claim or Interest through the Effective Date or (b) any Fee Claim after the Effective Date; or (y) any objection to Claims or Interests pending as of the Effective Date, regardless of whether such objection was brought by the Debtors or any other party in interest.

Objections to Claims or Interests shall not be subject to any defense, including, without limitation, res judicata, estoppel or any other defense because of the confirmation of the Plan and all such rights are expressly preserved and reserved by the Plan for the Debtors, their Estates, the Liquidation Trust (under the Sale Option) and the Reorganized Stand Alone Debtors (under the Stand Alone Option). Additionally, the rights of the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) to amend, modify or supplement any objection to a particular Claim or Interest to include relief pursuant to section 502(d) of the Bankruptcy Code are hereby preserved until sixty (60) days after the entry of a Final Order against a Holder of such Claim.

### 10.2   Estimation of Claims or Interests.

Through the Claims/Interests Objection Deadline, the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) may request that the Bankruptcy Court enter an Estimation Order fixing the value of, pursuant to

section 502(c) of the Bankruptcy Code, any Disputed Claim or Interest, regardless of whether a Debtor has previously objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim or Interest at any time during litigation concerning any objection to any Disputed Claim or Interest, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court enters an Estimation Order estimating any Disputed Claim or Interest, the amount of such estimation will constitute either the allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim or Interest, the Liquidation Trust or the Reorganized Stand Alone Debtors (as appropriate) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim or Interest. All of the aforementioned Claims and Interests objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims or Interests may be estimated and thereafter resolved by any mechanism permitted under the Bankruptcy Code or the Plan.

### 10.3 Amendments to Claims or Interests.

After the Confirmation Date, a Claim or Interest may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the Holder of such Claim or Interest solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount or priority.

### 10.4 Authority To Settle Disputed Claims or Interests.

From and after the Effective Date, the Liquidation Trust (under the Sale Option) or the Reorganized Stand Alone Debtors (under the Stand Alone Option) shall be authorized with respect to those Claims or Interests which are not allowed by Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims with a Disputed Amount in excess of $25,000.00, upon Bankruptcy Court approval of such settlement. Notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, the Liquidation Trust or the Reorganized Stand Alone Debtors, as appropriate, may settle or compromise any Disputed Claim with a Disputed Amount of $25,000.00 or less without approval of the Bankruptcy Court. This provision shall not prohibit the surrender of REMIC Certificates or interests therein to the Liquidation Trust (under the Sale Option) or the Reorganized Sale Debtors (under the Stand Alone Option) in connection with the resolution of Disputed Class 4C Claims.

### 10.5 No Recourse.

Notwithstanding that the allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is allowed in an amount for which there is insufficient value in the relevant fund or reserve to provide a recovery equal to that received by other Holders of Allowed Claims in the relevant Class, no Claim or Interest Holder shall have recourse to the Debtors, the Liquidation Trust, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, the Creditors' Committee or

any member or ex officio member thereof, any of the Interested Party Professionals, the Holder of any other Claim or Interest, or any of their respective property. However, nothing in the Plan shall modify any right of a Holder of a Claim or Interest under section 502(j) of the Bankruptcy Code. **THUS, THE BANKRUPTCY COURT'S ENTRY OF AN ESTIMATION ORDER MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS OR INTERESTS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS OR INTERESTS.**

### ARTICLE XI.

### ADMINISTRATIVE PROVISIONS

**11.1   Retention of Jurisdiction.**

Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, for the following purposes:

(a)     to determine the allowance, classification, or priority of Claims upon objection by the Debtors, the Creditors' Committee, the Liquidation Trust or the Liquidation Trustee, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens and other encumbrances;

(b)     to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person;

(c)     to protect the property of the Estates, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors, Liquidation Trust or the Buyer as the case may be, including Litigation Claims, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens, security interests or encumbrances on any property of The Debtors, the Estates, the Liquidation Trust, the Reorganized Sale Debtors or the Reorganized Stand Alone Debtors;

(d)     to determine any and all applications for allowance of Fee Claims;

72

(e)    to determine any Priority Tax Claims, Priority Non-Tax Claims, Administrative Claims or any other request for payment of Claims, including both fees and expenses, entitled to priority under section 507(a) of the Bankruptcy Code;

(f)    to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of distributions hereunder, including any and all disputes regarding the Purchase Agreement, as provided in section 10.13 of the Purchase Agreement;

(g)    to determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, or to determine any motion to reject an executory contract or unexpired lease pursuant to Article IX of the Plan;

(h)    except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(i)    to enter a Final Order closing the Chapter 11 Cases;

(j)    to modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)    to issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the full extent authorized by the Bankruptcy Code;

(l)    to determine any tax liability pursuant to section 505 of the Bankruptcy Code;

(m)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(n)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

(o)    to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(p)   to authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(q)   to hear and resolve Litigation Claims;

(r)   to resolve any disputes concerning any release, discharge, injunction, exculpation or other waivers and protections provided in the Plan;

(s)   to approve, if necessary, any distributions, or objections thereto, under the Plan;

(t)   to approve any Claims settlement entered into or offset exercised by the Liquidation Trust and the Liquidation Trustee;

(u)   to resolve any dispute or matter arising under or in connection with the Liquidation Trust;

(v)   to oversee any dispute concerning improper or excessive draws under letters of credit issued for the account of the Debtors; and

(w)   to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including the matters set forth in this Article XI, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter. Notwithstanding any provisions of the Plan, the Bankruptcy Court shall have concurrent but not exclusive jurisdiction over the prosecution of Causes of Actions, including but not limited to Avoidance Actions.

**11.2    Intentionally Omitted.**

**11.3    Amendments.**

(a)   **Preconfirmation Amendment.**

The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order, provided that (i) the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements and (ii) the Creditors' Committee, Berkshire and the Buyer (under the Sale Option) consent to such modifications, such consent not being unreasonably withheld.

**(b)    Postconfirmation/Preconsummation  Amendment  Not  Requiring Resolicitation.**

After the entry of the Confirmation Order and before substantial consummation of the Plan, the Debtors may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that: (i) the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing; (ii) the Creditors' Committee, Berkshire and the Buyer (under the Sale Option) consent, such consent not being unreasonably withheld; and (iii) such modification shall not materially and adversely affect the interests, rights, treatment or distributions of any Class of Allowed Claims or Interests under the Plan.  Any waiver under Section 5.3 hereof shall not be considered to be a modification of the Plan.

**(c)    Postconfirmation/Preconsummation  Amendment  Requiring Resolicitation.**

After the Confirmation Date and before substantial consummation of the Plan, the Debtors may modify the Plan in a way that materially or adversely affects the interests, rights, treatment, or distributions of a Class of Claims or Interests, provided that: (i) the Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtors obtain Bankruptcy Court approval for such modification, after notice and a hearing; (iii) the Plan as modified complies with the Bankruptcy Code and Bankruptcy Rules; (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to the Plan as modified; and (v) the Creditors' Committee, Berkshire and the Buyer (under the Sale Option), such consent not being unreasonably withheld.

### 11.4    Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision and make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 11.5    Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

### 11.6    Effectuating Documents and Further Transactions.

Each Debtor, each Reorganized Sale Debtor, each Reorganized Stand Alone Debtor, and the Liquidation Trust shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

### 11.7    Plan Supplement.

The Plan Supplement comprised of, among other things, the forms of the documents related to the Amended Certificates of Incorporation, Amended Bylaws, the Liquidation Trust Agreement, the Stand Alone Voting Trust Agreement, the Executory Contract Schedule, the Exit Facility Agreement and, to the extent necessary to implement the Plan, proposed amendments to the Reorganized Sale Debtors' organizational documents, to the extent not filed simultaneously with the Plan and Disclosure Statement, shall be filed with the Bankruptcy Court at least five (5) Business Days prior to the deadline established for voting on this Plan. Upon its filing, the Plan Supplement may be inspected in the offices of the Clerk of the Bankruptcy Court during normal business hours. A copy of the Plan Supplement shall be mailed to the Creditors' Committee, and any Holder of a Claim or Interest that makes a specific written request for such Plan Supplement to the Debtors. The documents contained in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

### 11.8    Confirmation Order and Plan Control.

To the extent the Confirmation Order and/or this Plan is inconsistent with the Disclosure Statement, any other agreement entered into between or among any Debtors, or any of them and any third party, the Plan controls the Disclosure Statement and any such agreements, and the Confirmation Order controls the Plan, the Disclosure Statement and any such agreements; provided, however, that the Purchase Agreement is not controlled by the Plan, the Disclosure Statement or anything contained in the Plan Supplement.

### 11.9    Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code as Administrative Fees under the Plan, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in Cash on the Effective Date, or as soon as reasonably practicable thereafter, and neither the Debtors, their Estates, the Reorganized Sale Debtors, the Reorganized Stand Alone Debtors nor the Liquidation Trust shall thereafter be liable for the payment of additional fees under section 1930 of title 28 of the United States Code other than with respect to the consolidated Chapter 11 Case which will continue after the Effective Date.

### 11.10    Withdrawal of Plan.

The Debtors reserve the right, subject to the Purchase Agreement, in the exercise of their reasonable discretion, to revoke and withdraw or to modify the Plan at any time prior to

the Confirmation Date or, if the Debtors are for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date. If the Debtors revoke or withdraw the Plan, (a) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or the Creditors' Committee or to prejudice in any manner the rights of the Debtors, the Creditors' Committee or any Person in any further proceeding involving the Debtors or the Creditors' Committee and (b) the result shall be the same as if the Confirmation Order were not entered, the Plan was not filed and the Effective Date did not occur.

### 11.11  Payment Dates.

Whenever any payment to be made under the Plan is due on a day other than a Business Day, such payment will instead be made, without interest, on the next Business Day or as soon thereafter as practicable.

### 11.12  Notices.

Any notice, request or demand given or made under this Plan or under the Bankruptcy Code or the Bankruptcy Rules shall be in writing and shall be hand delivered or sent by a reputable overnight courier service, and shall be deemed given when received at the following addresses whether hand delivered or sent by overnight courier service:

**If to the Debtors:**

**MORRIS, NICHOLS, ARSHT & TUNNELL**
Robert J. Dehney, Esq.
Derek C. Abbott, Esq.
Daniel B. Butz, Esq.
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Facsimile: (302) 658-3989

- and -

**RAYBURN COOPER & DURHAM, P.A.**
C. Richard Rayburn, Jr. , Esq.
Albert F. Durham, Esq.
Patricia B. Edmondson, Esq.
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina 28202-1675
Facsimile: (704) 377-1897

**If to the Creditors' Committee:**

**MCCARTER & ENGLISH, LLP**
William F. Taylor, Jr. , Esq.
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Facsimile: (302) 984-6399

- and -

**KING & SPALDING LLP**
Robert J. Stark, Esq.
1185 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 556-2222

**If to the Buyer or Berkshire:**

**CLAYTON HOMES, INC.**
Kevin Clayton
500 Alcoa Trail
P.O. Box 9790
Maryville, TN 37804
Facsimile: (865) 380-3750

-and-

| | |
|---|---|
| **MUNGER, TOLLES &** **OLSON LLP** | **YOUNG CONAWAY** **STARGATT & TAYLOR, LLP** |
| Thomas Walper, Esq. | Michael R. Nestor, Esq. |
| 355 S. Grand Avenue | The Brandywine Building |
| Los Angeles, CA 90071 | 1000 West Street, 17th Floor |
| Facsimile: (213) 687-3702 | Wilmington, DE 19801 |
| | Facsimile: (302) 571-1253 |

Notwithstanding anything to the contrary provided herein, all notices concerning this Plan shall be served upon the entities prescribed and in the manner prescribed under the Bankruptcy Code and the Bankruptcy Rules.

### 11.13 No Admissions.

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

# ARTICLE XII.

## CONFIRMATION REQUEST

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

Dated: February 6, 2004

NEW DIMENSION HOMES, INC.

By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President

DREAM STREET COMPANY, LLC

By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President

OAKWOOD SHARED SERVICES, LLC

By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President

HBOS MANUFACTURING, LP
By: Oakwood Mobile Homes, Inc., General Partner

By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President

**OAKWOOD MHD4, LLC**

By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President


**OAKWOOD ACCEPTANCE
CORPORATION, LLC**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President


**OAKWOOD HOMES CORPORATION**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Executive Vice President


**OAKWOOD MOBILE HOMES, INC.**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President


**SUBURBAN HOME SALES, INC.**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:  Vice President

**FSI FINANCIAL SERVICES, INC.**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:   Vice President


**HOME SERVICE CONTRACT, INC.**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:   Vice President


**TRI-STATE INSURANCE AGENCY, INC.**


By: /s/ Robert A. Smith
      Name: Robert A. Smith
      Title:   Vice President


**GOLDEN WEST LEASING, LLC**


By: /s/ Randelle R.. Smith
      Name: Randelle R. Smith
      Title:  Vice President


**CREST CAPITAL, LLC**


By: /s/ Randelle R. Smith
      Name: Randelle R. Smith
      Title:   Vice President

PREFERRED HOUSING SERVICES, LP
By: Oakwood Mobile Homes, Inc., General Partner


By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


- and -


**MORRIS, NICHOLS, ARSHT & TUNNELL**


/s/ Daniel B. Butz
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200


- and -


RAYBURN COOPER & DURHAM, P.A.
C. Richard Rayburn, Jr.
Albert F. Durham
Patricia B. Edmondson
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina 28202-1675
(704) 334-0891

# EXHIBIT E

Westlaw.

Not Reported in B.R.                                                                                                Page 1

Not Reported in B.R., 2003 WL 22948234 (Bkrtcy.D.Del.), 51 Collier Bankr.Cas.2d 709, 42 Bankr.Ct.Dec. 71
**(Cite as: Not Reported in B.R.)**

**H**
Briefs and Other Related Documents

United States Bankruptcy Court,D. Delaware.
In re: CORAM HEALTHCARE CORP. and
Coram, Inc., Debtors.
Arlin M. ADAMS, as Chapter 11 Trustee of the
estates of Coram Healthcare Corp. and Coram, Inc.,
Plaintiff,
v.
MEDICAL ACCOUNTS RECEIVABLE
SOLUTIONS, INC., and Margaret Starley,
Individually, Defendants.
**No. 00-3299 (MFW), ADV. 03-53964.**

Dec. 12, 2003.

Etta Rena Wolfe, Richards, Layton & Finger, Laura
Davis Jones, Rachel Lowy Werkheiser, Pachulski,
Stang, Ziehl Young & Jones, Wilmington, DE, for
Debtor.
Hedlund, Hanley, Koenigsknecht & Trafelet, John
B. York, Weir & Partners, LLP, Wilmington, DE,
Salene R. Mazur, Weir & Partners, LLP,
Philadelphia, PA, for Trustee.
Kenneth E. Aaron, Weir & Partners, LLP,
Wilmington, DE, for Debtor/Trustee/Plaintiff.
Deborah E. Spivack, Richards, Layton & Finger,
Wilmington, DE, for Debtor/Creditor Committee.
Shannon Stacy Frazier, Etta Rena Wolfe, Russell C.
Silberglied, Richards, Layton & Finger,
Wilmington, DE, for Creditor Committee.
Charles J. Brown, William David Sullivan, Elzufon,
Austin, Reardon, Tarlov & Mondell, Wilmington,
DE, for Defendants.

*OPINION* [FN1]

> FN1. This Opinion constitutes the findings
> of fact and conclusions of law of the Court
> pursuant to Federal Rule of Bankruptcy
> Procedure 7052.WALRATH, Bankruptcy

J.
**\*1** Before the Court is the Motion to Dismiss for
lack of personal jurisdiction and improper venue
filed by the defendant Margaret Starley ("Starley").
For the reasons stated below, the Motion will be
granted.

I. *BACKGROUND*

On August 8, 2000, Coram Healthcare Corp. and
Coram, Inc. (collectively "the Debtors") filed
voluntary petitions under chapter 11 of the
Bankruptcy Code. The Debtors are engaged in the
business of providing comprehensive infusion care
and related services to patients in non-hospital
settings. On or about April 1, 2001, Medical
Accounts Receivable Solutions ("MARS") and the
Debtors entered into an agreement ("the Agreement"
) whereby MARS acted as a collection agent for the
Debtors.

On March 7, 2002, Arlin M. Adams ("the Trustee")
was appointed the chapter 11 trustee in the Debtors'
cases. On June 29, 2003, the Trustee filed an
adversary proceeding against MARS and Starley
(collectively "the Defendants") asserting claims for
breach of contract, fraudulent misrepresentation,
unjust enrichment, and conversion. Starley, a
California resident, is the founder, president, board
member and sole shareholder of MARS. MARS is a
Delaware corporation with its principal place of
business in California. In lieu of an answer, Starley
filed the Motion to Dismiss. The Trustee opposes
the Motion and briefs have been filed by the parties.

II. *JURISDICTION*

This Court has jurisdiction over this matter, which
is a core proceeding, pursuant to 28 U.S.C. §
157(b)(2)(A), (E), and (O).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 2003 WL 22948234 (Bkrtcy.D.Del.), 51 Collier Bankr.Cas.2d 709, 42 Bankr.Ct.Dec. 71
**(Cite as: Not Reported in B.R.)**

### III. *DISCUSSION*

#### A. *Motion to Dismiss Standard*

Starley seeks dismissal pursuant to Rule 12(b)(2) and (3) of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 7012(b). In a motion to dismiss, the court may consider "sworn affidavits or other competent evidence" related to personal jurisdiction. *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 183 (Bankr.D.Del.2000). To prevail on a motion to dismiss for improper venue, "facts must be presented that will defeat the plaintiff's assertion of venue." *2215 Fifth St. Assocs. v. U-Haul Int'l, Inc.,* 148 F. Supp 2d 50, 54 (D.D.C.2001) (*citing* 5A Fed. Prac. & Proc.2d 1352).

#### 1. *Personal Jurisdiction*

Starley argues that the Court cannot exercise personal jurisdiction because the requirements of Delaware's long arm statute cannot be met. *See* 10 Del. C. § 3104(c)(4). She argues that she lacked the requisite minimum contacts with Delaware, set forth in *International Shoe* and the Fourteenth Amendment, because her only contacts with Delaware were in a corporate capacity. *See, e.g., International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The Trustee notes that service of process was properly made on Starley pursuant to Bankruptcy Rule 7004(d). He argues that the Court consequently has personal jurisdiction over Starley because Starley had minimum contacts with the United States as a California resident.

**\*2** Rule 7004(d) states that "the summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr.P. 7004(d). Under Rule 7004(b), service of process can be made by first class mail within the United States. When a federal statute or rule, such as Rule 7004(d), permits the service of process beyond the boundaries of the forum state, then the issue is whether the party has sufficient contacts

with the United States, not any particular state. *In re F/S Airlease II, Inc.,* 67 B.R. 428, 431 (Bankr.W.D.Pa.1986). *See, e.g., Brown v. C.D. Smith Drug Co.,* No. 98-494-SLR, 1999 U.S. Dist. LEXIS 13872 (D.Del. Aug.18, 1999) (holding that the relevant inquiry was whether the defendants had sufficient contacts with the United States, rather than the state, because Bankruptcy Rule 7004(d) allowed national service of process); *In re Pacques, Inc.,* 277 B.R. 615, 633 (Bankr.E.D.Pa.2000) (holding that personal jurisdiction over out-of-state defendants in adversary proceeding depended on minimum contacts with the United States, not Pennsylvania); *In re Geauga Trenching Corp.,* 110 B.R. 638, 648 (Bankr.E.D.N.Y.1990) (holding that, where trustee brought a post-petition breach of contract claim, a federal "minimum contact" test rather than a state "minimum contact" test is applied).

Thus, Starley's argument based on *International Shoe* and the Fourteenth Amendment is misplaced. Because this Court has jurisdiction under section 1334(b) of title 28 and "service of process was effected pursuant to a federal rule [7004] having the force of federal law" the Fourteenth Amendment is not implicated. *Brown,* 1999 U.S. Dist. LEXIS 13872 at \*10.

In this case, Starley was properly served by first class mail pursuant to Rule 7004(b). As a resident of California, she has sufficient minimum contacts with the United States. Consequently, the exercise of personal jurisdiction over Starley in the adversary proceeding does not constitute a due process violation. Therefore, we conclude that we have personal jurisdiction over Starley and the Complaint cannot be dismissed on this basis.

#### 2. *Venue*

Section 1409 of title 28 governs venue of adversary proceedings in bankruptcy cases. The general rule under section 1409(a) is that proper venue of a proceeding arising under or related to a case under title 11 lies in the court in which the bankruptcy case is pending. 28 U.S.C. § 1409(a). If the claim arises after the commencement of the case,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Page 3

Not Reported in B.R., 2003 WL 22948234 (Bkrtcy.D.Del.), 51 Collier Bankr.Cas.2d 709, 42 Bankr.Ct.Dec. 71
(Cite as: Not Reported in B.R.)

however, section 1409(d) applies:

(d) A trustee may commence a proceeding arising under title 11 or arising in or related to a case under title 11 based on a claim arising after the commencement of such case from the operation of the business of the debtor only in the district court for the district where a State or Federal court sits in which, under applicable non-bankruptcy venue provisions, an action on such claim may be brought.

*3 28 U.S.C. § 1409(d) (2003).

"In carrying on its business after the filing of bankruptcy, the presumption in favor of venue in the home bankruptcy court dissipates, and the debtor is exposed to liability in any court where the controversy might be heard as if the debtor were an ordinary citizen." *Geauga,* 110 B.R. at 652 (*citing In re Continental Airlines, Inc.,* 61 B.R. 758 (Bankr.S.D.Tex.1986)).

In the present case, the parties entered into the Agreement post-petition and the alleged wrongdoing occurred post-petition. Therefore, section 1409(d) applies. *See, e.g., In re Bayview Plaza Associates Ltd. P'ship,* 209 B.R. 840, 843 (Bankr.D.Del.1997) (applying section 1409(d) to a post-petition claim arising from the operation of the debtor's business). Thus, we must consider what applicable non-bankruptcy venue provisions dictate.

Section 1391 of title 28 provides the basis for venue in non-bankruptcy cases. *See, e.g., In re Olympia Holding Corp.,* 139 B.R. 565 (Bankr.M.D.Fla.1992) . If jurisdiction is based solely on diversity, section 1391(a) applies. Otherwise, section 1391(b) applies.

Diversity jurisdiction exists in this case because the Debtors are Delaware corporations, which maintain their principal place of business in Colorado [FN2] and Starley is a resident of California. However, our jurisdiction over this action is not based solely on diversity. Instead, our jurisdiction over the adversary proceeding is premised on sections 1334 and 157 of title 28.[FN3]

FN2. Since Coram operates numerous facilities in many states, we conclude that

its principal place of business is in Denver, Colorado, where its principal executive offices are located.

FN3. District courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *See* 28 U.S.C. § 1334. Bankruptcy judges are given the power to determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." *See* 28 U.S.C. § 157(b)(1). Section 157(b)(2) provides a non-exhaustive list of matters constituting core proceedings. *See* 28 U.S.C. § 157(b)(2).

The adversary proceeding involves post-petition contract claims of the trustee and arises in the Debtors' bankruptcy case. *See Geauga,* 110 B.R. at 645 (holding that trustee's post-petition contract claim is a core proceeding because it arises in a title 11 case).

The Trustee's post-petition breach of contract claims are core proceedings. "Simply because the proceeding presents questions of state law does not necessarily mean that the proceeding is 'non-core' or otherwise beyond the jurisdiction of the bankruptcy courts." *In re Popular Run Five Ltd. P'ship,* 192 B.R. 848, 857 (Bankr.E.D.Va.1995). *See also, In re Agri-Concrete Prods., Inc. v. Fabcor, Inc.,* 153 B.R. 673 (Bankr.M.D.Pa.1993) (holding that post-petition breach of contract actions are core proceedings); *In re Jackson,* 90 B.R. 126 (Bankr.E.D.Pa.1988) (holding trustee's claim for breach of contract against attorneys for post-petition conduct was core proceeding because it related directly to administration of debtors' estate; *In re Tidwell Industries, Inc.,* 87 B.R. 345 (Bankr.E.D.Pa.1988) ("actions based upon post-petition contracts are core and not related proceedings"); *In re J.B. Van Sciver Co.,* 73 B.R. 838 (Bankr.E.D.Pa.1987) (holding breach of post-petition real estate sales agreement is a core proceeding).

The Trustee's breach of contract claim in this case is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 4

Not Reported in B.R., 2003 WL 22948234 (Bkrtcy.D.Del.), 51 Collier Bankr.Cas.2d 709, 42 Bankr.Ct.Dec. 71
**(Cite as: Not Reported in B.R.)**

a core proceeding because it is a matter "concerning the administration of the estate", seeks an order "to turn over property of the estate" and is a proceeding "affecting the liquidation of the assets of the estate." 28 U.S.C. § 157(b)(2)(A), (E) & (O). *See Geauga,* 110 B.R. at 646; *In re Agri-Concrete Prods., Inc.,* 153 B.R. at 676-77.

**\*4** Since jurisdiction over this action is not based solely on diversity jurisdiction, the applicable venue provision is section 1391(b). Section 1391(b) provides:
(b) a civil action wherein jurisdiction is not founded solely on diversity of citizenship may ... be brought in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. 1391(b).

Pursuant to section 1391(b), venue would also lie in Colorado, Texas, Arizona, or Illinois, where Starley, MARS, and the Debtors conducted substantial business related to the Agreement and where the alleged breaches occurred. It is not proper, however, in Delaware since the parties conducted no business in this state. Therefore, we will grant the Motion to Dismiss for improper venue.

### IV. *CONCLUSION*

For the foregoing reasons, Starley's Motion to Dismiss will be granted.

An appropriate Order is attached.

### *ORDER*

AND NOW, this 12th day of DECEMBER, 2003, upon consideration of Margaret Starley's Motion to Dismiss; it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the adversary proceeding against Margaret Starley is DISMISSED without prejudice.

Bkrtcy.D.Del.,2003.
In re Coram Healthcare Corp.
Not Reported in B.R., 2003 WL 22948234 (Bkrtcy.D.Del.), 51 Collier Bankr.Cas.2d 709, 42 Bankr.Ct.Dec. 71

Briefs and Other Related Documents (Back to top)

• 2001 WL 34836743 () Report of Independent Restructuring Advisor Goldin Associates, L.L.C. (Jul. 11, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.